

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

PKC:MER
F.#2004R00374

*One Pierrepont Plaza*
*Brooklyn, New York  11201*

*Mailing Address*:  147 Pierrepont Street
*Brooklyn, New York 11201*

April 26, 2006

BY HAND

The Honorable Frederic Block
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:  United States v. Josue Flores Carreto, et al.
           Criminal Docket No. 04-140 (S-1) (FB)

Dear Judge Block:

      The government respectfully submits this letter in response to recent submissions made through counsel by defendants Josue Flores Carreto, Gerardo Flores Carreto and Daniel Perez Alonso, (collectively, "the defendants") who are scheduled to be sentenced by the Court on April 27, 2006 at 11:00 a.m.  The government also submits this letter in opposition to the April 24, 2006 pro se motions filed by the defendants seeking to withdraw their guilty pleas and seeking new counsel.  As discussed below, the defendants' pro se motions, like their sentencing submissions, are without merit.  These motions should therefore be denied, and the sentencing of the defendants should proceed as scheduled.

**I.   Factual and Procedural Background**

      The factual background of the case is set forth at greater length in the government's Trial Brief, the defendants' allocutions at the time they entered their guilty pleas, and the Presentence Investigation Reports.  As the Court is already aware, the defendants' modus operandi was to recruit young, uneducated women and girls from impoverished areas of Mexico and use some combination of deception, fraud, coercion, rape, forced abortion, threats and physical violence to compel them to prostitute themselves.  In some instances, the defendants kidnaped, raped, and beat the women to gain control of them.

Violence was frequent and severe: several women were beaten by one or more of the defendants and some were assaulted with instruments such as cables, beer bottles, and belts. Three of the victims were forced to have abortions when they became pregnant.

In other cases, defendants would deceive and manipulate the victims, entering into relationships – and sometimes marriages – with them, then using those bonds to exert psychological pressure and advance false promises.

In every case, the defendants gave the women rules to follow and forbade them from keeping virtually any of money they received from prostitution, beat them for talking to other women or for hiding money, forbade them from contacting their families unless the defendant was present and forbade them from giving their address to family members.

The victims were ordered to perform acts of prostitution at a rate of approximately $25 to $35 per customer. Of that amount, the owners and managers of the brothels generally took half, and the women were generally ordered to give the other half to the defendants and other members of the Carreto family.

In this way, the defendants and their co-conspirators made hundreds of thousands of dollars in prostitution profits, while the women who had been separated from their families and enticed and coerced into prostitution received next to nothing.

Trial in this case was set for April 4, 2005, and a jury was selected and empaneled on that day. On April 5, 2005, the defendants pled guilty to all 27 counts of the above-captioned indictment. The Court carefully reviewed the defendants' rights, the statutory penalties and the applicable advisory guideline ranges with the defendants before accepting their pleas. See April 5, 2005 Tr. at 5-83.

The United States Probation Department's Presentence Investigation Reports ("PSR") were finalized on December 15, 2005 (Daniel Perez Alonso), January 25, 2006 (Josue Flores Carreto), and January 27, 2006 (Gerardo Flores Carreto).

Sentencing in this case was originally scheduled for March 2, 2006. On the eve of that date, defendant Daniel Perez Alonso retained private counsel and all defendants sought additional time to prepare submissions. At a status conference on March 2, 2006, the Court granted the defendants additional time until March 9, 2006 to file objections to the Presentence

3

Investigation Reports, and until April 13, 2006 to file any other submissions. The March 9, 2006 deadline was subsequently extended to March 13, 2006. The Court set the case down for sentencing on April 27, 2006.

The defendants, without seeking an extension of time beyond these dates, filed various submissions dated April 21, April 22, and April 24, 2006, which include objections to the Presentence Investigation Reports, and other challenges to the sentencing recommendations. In their April 24, 2006 pro se motions, all three defendants seek to withdraw their guilty pleas.

The contentions raised in each of these submissions are without merit, as set forth below.

**II.   Objections to PSR by Josue Flores Carreto**

In his letter dated April 22, 2006, which was received by the government on April 24, 2006, defendant Josue Flores Carreto objects to various calculations contained in the PSR dated January 25, 2006. Defendant's objections are unfounded and his request for a sentence below the advisory guideline range should be denied.

     A.   Obstruction of Justice Adjustment Is Proper

The two-level adjustment for obstruction of justice (see PSR ¶ 90) was properly included in the Guidelines calculation. Defendant argues that the enhancement is based on the "subjective" conclusion of the Probation Officer (JFC let. at 2), and disputes that his conversation with Minerva C. was intended to obstruct justice. These arguments are entirely without merit. The factual basis for this enhancement was outlined in the government's letter dated March 29, 2005, submitted in support of its motion in limine, attached hereto as Exhibit A. Specifically, the government proffered its evidence that Josue Flores Carreto called Minerva C. (who is identified as "Jane Doe 8" in the indictment) from the MDC and asked if he could "count on" her. Later in the conversation, he said that "You already know you should behave and the rest doesn't matter." After that conversation, Jane Doe 8 refused to continue to cooperate with the government. In a conversation on February 15, 2005, Jane Doe 8 told Josue that she had been asked to come to the United States to testify and would not be doing so, making reference to the fact that she has a daughter with the defendant. It is clear that Jane Doe 8's lack of cooperation is due to the

defendant's veiled threat during their telephone conversation. The enhancement for defendant's obstruction of justice is therefore appropriate.

B. <u>Adjustment for Acceptance of Responsibility Is Not Warranted</u>

Defendant's request for a three-level reduction for acceptance of responsibility should also be denied. A "defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." U.S.S.G. § 3E1.1, application note 3. Rather, acceptance of responsibility consists of a timely guilty plea "combined with truthfully admitting" the offense conduct, and "truthfully admitting or not falsely denying any additional relevant conduct." <u>Id.</u> Even these indicia of acceptance can be "outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." <u>Id.</u> The guidelines make clear that obstruction of justice indicates a defendant has not accepted responsibility. <u>Id.</u>, application note 4.

As reported in PSR ¶ 91, defendant's refusal to provide any statement to the Probation Department, coupled with his obstruction of justice, demonstrates that he has not accepted responsibility for his crimes, and he is not entitled to such an adjustment for acceptance. <u>See</u> U.S.S.G. § 3E1.1, application notes 3 and 4.[1]

Defendant Josue Flores Carreto's request for a three-level reduction, or indeed, any reduction, based on acceptance of responsibility should be denied.

C. <u>Other Objections</u>

Josue Flores Carreto also joins in the objections set forth in co-defendant Gerardo Flores Carreto's letter dated April

---

[1] Even if defendant had demonstrated some acceptance of responsibility, a three-level departure is unavailable where, as here, the defendant did not plead guilty until the government had thoroughly prepared for trial and a jury had been empaneled. <u>See</u> U.S.S.G. § 3E1.1(b)(providing that third point for acceptance is dependent on timely notification of intent to plead guilty that permits government to avoid preparing for trial). For this reason, the Probation Department recommended only a <u>two</u>-level adjustment for co-defendants Gerardo Flores Carreto and Daniel Perez Alonso, pursuant to U.S.S.G. § 3E1.1(a).

21, 2006.  These objections should be denied for the reasons discussed in Section III below.

**III. Objections to PSR by Gerardo Flores Carreto**

In a letter dated April 21, 2006, defendant Gerardo Flores Carreto also objects to various calculations in his PSR. His objections, like those of Josue Flores Carreto, are both untimely and without merit.

A.  <u>Vulnerable Victim Enhancement Is Appropriate</u>

In an attempt to avoid the four-level enhancement that correctly follows from the defendant's careful choice of particularly vulnerable victims, defendant claims to be from same economic background as the victims in this case.  The Carreto Family is a rich and powerful family in the town of San Miguel de Tenancingo, Tlaxcala, Mexico.  The defendant's mother, Consuelo Carreto Valencia, is not a seamstress, as defendant claims, but instead is another leader in the Carreto sex trafficking organization, who played a direct role in assaulting and abusing the victims in this case, and is currently in custody in Mexico on charges related to her sex trafficking activity, pending the United States government's request for extradition on the indictment in this case.  She personally received tens of thousands of dollars sent via wire transfer by the defendants in this case.  The defendants lived in a massive compound in Tenancingo, replete with new cars and other luxuries, in stark contrast to the abject poverty of the surrounding area.

The vulnerable victim enhancement is warranted because the defendants selected their victims specifically because of their vulnerabilities.  As described in the background section above, the defendants routinely and deliberately pursued young, uneducated, poor women from impoverished towns throughout Mexico, and used various ruses to convince the young women that they loved them and wanted to marry them.  The defendants arrived in the small towns in nice, new cars and used various aliases to conceal the fact that they were members of the Carreto sex trafficking family.  The defendants then used an overwhelming combination of force, fraud and coercion to maintain control over their victims.

Contrary to defendant's suggestion that he and the victims were similarly situated, the defendants exploited a dramatic imbalance of wealth, power, status, knowledge, and economic opportunity that existed between the defendants and the

carefully-selected victims.  Moreover, the defendants proceeded to render their victims even more vulnerable by physically, verbally, and sexually abusing them, and isolating them from their families in a foreign land, making the victims exceptionally susceptible to the tactics of force, fraud, and coercion the defendants used to continue to compel the victims into prostitution.[2]  The vulnerable victim enhancement is entirely appropriate in this case, and defendant's objections thereto are unfounded.

>   B.   Over 50 Women Have Been Coerced Into Prostitution by The Carreto Family

Paragraph 43 of Gerardo Flores Carreto's PSR reports that the government advised the Probation Department that at least 50 women were coerced into prostitution by the Carreto family from approximately 1991 to 2004.  Defendant requests that "this commentary should be stricken from the record completely as the defendant denies this."  (GFC let. at ¶ 2).  In support of his request, defendant argues that "the government has not established this allegation before the court; and it is highly inflammatory."  Id.  During its investigation, the government obtained reliable information about the operation and scope of the Carreto sex trafficking organization from numerous sources, including a cooperating witness, multiple victims, and Mexican law enforcement officials.  The evidence gathered by the government indicates that 50 is a reliable, if conservative, estimate of the number of victims of the Carreto sex trafficking organization, and the government's representations of that information are properly included in the PSR.

---

[2] The vulnerabilities the defendants exploited have been recognized as factors that can render victims particularly susceptible to human trafficking crimes.  See 22 U.S.C. § 7101(a), (b)(4), (b)(5) (Trafficking Victims Protection Act legislative findings recognizing disproportionate vulnerability of women and children affected by "the lack of economic opportunities in countries of origin" who are transported "to unfamiliar destinations"); United States v. Veerapol, 312 F.3d 1128, 1132-33 (9th Cir. 2002) (affirming application of vulnerable victim enhancement where poor, undocumented immigrant faced "linguistic, educational, and cultural barriers," making her susceptible to crime).

### C. Forced Prostitution Profits Were Accurately Reported to Probation

Defendant claims that the government's estimate that the Carretos obtained hundreds of thousands of dollars from the forced prostitution of their victims is "pure conjecture or speculation." (GFC let. at ¶ 3). To the contrary, in Rule 16 discovery, the government provided ample documentary proof of the substantial financial benefits the defendants derived from this criminal organization. For example, the defendants received (a) copies of wire transfer receipts seized during the searches of their apartments in Corona, Queens, and in their homes in Mexico; (b) copies of bank statements seized during searches of the Carreto Family homes in Mexico; and © hundreds of pages of wire transfer records that show that thousands of dollars were being sent *each week* by the defendants, co-conspirators, and their victims in New York to defendants and co-conspirators in Mexico. Defendant's claim that "[t]he defense has not been shown any documents proving this claim" (GFC let. at ¶ 3), is simply untrue.

### D. Victim Impact Statements Are Properly Before the Court

Defendant "objects to the introduction of the victim impact statements in this case," arguing that the victims wrote their statements with the assistance of "either a psychologist or a social worker, or a lawyer," and questioning the authenticity of the statements generally. (GFC let. at ¶ 4).

The Justice For All Act, codified at 18 U.S.C. § 3771, expressly recognizes a victim's right to be heard at sentencing. See 18 U.S.C. § 3771(a)(4). The victims must be accorded their statutorily protected rights to address the Court regarding the impact of the defendants' criminal conduct. As one Court of Appeals recently explained, "victims should always be given the power to determine the form of the statement" they make to the Court, and their statutory right to address the court at sentencing does not restrict the form a victim's statement may take, as "the victim may wish to communicate in other appropriate ways." Kenna v. United States District Court, 435 F.3d 1011, 1016 (9th Cir. 2006) (granting writ of mandamus to compel court to permit victim to speak at co-defendant's sentencing after having submitted prior impact statements in connection with earlier co-defendant's sentencing).

Contrary to defendant's erroneous assertion, the victim impact statements submitted pursuant to this statutory right were not provided by the government, but instead were provided

directly to the Probation Department in connection with the preparation of the PSRs.  While the government played no role in preparing the victim impact statements,[3] the victims are represented by private, non-governmental attorneys, and are receiving other services from non-governmental organizations that assist victims in addressing the physical, psychological and emotional issues caused by defendants' criminal conduct.  To the extent these attorneys and organizations may have assisted the victims in articulating and recording their statements, there is nothing improper in such assistance.  The statements, including their calls for severe punishment and their reference to emotional and psychological harm, are entirely consistent with the nature of the crimes the defendants pled guilty to committing against these victims, and are entirely consistent with uncontested facts in the PSR regarding the experiences the victims endured at the defendants' hands.  Defendant cites no credible grounds for questioning their authenticity.[4]

**IV.   Sentencing Memorandum by Daniel Perez Alonso**

In his letter filed April 21, 2006, defendant Daniel Perez Alonso adopts the previously filed sentencing submissions made by prior counsel and urges the Court to consider both defendant's relationship with prior counsel and the government's pre-trial plea offers as mitigating sentencing factors, pursuant to 18 U.S.C. § 3553 et seq.  The defendant's request for a sentence below the Guidelines range is without merit and should be denied.

---

[3] The government's role was limited to putting the Probation Officer in contact with the victims' attorneys.

[4] Defendant attempts to diminish the significance of the victim impact statements by referring, misleadingly, to "love letters" "believe[d]" to be in the government's possession.  Only one victim, Jane Doe 9, the victim of the attempt charged in Count Six of the indictment, wrote such letters, and the government provided them in discovery.  This argument is a red herring, as any expressions of love on the part of the victims are a symptom and direct effect of the coercion, manipulation, and deception the defendants engaged in by professing love and commitment to the victims while brutally exploiting them.

### A. Daniel Perez Alonso Was an Important Member of the Carreto Sex Trafficking Organization

In his letter dated February 15, 2006, defendant claims that "he only knew members of the Carreto family for two months in Mexico and six months in the United States." This assertion is not supported by the evidence. According to several witnesses, Daniel Perez Alonso began working with the Carretos in the late 1990s, when he began recruiting young women into forced prostitution. Beginning in early 2000, he also worked at the Flowers billiards hall in Tenancingo owned by the Carreto family. Daniel Perez Alonso was a close and trusted associate of Josue Flores Carreto. Their relationship is evidenced not only by the time they shared apartments in both Mexico City and Queens, see PSR ¶¶ 52, 53, but also by the time they spent together nightly at Empire Billiards in Queens, see PSR ¶ 66. Finally, the defendant's birth certificate and contact information in New York were recovered during the search of Consuelo Carreto Valencia's home in Tenancingo. (PSR ¶ 69). This evidence belies defendant's attempt to distance himself from the Carreto family.

### B. Daniel Perez Alonso's Victimization of Virginia G.

Defendant's assertion that Virginia G. (identified in the indictment as "Jane Doe 3") was 20 years old when they met at a dance in Mexico City is simply wrong, as Jane Doe 3 was substantially younger, see PSR ¶ 52. Defendant's assertion that he never raped her is false. Two weeks after they met, he took Jane Doe 3 to his brother's home in Tenancingo, promising that they would return to Mexico City that night. He later refused to allow her to leave, confiscated her cell phone, took what little money she had brought with her, and raped her. (PSR ¶¶ 52-53).

Defendant subsequently brought Jane Doe 3 to Mexico City and forced her into prostitution, where they shared an apartment with Josue Flores Carreto and Jane Doe 1. Daniel Perez Alonso routinely and savagely beat Jane Doe 3 in that apartment, and would regularly force Jane Doe 3 to watch Josue Flores Carreto beat Jane Doe 1, and threaten that the same would happen to Jane Doe 3 if she disobeyed his orders. (PSR ¶¶ 52-53).

Defendant controlled every aspect of Jane Doe 3's life. Both he and Josue Flores Carreto made arrangements concerning when and where Jane Doe 3 would engage in prostitution. Perez refused to allow Jane Doe 3 to go outside of the apartment alone, except to and from the brothels. Defendant searched Jane Doe 3's clothes and bags at the end of each day and seized all of the money she had with her. (PSR ¶¶ 52-53). He frequently screamed at Jane Doe 3 or hit her when she came home with too little money

10

or when she refused to obey his orders. He repeatedly punched, slapped, and kicked her, and threatened to strike Jane Doe 3 with his belt. In short, Jane Doe 3 feared defendant, who told her that if she left him or went out with another man, he would make her life impossible and that she would never be rid of him. (PSR ¶ 53).

Defendant impregnated Jane Doe 3 twice while they were living in New York. Both times, he forced her to have an abortion. He told Jane Doe 3 that she could not have a baby because she would not be able to prostitute herself anymore. (PSR ¶ 53). Based on these facts set forth in the PSR, defendant was fully engaged in the brutal forms of forced prostitution that characterized the Carreto sex trafficking family, and defendant cannot plausibly seek to minimize his involvement or distance himself from this conduct.

C.  Daniel Perez Alonso Was a "Manager" in the Organization

Defendant objects to the addendum to his PSR, claiming he was not a manager, and thus should not be given a three-level enhancement for his role in the organization. This claim is completely refuted by defendant's admission that he was a manager during his guilty plea. See 4/5/05 Tr. at 79. Defendant's conclusory assertion that "he did not fully understand this part of the allocution" is belied by the careful colloquy he engaged in with the Court prior to his allocution.

This assertion is also refuted by the defendant's actions during the course of the conspiracy. For example, while he lived in the apartment he shared with Josue Flores Carreto in Mexico City, he was often responsible for escorting both Jane Doe 1 and Jane Doe 3 to and from work. (PSR ¶ 52). Also, in June 2003, defendant smuggled Jane Doe 3 into the United States along with Gerardo Flores Carreto and Jane Doe 2. Id. The enhancement for defendant's role as a manager in the organization is appropriate and consistent with the evidence.

D.  Section 3553 Sentencing Factors Weigh In Favor of a Sentence Within or Above the Guideline Range

In his most recent submission, defendant contends that his relationship with prior counsel and the government's pre-trial plea offers qualify as mitigating sentencing factors, as defined by 18 U.S.C. § 3662. This argument is without merit and should be rejected by the Court. At the time he pled guilty, defendant confirmed that he was satisfied with his legal representation, notwithstanding prior issues he had raised. See 4/5/05 Tr. at 40-41. He verified that he understood all the

implications of his decision to plead guilty, including the advisory guideline range associated with his plea. See id. at 60-63. Because defendant knowingly, voluntarily, and intelligently pled guilty to the charges in the indictment, aware that his plea could result in a sentence in the advisory guideline range explained to him at the time and now set forth in the PSR; the earlier plea negotiations, and the lower guideline range they might have involved, became immaterial.

Defendant correctly identifies the statutory factors under 18 U.S.C. § 3553 that the Court must consider when imposing a particular sentence. Those factors, however, weigh in favor of a significant sentence in this case, not against it, as defendant claims. There is no dispute that the crimes the defendant pled guilty to are very serious offenses deserving of serious punishment. The government respectfully submits that the principles of specific and general deterrence also weigh heavily in favor of a substantial sentence. The defendant's lack of a prior criminal history seriously understates his actual criminal conduct, which went unprosecuted until he was arrested in this case. He should be punished in accordance with the true scope of his criminal activity, spanning multiple years and affecting multiple victims. A substantial sentence is an important means of deterring and condemning the reprehensible crimes of sex trafficking and alien smuggling, and is appropriate in light of the § 3553 factors.

### V. Defendants' Pro Se Motions to Withdraw Valid Guilty Pleas Must Be Denied

The defendants, in pro se motions filed April 24, 2006, seek to withdraw from their respective guilty pleas, entered on April 5, 2005, in advance of the sentencing in this matter scheduled for April 27, 2006.

Under Rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure,

> [a] defendant may withdraw a plea of guilty . . . after the court accepts the plea, but before it imposes sentence if . . . the defendant can show a fair and just reason for requesting the withdrawal.

Id. A defendant who wishes to withdraw his guilty plea bears the burden of showing that there are valid grounds for withdrawal. United States v. Couto, 311 F.3d 179, 185 (2d Cir. 2002). Additionally, in determining whether to permit a defendant to

withdraw a plea, a court must give due regard to any prejudice the government might suffer as a result. United States v. Maher, 108 F.3d 1513, 1529 (2d Cir. 1997). The burdens imposed on defendants who seek to withdraw a guilty plea arise from the well-settled rule that the guilty plea is an "important component[] of this country's criminal justice system." Blackledge v. Allison, 431 U.S. 63, 71 (1977). As the Second Circuit stated in United States v. Sweeney, 875 F.2d 68 (2d Cir. 1989),

> [s]ociety has a strong interest in the finality of guilty pleas, and allowing withdrawal of pleas undermines confidence in the integrity of our [judicial] procedures . . . , increas[es] the volume of judicial work, [and] delays and impairs the orderly administration of justice.

Id. at 71 (internal quotation marks omitted).

It is well-settled that a change of heart about the possible penalty in a case is not a valid basis for the withdrawal of a guilty plea. United States v. Gonzalez, 970 F.2d 1095, 1100 (2d Cir. 1992); see also United States v. Goodman, 165 F.2d 169, 173 (2d Cir. 1999). It also is well-settled that a change of heart prompted by a reevaluation of the government's case is not a sufficient basis to permit the withdrawal of a guilty plea. Gonzalez, 970 F.2d at 1100.

In assessing the validity of a motion to withdraw a plea, the Court may also properly consider the timing of the motion, Gonzalez, 970 F.2d at 1100, which in this case falls over one year after the defendants pled guilty on April 5, 2005. The significant delay between the time the defendants pled guilty and the time they sought to withdraw their pleas confirms that the defendants did not have a "swift change of heart indicat[ing] [a] plea made in haste or confusion." See id. (citations and internal quotations omitted). They had no change of heart for over one year following entry of their guilty pleas, and instead made their motion on the eve of sentencing, undermining the credibility of their assertions that their motion is based on defects in the effectiveness of counsel or the requirements of Rule 11. See id. (affirming district court's rejection of motion to withdraw plea based on assertions that defendant relied on incorrect advice of counsel, and citing cases in which delays of many months between plea and motion indicated that motion was not based on involuntariness, but rather was based on apprehension of sentencing).

As the Supreme Court stated in United States v. Hyde, 520 U.S. 670 (1997), to permit the withdrawal of a guilty plea without adequate reason would "degrade the otherwise serious act of pleading guilty into something akin to a move in a game of chess." Id. at 677.

Where the defendant moves to withdraw the plea on the grounds that the plea was not entered knowingly and voluntarily, the motion may be denied without a hearing where the allegations are "inherently incredible" or "simply conclusory." Gonzalez, 970 F.2d at 1100. Also, a hearing is not necessary if the defendant's allegations are contradicted by the statements made under oath at the plea proceeding. See Gonzalez, 970 F.2d at 1101; see also United States v. Diaz, 176 F. 3d 52, 114 (2d Cir. 1999) (denying application to remand for evidentiary hearing where defendant's claim that he was threatened into pleading guilty found no support in record and was contradicted by his plea allocution); United States v. Torres, 129 F.3d 710, 715-16 (2d Cir. 1997) (same).

In support of their motion, the defendants contend that there is a fair reason for requesting withdrawal of their guilty pleas, because: (1) the defendants were not adequately advised of their right to testify at trial as required under Rule 11(b)(1)(E), see Declarations at ¶ 4; (2) the district court did not verify, pursuant to Rule 11(b)(2), that the plea voluntary and was not based on any promises not set forth in the plea agreement; see id.; and (3) counsel was ineffective in failing to obtain allegedly exculpatory investigative files from Mexico. See Declaration at ¶ 6. These contentions are devoid of any merit.

A. The Pleas Were Entered Knowingly, Voluntarily, and Intelligently in Accordance with Rule 11.

The record in this case is abundantly clear that the defendants entered their guilty pleas knowingly, voluntarily, and intelligently, and their motion provides no valid grounds for withdrawal.

At the time the defendants entered their guilty pleas, the Court went to great lengths to verify on the record that each defendant was fully informed of the consequences of pleading guilty. There was extensive discussion on the record regarding the fact that pleading guilty to the entire indictment could potentially provide advantages for sentencing purposes, but could nonetheless result in sentences equal to those that could be imposed after trial. See 4/5/05 Tr. at 5-14.

The Court adequately advised the defendants of the trial

14

rights relinquished by the guilty plea, including the right to testify. See 4/5/05 Tr. at 45-46.

Likewise, the Court verified that the plea was voluntary, and not based on any extrinsic promises. See 4/5/05 Tr. at 69-71. The transcript of the thorough plea colloquy conducted on April 5, 2005 belies defendants claims that their pleas were not entered into knowingly, voluntarily and intelligently.

Accordingly, defendants' contentions are without merit.

B. Counsel's Failure to Obtain Allegedly Exculpatory Evidence from Mexico

The assertion that counsel failed to obtain allegedly exculpatory evidence from Mexico likewise does not warrant withdrawal of a guilty plea. Significantly, defendants do not contend that the government possessed exculpatory information unknown to the defense at the time of the guilty plea. Rather, defendants suggest that there is information in Mexico which they believe to be exculpatory, and their counsel failed to obtain it. This contention does not offer any basis for withdrawing the plea. After being fully advised of the consequences of pleading guilty, including waiver of the right to present evidence on their behalf at trial, see 4/5/05 Tr. at 45-46, the defendants pled guilty, and cannot now withdraw their pleas on the basis of evidence that might exist and that they might have wished to present at trial had they not knowingly, voluntarily, and intelligently entered guilty pleas.

To the extent that paragraph 6 of the defendant's declarations can be construed as a general assertion of ineffectiveness of counsel, rather than as a specific objection to counsel's failure to obtain certain evidence, this assertion does not permit withdrawal of the guilty plea. At the time of the guilty plea, this Court engaged in a thorough colloquy with the defendants regarding the adequacy of their representation. See 4/5/05 Tr. at 31, 35 and 40-41. Each defendant verified for the Court that he was satisfied with the advice of counsel, understood the consequences of pleading guilty, and knowingly and voluntarily decided to plead guilty. See 4/5/05 Tr. at 68-71. In light of the defendants' satisfaction with counsel at the time of the plea, and their knowing, voluntary and intelligent decision to plead guilty, their vague, conclusory assertions of ineffectiveness of counsel provide no grounds for withdrawal of their pleas.

The defendants' motions to withdraw their guilty pleas should therefore be denied, and the sentencing in this case

should proceed as scheduled.

**V.     Conclusion**

For the foregoing reasons, the defendants' pro se motions to withdraw their guilty pleas should be denied.  The defendants' untimely and unfounded objections to the Presentence Investigation Reports should be rejected, and the defendants should be sentenced, in accordance with the recommendations set forth in the Presentence Investigation Reports, the advisory United States Sentencing Guidelines, and the sentencing factors set forth in 18 U.S.C. § 3553, to sentences reflecting the severity of the criminal conduct to which they pled guilty.

                                    Respectfully submitted,

                                    ROSLYNN R. MAUSKOPF
                                    United States Attorney

By:     _____
        Monica E. Ryan
        Assistant U.S. Attorney
        (718) 254-6470


        WAN J. KIM
        Assistant Attorney General
        Civil Rights Division
        U.S. Department of Justice

By:     _____
        Hilary Axam
        Trial Attorney
        Civil Rights Division

cc:  Roy Kulcsar, Esq.
     Michael Musa-Obregon, Esq.
     Charles Hochbaum, Esq.
     Clerk of the Court (FB)