```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA        *    Case No. 04-CR-140(FB)
                                *
                                *    Brooklyn, New York
                                *    April 27, 2006
        v.                      *    11:47 a.m.
                                *
JOSUE CARRETO, et al.,          *
                                *
            Defendants.         *
                                *
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *



              TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
                BEFORE THE HONORABLE FREDERIC BLOCK
                   UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

For the Plaintiff:              MONICA E. RYAN, ESQ.
                               ANNE MILGRAM, ESQ.
                               United States Attorneys Office
                               147 Pierrepont Street
                               Brooklyn, NY  11201

                               HILARY S. AXAM, ESQ.
                               Department of Justice
                               United States Government

For the Defendant,             ROY R. KULCSAR, ESQ.
 Josue Flores Carreto:         27 Union Square West
                               Suite 503
                               New York, NY  10003


ESR Operator:                  MS. ANDRIJA DANDRIDGE


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Transcription Service, Inc.**
**67Elaine Drive**
**Shelton, Connecticut 06484 (203)929-9992**

```
APPEARANCES:

For the Defendant,          MICHAEL MUSA-OBREGON, ESQ.
 Gerardo Flores Carreto:    Law Offices of S. Michael
                             Musa-Obregon
                            400 Madison Avenue
                            Suite 1101
                            New York, NY  10017


For the Defendant,          CHARLES S. HOCHBAUM, ESQ.
 Daniel Perez Alonso:       Charles S. Hochbaum, P.C.
                            44 Court Street, Suite 307
                            Brooklyn, NY  11201



Interpreter:                MS. LIBIA CLANCY
```

1        (Proceedings commenced at 11:47 a.m.)

2            THE CLERK:  Criminal cause for sentencing *United*

3    *States of America vs. Josue Flores Carreto, Gerardo Flores*

4    *Carreto and Daniel Perez Alonso*.

5            At this time, I ask the parties to state your

6    appearances for the record.

7            MS. RYAN:  Good morning, Your Honor.  Monica Ryan

8    for the United States, along with Anne Milgram, Special

9    Assistant United States Attorney, and Hilary Axam, a trial

10   attorney from the Department of Justice.

11           MS. MILGRAM:  Good Morning, Your Honor.

12           MS. AXAM:  Good morning, Your Honor.

13           THE COURT:  Good morning.

14           MR. KULCSAR:  Good Morning, Your Honor, with

15   profound apologies for being so late.  Roy Kulcsar for Josue

16   Flores Carreto.

17           MR. MUSA-OBREGON:  Your Honor, on behalf of Gerardo

18   Flores Carreto, Michael Musa-Obregon.

19           MR. HOCHBAUM:  For the defendant, Daniel Perez

20   Alonso, Charles Hochbaum.  Good morning, Your Honor.

21           THE COURT:  Good morning everybody.

22           You know, we're going to have a probably pretty

23   lengthy proceeding here because we have three defendants and

24   they're looking at substantial time and we have about six

25   victims who want to also make comments, so that's going to

4

1    all take a good deal of time, let alone going through the

2    advisory guideline calculations.

3           I think probably the best way to start will be to

4    hear from the victims.  I guess we could do that in the first

5    instance, unless anybody has any serious objection to that.

6           MR. HOCHBAUM:  Well, Judge, I believe that the

7    defense has some matters they would like to place on the

8    record before we do that.

9           THE COURT:  Well, that's one thing we can do also,

10   but the victims do have the right to comment.  So, they're

11   going to be given a chance.

12          MS. RYAN:  Your Honor, I --

13          THE COURT:  What's your preference, Ms. Ryan?

14          MS. RYAN:  Your Honor, I think we would prefer to

15   wait.  We've explained to the victims that it's their right

16   to speak or not to speak and I think they may feel more

17   comfortable after hearing what --

18          THE COURT:  So --

19          MS. RYAN:  -- some things that may be said in court

20   today.

21          THE COURT:  All right.  Well, you know, I have the

22   discretion to do it, you know, at the beginning, in the

23   middle or at the end.

24          MS. RYAN:  Of course, Judge.

25          THE COURT:  So, and that's apparently Mr.

1    Hochbaum's preference as well, I take it, so we'll proceed

2    then with making our advisory guideline calculations in the

3    first instance and to talk, in the course of doing that,

4    about all issues that need to be addressed.  How is that?

5              MS. RYAN:  That's fine.  Thank you, Your Honor.

6              THE COURT:  All right.

7              MR. HOCHBAUM:  Judge, prior to going into the

8    advisory guidelines, it seems to me that there are some

9    issues that --

10             THE COURT:  We have some motions will have to be

11   disposed of.

12             MR. HOCHBAUM:  That's correct, Judge.

13             THE COURT:  Right.

14             MR. HOCHBAUM:  With regard to that -- let me know

15   when you're ready.

16             THE COURT:  Pardon?

17             Is there any problem hearing me?  I have the

18   microphone on.  Is there any problem hearing me?

19             MS. DANDRIDGE:  That's okay.

20             THE COURT:  Okay.

21             The microphones are on, since this is being taken

22   by ESR, so we need the microphones.  You don't have to get

23   too close to them because if you do, there will be some

24   feedback.  My own preference is not to use the microphones

25   for that reason, but when we have ESR, we have no choice in

1      the matter.  Okay?

2                  All right.  Now, so let's first address the

3      motions.  What motions are pending in behalf of your client,

4      Mr. Hochbaum, and you represent --

5                  MR. HOCHBAUM:  Daniel Perez Alonso, Judge.

6                  THE COURT:  Daniel Perez Alonso.

7                  MR. HOCHBAUM:  Yes, Judge, and just so the record

8      is clear, I got retained late in March of this year to

9      represent the defendant for sentence.  I've had meetings with

10     the defendant.  Subsequent to this day's proceeding, it is my

11     understanding that the defendant, along with the other

12     defendants, filed a motion to withdraw his plea of guilty.

13                 THE COURT:  I have that collective motion on behalf

14     of all the defendants.

15                 MR. HOCHBAUM:  Right.

16                 THE COURT:  Any other motions?

17                 MR. HOCHBAUM:  Well, Judge, it's my understanding

18     after conference with co-counsel that materials that are

19     instrumental to a determination in this case both of the

20     guilty pleas and of any subsequent sentencing proceeding, if

21     in fact the guilty pleas are not withdrawn, has been provided

22     to us today.  Those materials consist of transcripts of

23     proceedings involving some of the victims in trials in

24     Mexico.

25                 Maybe one of my co-counsel can speak more

1    specifically towards this.  He's actually read them and

2    they're in Spanish.

3         MR. MUSA-OBREGON:  Your Honor, on behalf of Gerardo

4    Carreto Flores.  This morning I -- upon arriving in court, I

5    met with an investigator that was hired by all three

6    defendants collectively.  That investigator is a gentleman by

7    the name of Willie Acosta.  Mr. Acosta was working for the

8    defendants without the supervision of counsel and he went to

9    Mexico over the last month.

10        He had contacted all three of the defense lawyers

11   and indicated to us previously that there were -- there

12   existed some transcripts from a proceeding in Mexico that

13   contained exculpatory information with respect to the

14   statements that were made by the -- three of the victims in

15   the proceedings here that were also taken in Mexico.

16        We urged -- all three counsel urged the

17   investigator that if these transcripts indeed existed to

18   bring them to our attention and bring them to us immediately.

19        Last night I received a call at about 10:30 at

20   night from the investigator where he called me generically,

21   but did not mention that these transcripts existed until I

22   directly asked him "Well, do you have these transcripts?"  He

23   said, "Yes."

24        I then made arrangements to -- for him to bring

25   them to court this morning.  Upon my arriving, I perused the

1    transcripts and it does appear -- they do appear to have

2    sworn statements of fact by three of the victims in this case

3    where they directly contradict their position before the

4    government --

5                THE COURT:  That was down in Mexico, you see.

6                MS. RYAN:  Yes --

7                MR. MUSA-OBREGON:  In Mexico.

8                THE COURT:  They probably --

9                MS. RYAN:  Your Honor, if I can --

10               THE COURT:  They probably --

11               You don't have to --

12               MS. RYAN:  Thank you.

13               THE COURT:  -- they're probably scared to death

14   when they did that.

15               Look aside from that, I do recall that your clients

16   pled guilty, g-u-I-l-t-y.  Right.  And that happened back not

17   too long ago.  Well, it did happen a long time ago on April

18   5th, 2005.  And, boy, I read over the transcript of those

19   proceedings very carefully.  Not to pat myself on the back,

20   you know, too hard because I don't want faint from the

21   process.  It's about the best plea allocution I ever took in

22   my distinguished 11 plus years on the bench.

23               Why?  Because I know that there's going to be a

24   life subsequent to my sentence.  Not that your clients don't

25   have the right to appeal, okay?  But everything suggested to

1    this wise Judge that I should, you know, use every

2    prophylactic lawful means at my disposal to minimize the

3    potential of 2255 collateral applications raising issues on

4    appeal and indeed, in raising issues before me today which

5    we'll discuss.

6              So, when I read over the plea allocution, I said,

7    "Boy, Judge Block, you did a good job."  Okay, but they all

8    pled guilty.  So if they had all this information and they

9    knew what happened in Mexico, why pray tell did they plead

10   guilty?

11             Do you have a good answer for that, Mr. Kulcsar?

12             MR. KULCSAR:  Your Honor, as I'm sure Your Honor

13   remembers, I was not counsel for Josue --

14             THE COURT:  Well, but I'm giving you an opportunity

15   to respond to that question, if you would like.  Do you have

16   an answer to that first?

17             MR. KULCSAR:  Well, Your Honor --

18             THE COURT:  If not, then Mr. Musa-Obregon, do you

19   have an answer to that question?

20             MR. MUSA-OBREGON:  Yes, Judge, I don't know if I

21   have an answer to that.  It's a complex --

22             THE COURT:  All right.

23             MR. MUSA-OBREGON: -- question, but I have a

24   response and that is that being intimately familiar with the

25   proceedings down -- before the pleas were taken, defense

1    counsel -- the position that Mr. Carreto would like me to

2    advance at this point, and I'm doing this at his request, is

3    that --

4              THE COURT:  Well, you're doing the best job you can

5    as his counsel.  They're up against it.  We understand that.

6    Go ahead.

7              MR. MUSA-OBREGON:  He had us ask -- the defense

8    lawyers ask the prosecutors whether the women were

9    maintaining this position against the defendants with respect

10   to the violence, with respect to the forced prostitution, et

11   cetera, et cetera.  And we specifically asked if there

12   existed any types of indications that their position had been

13   different.

14             THE COURT:  It doesn't affect their guilty plea.

15   You think I should consider it on the issue of sentencing and

16   shouldn't give any credibility to those three people?  You

17   know, is that what you're suggesting?  They still pled guilty

18   to all counts.

19             MR. MUSA-OBREGON:  In the alternative, I would

20   suggest that, Judge.  I think --

21             THE COURT:  Okay.  I'll take it under advisement.

22             Mr. Hochbaum, do you wish to say anything?

23             MR. HOCHBAUM:  Judge, my client feels that in light

24   of the information, and it's obviously a problem for us that

25   it came so untimely, that it raises significant issues.  With

1      regard to the guilty plea, my client's position was that --

2              THE COURT:  Okay.

3              MR. HOCHBAUM:  -- he did not get appropriate advice

4      from his prior attorney, which is one of the reasons we wrote

5      a letter to you in January of '06 with regard to that

6      attorney and why I was subsequently retained.

7              So I have reviewed the transcript of the plea, but

8      I have not -- was not a party to the plea.

9              THE COURT:  Well, of course.

10             MR. HOCHBAUM:  And my client's proposition is that

11     this information changes dramatically the position of all

12     parties with regard to the guilty plea and that he should be

13     allowed the opportunity --

14             THE COURT:  So, with that information, you would

15     have counseled him to have gone forward with the trial.  And

16     you think that that's the counsel you would have given him at

17     that time?  If you were the lawyer, not Mr. Lashley?

18             MR. HOCHBAUM:  I think it's --

19             THE COURT:  Is that what your position is?

20             MR. HOCHBAUM:  My position is that it's likely that

21     I would have entered into further negotiations --

22             THE COURT:  I see.

23             MR. HOCHBAUM:  -- and potentially advised him that

24     these transcripts and the statements of the witnesses down

25     there may have a -- might have had a significant impact on

12

```
1     whether or not there would have been a determination --
2               THE COURT:  Do you have --
3               MR. HOCHBAUM:  -- of guilt.
4               THE COURT:  -- any reason why they pled guilty?  I
5     mean we went through an elaborate proceeding.  How many pages
6     is this?
7               MR. HOCHBAUM:  Well --
8               THE COURT:  Eighty-some-odd pages.  Have you read
9     the transcript?
10              MR. HOCHBAUM:  I have read the transcript.
11              THE COURT:  Pretty good, huh?  You know Judge
12    Block.  You agree with me that's one of my better proceedings
13    I've ever conducted in 11 plus years?
14              MR. HOCHBAUM:  Well, Judge, I tried cases --
15              THE COURT:  I don't want you to make an admission -
16    -
17              MR. HOCHBAUM:  -- in front of you.
18              THE COURT:  -- against interest.  You realize --
19              MR. HOCHBAUM:   I certainly agree with the Court
20    that the Court covered those important issues that are --
21              THE COURT:  Is there anything I did not cover?  I
22    mean, you know, I pride myself in doing a good job.
23              MR. HOCHBAUM:  Well, it appears according to the
24    defendants that there was some question as to whether or not
25    the Court advised the defendant with regard to his right to
```

1    testify during the trial.  I did not see that --

2                THE COURT:  Right.

3                Well, did you read --

4                MR. HOCHBAUM:  -- in the transcript.

5                THE COURT:  You read the transcript.

6                MR. HOCHBAUM:  I did, Judge.

7                THE COURT:  Do you agree with that assessment?  Do

8    you think Judge Block did advise him of his right to testify?

9                MR. HOCHBAUM:  I believe that the defendant's

10   constitutional rights were adequately advised under the

11   standards set forth, Judge.  However --

12               THE COURT:  So on page 45 of the transcript, the

13   Court said, "At the trial, while you would have the right to

14   testify if you wish to do so, you could not be required to

15   testify."  Then we explained his Fifth Amendment right.  So,

16   maybe your client is in error about that, but people make

17   mistakes.

18               MR. HOCHBAUM:  That may be true, Judge, but it

19   seems to me that --

20               THE COURT:  Ms. Ryan can't wait to talk.  She

21   doesn't think I'm doing --

22               MS. RYAN:  Your right, Judge.

23               THE COURT:  -- an adequate job.  But you're doing a

24   good job for your clients.  I understand all that, but their

25   -- they accepted responsibility.  They pled before the Court.

1    Anything else you wish to say about your motions?

2              MR. MUSA-OBREGON:  Well, Your Honor --

3              THE COURT:  Let's go on.  Let's move it along.

4    They're kind of silly.  Let's go on.

5              MR. MUSA-OBREGON:  With the expectation that Your

6    Honor will deny this request, I would, at this point --

7              THE COURT:  Right.

8              MR. MUSA-OBREGON:  -- request the opportunity to

9    review these transcripts and --

10             THE COURT:  You can do whatever you want to do.

11   Your motion is silly.  It's going to be denied.

12             Ms. Ryan, go ahead.

13             MS. RYAN:  Your Honor, I just wanted to put one

14   fact on the record.  I think --

15             THE COURT:  Just make a record here.  We're making

16   a record.  It's going to be reviewed by other authorities.

17             MS. RYAN:  Exactly.

18             THE COURT:  The motion's going to be denied.  What

19   do you want to say?

20             MS. RYAN:  Thank you, Your Honor.  Obviously, the

21   government's in complete agreement with Court about the --

22             THE COURT:  Do you wish to add anything?

23             MS. RYAN:  Yes.

24             THE COURT:  To these claims here of this sudden

25   appearances of some other statements arguably in Mexico.

1          MS. RYAN:  I have a few points.  First, the

2     government hasn't seen any of these materials.

3          THE COURT:  Right.

4          MS. RYAN:  But, I do have some expectations about

5     what they might contain, only because everyone in this

6     courtroom knows that both the defendants and the victims have

7     all been in this country at least since January of 2004 when

8     they were all arrested by Immigration and Customs

9     Enforcement.

10         THE COURT:  By the way, do you have any of these

11    so-called documents?

12         MR. MUSA-OBREGON:  Yes, Judge.  They --

13         MR. HOCHBAUM:  Transcripts we have --

14         MR. MUSA-OBREGON:  They were provided --

15         THE COURT:  Okay.

16         MR. MUSA-OBREGON:  -- to us and they look

17    authentic.

18         THE COURT:  You haven't given them to the

19    government though, have you?

20         MR. MUSA-OBREGON:  No, I just received them --

21         THE COURT:  Just received.

22         MR. MUSA-OBREGON:  -- moments before coming into

23    court.

24         THE COURT:  Moments before the sentencing.

25         What else, Ms. Ryan?

1          MR. KULCSAR:  They're in Spanish apparently also,

2     Your Honor, obviously.

3          THE COURT:  Moments before the sentence you had --

4     this --

5          MR. MUSA-OBREGON:  Well, Your --

6          THE COURT:  -- plea was taken a year ago and just

7     on the eve of sentence, these things appear, but it doesn't

8     affect the fact that they pled guilty.

9          Go ahead, Ms. Ryan.

10          MS. RYAN:  Exactly, Your Honor, and I'd like to

11     point out that I think even if these documents contain

12     anything that the defendants might deem helpful, it's legally

13     irrelevant to this case.  The defendants pled guilty to

14     smuggling these young women into the United States and

15     forcing them into prostitution in New York --

16          THE COURT:  They did plead guilty to those things,

17     right? --

18          MS. RYAN:  Clearly after they had left Mexico.  And

19     obviously as the Court's already recognized the government's

20     position that whatever statements may have been made by any

21     of these victims in Mexico were done at the coerced efforts

22     of the defendants.

23          THE COURT:  All right, now, in terms of processing

24     the matter because, you know, we have to be very careful

25     because the defendants are going to go to jail for a long

1    time in all probability, though I haven't made that

2    determination yet, we can anticipate that this will be

3    furthered -- this proceeding will have another chapter to it,

4    so to speak, and that may be on the Court of Appeals.  So, we

5    want to make a very good record.  A very clear record.

6              Maybe we should give the defense an opportunity to

7    produce these documents.  We can mark them at this particular

8    time and we can at least have them as part of this

9    proceeding.

10             What do you think of that idea, Ms. Ryan?

11             MS. RYAN:  Yes, we --

12             THE COURT:  If we have them, but they should at

13   least be able to present them to the Court.

14             MR. HOCHBAUM:  The problem, Judge, is that they're

15   in Spanish.

16             THE COURT:  Well, I can only -- I can't do more

17   than that.

18             MR. HOCHBAUM:  Well, it seems to me that --

19             THE COURT:  Do you want to have them submitted, Mr.

20   Hochbaum, to the Court and have them marked at this time so

21   that they can be officially part of this proceeding?  Yes or

22   no.

23             MS. RYAN:  Your Honor, I think it's more

24   appropriate for these kind of materials to be attached to a

25   2255 motion by these defendants.  This is the day of

1    sentencing and this is the first time this material's come

2    forward.

3              THE COURT:  We can have them identified now.

4    That's okay, if you want to do that --

5              MS. RYAN:  And we have no guarantees as to any of

6    its authenticity either.

7              THE COURT:  Of course not.  I just want to know

8    whether -- since they're being referred to, the Court's, you

9    know, preference is to have, you know, everything that's

10   referred to before the Court.  I'm not saying what

11   significance to be attached to it, but since it's been

12   referred to, like the best evidence rule, you know.

13             You want to have them marked now?

14             MR. HOCHBAUM:  No, Judge, what I want is a

15   government --

16             THE COURT:  All right, I'm giving you the choice --

17             MR. HOCHBAUM:  Judge, may I just --

18             THE COURT:  Yes.

19             Would you like to have them marked, Mr. Obregon?

20             MR. HOCHBAUM:  No, Judge, what I want --

21             THE COURT:  Just one second.  I'm conducting the

22   proceeding.  I'm just asking each of you if you like to have

23   them marked so we have them officially as part of these

24   proceedings.

25             MR. MUSA-OBREGON:  Your Honor, may I confer with

1    co-counsel?

2              THE COURT:  Mr. Kulcsar, would you like to have

3    them marked?

4              MR. KULCSAR:  Well, I've been trying to address the

5    Court with respect to a different aspect that I think the

6    Court has to consider.  I think they --

7              THE COURT:  Just answer my question whether you

8    would like to have them marked?

9              MR. KULCSAR:  I think they should be made available

10   to the Court or to an official court interpreter, so that the

11   Court can determine exactly the significance because leaving

12   aside the issue of withdrawing the plea --

13             THE COURT:  Stop.

14             Do you have these papers in court today?

15             MR. MUSA-OBREGON:  Yes, I do, Your Honor.

16             THE COURT:  Produce them to the court's clerk and

17   they'll be marked.

18             MR. MUSA-OBREGON:  I'm handing over to the court's

19   clerk documents received from Investigator Acosta this

20   morning; book 1, part 1 in a burgundy binder and book 1, part

21   2.  They apparently have been -- sections have been

22   highlighted, the stick-ons, with respect to relevant

23   testimony in this case.

24             THE COURT:  Good.  So they're marked now and we

25   have these documents identified.  Okay, so the clerk of the

1        court will mark this as a court exhibit at this time.

2              (Court Exhibit A marked for identification.)

3              MR. HOCHBAUM:  Judge, it is our request, however,

4        that in light of production of this material and the nature

5        of it, that being in Spanish, that the Court consider a joint

6        request by counsel to adjourn the sentence --

7              THE COURT:  All right.

8              MR. HOCHBAUM:  -- to allow us to provide

9        interpreted copies --

10             THE COURT:  All right.  I understand your request.

11             MR. HOCHBAUM:  -- to the Court --

12             THE COURT:  You made them request on behalf of your

13       client.  It's denied.  We're going to go forward with this

14       sentencing.

15             Let me just dispose of the motion for the

16       withdrawal of the plea that's before me.  That's denied as

17       well.

18             Just to go back to this last minute, you know,

19       Spanish, you know, document or set of papers, the reason for

20       the denial of any application for adjournment is that it's at

21       the eve of trial, the plea allocution was taken back on April

22       5th, 2005, over a year ago, the record is replete with the

23       Court's indulgence for a number of adjournments at the behest

24       of defense counsel and the time has come now for sentencing.

25       These last minute types of things just are counterintuitive

1      in terms of going forward.

2            But be that as it may, in the face of the clear

3      pleas of guilty rendered by each defendant, even if they have

4      statements in Mexico from some of these victims, it doesn't

5      really countermand the fact that they each stood before Judge

6      Block and pleaded guilty to all these crimes, and that's what

7      really dominates.

8            And you can make comments about this in respect to

9      sentencing.  I'll listen to you.  If you want to make

10     whatever comments you want as a result of these documents,

11     fine.  The Court has marked this as an exhibit and we'll

12     proceed.

13           Now, as far as the withdrawal of the plea, of

14     course the Court was very concerned about whether counsel was

15     acceptable to the defendants and in particular in respect to

16     Mr. Lashley, there was a long history about that.

17           And, you know, right at the outset of the

18     proceedings back on April 5th, 2005, when the pleas were

19     taken, I painstakingly explored whether there's any problem

20     that any of the defendants had with their counsel and in

21     particular with Mr. Lashley.  And I called specific attention

22     to Mr. Lashley's situation.

23           There were applications that were filed in the

24     Court of Appeals to seek withdrawal of counsel and

25     substitution of counsel.  We carefully made sure that each of

1    the defendants were satisfied with their legal

2    representation.  It was agreed to withdraw their application

3    to the Court of Appeals because they were happy with legal

4    representation.

5              I'm not going to read to you chapter, book and

6    verse, but I've gone over the minutes and I can't think of

7    how I could have done it more poignantly or more effectively

8    than what I did when we explored whether or not there was any

9    problems with counsel.

10              Now, having said that preliminarily in terms of the

11    withdrawal of the guilty plea, I just call your attention to

12    some specific parts of the transcript and I'll read them

13    verbatim.  On page 47, I expressly told all the defendants:

14              "I want you to understand that when you give

15              me that guilty plea you cannot count on withdrawing

16              your guilty plea once you give it to me.  You will

17              be giving me your guilty plea with the

18              understanding that it will stick.  That you will

19              not later on be able to withdraw your plea.  It I

20              very important that you understand that."

21              And I asked each one in turn whether there was any

22    problem with that and they each said no.  Then I said they

23    each recognize that they understand that.

24              Then I went on to say:

25              "Now if I sentence you contrary to the law --

1          in other words, if I do something that I should not

2          be doing, namely giving an incorrect or unlawful

3          sentence, certainly you would have the right to

4          appeal because I should not sentence you, nor do I

5          intend to contrary to the law.

6               But even in that case, while you would have

7          the right to have an unlawful sentence corrected by

8          appealing to a higher authority, still you would

9          not be able to withdraw your guilty plea once you

10         give it to me.  Only to make sure you have a legal

11         sentence rendered."

12         Then I asked each defendant in turn whether there

13    was any problem with that, whether everybody understood that

14    and they all said yes.  And then we went on with the rest of

15    the proceedings.

16         At the end of the part of the proceedings where I

17    advised everybody of their rights, I asked whether or not

18    they understood about all their rights and that they

19    understood that nobody has made any promises to you.  I asked

20    specifically whether anyone threatened or forced the

21    defendant to plead guilty or made any promise to induce the

22    defendant to plea guilty.  We covered that very carefully.

23         And there's one other part which I want to refer to

24    also.  Yes.  After I had finished advising them of their

25    rights and the fact that we have the *Pimentel* letter and

24

1    there were estimates made, I told them again "It is important

2    for you to understand again" -- this is at page 64 of the

3    transcript -- "that whatever sentence I render, you will not

4    be able to withdraw your guilty plea once you give it to me."

5    So this is the third time you see I'm counseling the

6    defendant's about that.

7              The reason why I am taking the time to go through

8    this is because I think it's important for me to make a

9    proper record in the face of their application to withdraw

10   their guilty plea.  And yes, I think it's important that we

11   all recall these events.

12             Then I went on to say:

13                  "It is important for you to understand that

14                  the government has put forward their estimate.  The

15                  estimate of what the sentencing could turn out to

16                  be, but I'm not bound by that.  I may agree or

17                  disagree.  I will make my own independent

18                  assessment.  It may well be that the sentence may

19                  exceed the government's estimate or it may well be

20                  it is less than the government's estimate."

21             I said also:

22                  "I cannot tell you at this particular time,

23                  but it is important for you to understand that that

24                  estimate is not chiseled in stone.  That I, the

25                  Judge, am responsible for making your sentence and

1    it is me and only me who will determine what your

2    sentence will be."

3    Then I said:

4         "Does anybody have any problems with that or

5    any questions at this particular time?"

6    And I said after that:

7         "It is very very important that each of you

8    understand that.  This is a good time to ask me

9    questions about that or anything else I said before

10   we proceed to the taking of your plea.  So take a

11   moment.  If you wish to talk to your lawyers, you

12   can do so at this time.  If I don't hear anything

13   from you, I will at that time work under the

14   assumption you understood each and everything that

15   I said to you, that you have no questions to ask

16   and you are perfectly satisfied with the Court's

17   representation of these proceedings."  I think it

18   should be the Court's presentation, I guess.  "Take

19   a moment to think about all of that and I will give

20   you that opportunity".

21   Then there was a pause and I said:

22        "Does anyone wish to speak to their lawyer

23   again?  All right.  Do I hear any questions at

24   all?"

25   And Mr. Del Valle said:

1              "No question, Your Honor.  We are ready to

2        proceed."

3              Now, I just want to add also that at the onset of

4     the proceedings, I inquired of the defendants as to why is it

5     that at the eleventh hour when the jurors were here ready to

6     be voir dired that they were having a change of heart at the

7     eleventh hour.  And I said that it may well be that you will

8     do no worse if you plead to the entire indictment than you

9     would if you did go forward to trial.  And I was concerned

10    about that.  And the lawyers assured me that this was what

11    their clients preferred.

12             They spoke about the fact that they would arguably

13    be entitled possibly to acceptance of responsibility and that

14    they felt that by pleading, they would be in a better

15    position come sentencing rather than to run the risk of

16    apparently facing certain conviction on all of these charges

17    or most of these charges as evidenced by their guilty pleas

18    and the strong evidence apparently that the government had at

19    its disposal.

20             So they made a reasoned decision to take these

21    pleas after I inquired about all of that.

22             And so I think having said all of that, Mr.

23    Kulcsar, do you have a hard time hearing me?  I have the

24    microphone on.  You seem to be bending forward.

25             MR. KULCSAR:  I appreciate that.

1          THE COURT:  Do you wish me to speak a little

2    louder?

3          MR. KULCSAR:  Thank you.

4          THE COURT:  I'll try --

5          MR. KULCSAR:  That would be great.  Thank you.

6          THE COURT:  -- because you have some --

7          MR. KULCSAR:  I know, Your Honor.

8          THE COURT:  -- hearing problems --

9          MR. KULCSAR:  Thanks, Your Honor.

10         THE COURT:  -- and I have a low voice.

11         MR. KULCSAR:  I know that, Your Honor.

12         THE COURT:  So the combination of some hearing loss

13   and a low voice by the Judge is not a good tandem.

14         MR. KULCSAR:  Thank you.

15         THE COURT:  All right?  I'll try to speak louder.

16         So all of what I just said sets the stage for

17   telling you and explaining to you why these motions now at

18   the eleventh hour to withdraw the guilty plea are denied.

19         And, you know, separate apart from the fact that I so

20   painstakingly alerted all of the defendants the fact that I

21   will not allow them to withdraw the guilty plea, the -- and

22   they knew about that, to make the application on the eve of

23   sentence, you know, adds further fuel to the fire and further

24   warrants the Court denying the motions.

25         So the record is clear about that, so all motions

1      are denied.

2              If there are any other motions out there, I don't

3      know of any, but they should be deemed denied as well.

4              Are there anything -- anything else out there, Mr.

5      Kulcsar?

6              MR. KULCSAR:  Your Honor --

7              THE COURT:  Any other motion?

8              MR. KULCSAR:  -- I think --

9              THE COURT:  Any other motions?

10             MR. KULCSAR:  Yes, I'm addressing Your Honor's --

11             THE COURT:  Ask me --

12             MR. KULCSAR:  -- review of the transcript.

13             THE COURT:  I'm giving you an opportunity to tell

14     me whether there are any other motions.  You don't have to

15     debate with me about my review of the record.  It's not what

16     I'm asking you to do.  Are there any other motions by your

17     client?  Yes or no.

18             MR. KULCSAR:  You determined that whatever the

19     application was for an adjournment.

20             THE COURT:  Pardon?

21             MR. KULCSAR:  That you --

22             THE COURT:  That's been denied.

23             MR. KULCSAR:  That's foreclosed.

24             THE COURT:  Mr. Obregon?

25             MR. KULCSAR:  I was just going to add one aspect to

1    the transcript.  Since I wasn't here, I did read it.  And I

2    thought in might be pertinent, but if Your Honor has already

3    determined that issue, then I'll move on to --

4             THE COURT:  I just want to know if there's any

5    other motions.

6             MR. KULCSAR:  Well, I think there's another

7    application with respect to the sentencing issue.

8             THE COURT:  We're not at sentencing.  I'm just

9    dealing with motions here before we proceed to sentencing.

10            MR. KULCSAR:  Well, the other aspect to the motion

11   for postponement relates to this:  Your Honor at the time of

12   taking the plea, also asked the defense counsel whether they

13   were aware of any valid defenses that existed at the time of

14   taking the plea and I believe counsel in good faith answered

15   no.

16            I also note in speaking to Mr. Del Valle in

17   reviewing some of the discovery, there was a type of *Brady*

18   letter sent out by the government that made reference to

19   Mexico and in point of fact, definitively stated that the

20   only evidence of an exculpatory -- and I use that word

21   broadly -- nature was apparently a --

22            THE COURT:  Do you have any other motions?  You can

23   talk all you want to.  I'm not going to allow you to do that

24   of course, but I'm asking you very specifically so we have a

25   nice clean record for higher authorities to review.

30

```
1                Do you or do you not have any other motions before
2       we proceed to sentencing --
3                MR. KULCSAR:  No.
4                THE COURT:  -- at this time?  All right.
5                Mr. Obregon, how about you?
6                MR. MUSA-OBREGON:  No, Your Honor.
7                THE COURT:  And Mr. Hochbaum?
8                MR. HOCHBAUM:  No, Judge.  I have a request,
9       however, that we might do this from the table.  I can sit
10      with my client.
11               THE COURT:  You have a hard time standing?
12               MR. HOCHBAUM:  I don't --
13               THE COURT:  You can pull up a chair.  You can sit
14      if you like.  Any problems?
15               MR. HOCHBAUM:  No, just in terms of the length of
16      the anticipated procedure here, Judge, just thought it might
17      be better if all counsel were able to work from the table.
18               THE COURT:  I like to have you close by here
19      because we have to record you by these microphones.  But if
20      you need to sit because you're, you know, feeling like Barry
21      Bonds these days, by all means I'll accommodate that.
22               Anybody else wish to sit in front of me?  All
23      right.
24               MR. HOCHBAUM:  Okay.
25               THE COURT:  Feel free to do so if at any time you
```

1        need that type of comfort.

2                    Now, having cleared these motions and having denied

3        your request for adjournments, is there any other reason why

4        we should not proceed to sentencing at this time?

5                    MR. KULCSAR:  No, Your Honor.

6                    THE COURT:  Mr. Kulcsar, none?

7                    None?  None?  Okay.

8                    MR. HOCHBAUM:  No, Your Honor.

9                    THE COURT:  We understand all your rights are being

10       protected and --

11                   MR. KULCSAR:  Your Honor, I --

12                   THE COURT:  -- carefully done.  So now we'll

13       proceed first with --

14                   MR. HOCHBAUM:  However, Judge, I would like the

15       opportunity, I mean since I'm not standing by my client, to

16       find out if there's some other issue he wants me to address,

17       which is why I wanted to do this from the table, but --

18                   THE COURT:  Well, you know, we -- you want to have

19       an opportunity to consult with your client now?  I'll give

20       you a brief opportunity, each of you, before we proceed.

21                   MR. HOCHBAUM:  Thank you, Judge.

22                   THE COURT:  I'm going to work under the assumption

23       that we're ready to proceed with sentencing, but if you want

24       a brief moment to talk to your client, go ahead.

25                   (Pause/counsel conferring.)

32

1          MR. KULCSAR:  The question is whether we're ready

2     to proceed with sentencing.  I would request we not proceed

3     with sentencing because --

4          THE COURT:  You made that request.

5          MR. KULCSAR:  And the reason simply stated is this:

6     Whatever value that material has or doesn't have with respect

7     to a motion to withdraw a plea or anything else --

8          THE COURT:  Right.

9          MR. KULCSAR:  -- it does have certain significance

10     with respect to the calculations that are in the PSR.  For

11     example --

12          THE COURT:  You can address those issues during the

13     course of the sentencing.

14          MR. KULCSAR:  Well, I can't because I'm not fully

15     cognizant of what's in the transcript and I --

16          THE COURT:  It's not my fault.

17          MR. MUSA-OBREGON:  It's not defense counsel's fault

18     either, Judge.

19          THE COURT:  You just can't come here, you know,

20     when we're ready to start sentence and present me with a

21     whole document of Spanish material and ask for an

22     adjournment.  Look we've discussed it.  It's denied.  The

23     circuit court's not going to change it.  You're making your

24     record.  Let's go forward.

25          MR. KULCSAR:  I do have three photographs that I

1     would ask to be marked --

2              THE COURT:  Well, why don't you wait until we go

3     forward with sentencing --

4              MR. KULCSAR:  Okay.

5              THE COURT:  -- and then you'll have an opportunity

6     to do that.  Are you court assigned, Mr. Kulcsar?

7              MR. MUSA-OBREGON:  No, he's --

8              THE COURT:  Court appointed or are you paying

9     counsel?

10             MR. MUSA-OBREGON:  -- he's private, Your Honor.

11             THE COURT:  You're private.  Yes, because, you

12    know, court assigned counsel usually knows the procedure and

13    sometimes private counsel is not as knowledgeable about how

14    the Court proceeds to handles sentences.  So you listen

15    carefully, okay?  You'll be educated.

16             MR. MUSA-OBREGON:  Your Honor, to the extent that

17    Mr. Kulcsar's motion was made and denied by the Court, I will

18    join in the application --

19             THE COURT:  Everybody joins in everything.  We

20    understand that.  We're here to painstakingly protect your

21    rights.  This is one of my job responsibilities.

22        (Recess 12:22 p.m. to 12:23 p.m.)

23             THE COURT:  Let's return now and proceed with

24    sentencing.

25        (Pause/counsel conferring.)

```
 1              THE COURT:  Mr. Hochbaum, I think you've had ample
 2     opportunity.  Let's go forward.
 3          (Pause/counsel conferring.)
 4              THE COURT:  Mr. Hochbaum, come on up here.  I'm
 5     telling you to come up here now.  Come on, right now.  We're
 6     not going to stay here all day.  Under the circumstances,
 7     it's not indicated.  Let's go.
 8              THE CLERK:  Counsel.
 9              THE COURT:  Mr. Hochbaum, I'm ordering you to come
10     up here.
11              MR. HOCHBAUM:  I'm in the midst of a conversation,
12     Judge.
13              THE COURT:  I'm ordering you to come up here.
14          (Pause.)
15              MR. HOCHBAUM:  I apologize, Judge.  It would have
16     been easier without, you know, but I tried to get this --
17              THE COURT:  Mr. Hochbaum, I'm trying to protect
18     your client's rights here, but we can't stay here all day.
19     There's a long history here.  You've had ample opportunity to
20     have many discussions with your client since you took over
21     for Mr. Lashley.  If you want to say one thing further on the
22     record now, you can do so.  Let's go forward with the
23     sentence.
24              MR. HOCHBAUM:  I would like to say one thing on the
25     record, Judge.  The discussion I was having with my client
```

1    was not a discussion that was possible at an earlier time.

2    It related to the Court's determination of the motions and

3    the requests for adjournment, so --

4              THE COURT:  I denied that.

5              MR. HOCHBAUM:  I understand that, Judge, so I

6    needed to talk with him about what position he wanted me to

7    take --

8              THE COURT:  Okay.

9              MR. HOCHBAUM:  -- during the sentencing process in

10   light of those decisions rendered by the Court in the last --

11             THE COURT:  Good.

12             MR. HOCHBAUM:  -- 10 minutes, so --

13             THE COURT:  You've had an opportunity, in my

14   opinion, to have a chance to talk to him about it.  Under the

15   circumstances, we're ready to proceed.

16             All right, now let's take --

17             MR. HOCHBAUM:  Judge, most respectfully, I would

18   accept --

19             THE COURT:  You can accept.

20             MR. HOCHBAUM:  -- that determination and let the

21   record reflect I need an additional five minutes with my

22   client.  If the Court doesn't want to give that to me, that's

23   fine

24             THE COURT:  Well, we'll take a break before we get

25   to your client because it's 12:30 and I want to get through

1        with one of these sentences first.  And so, at the break,

2        you'll be able to further talk with your client.

3                    MR. HOCHBAUM:  Very good.

4                    THE COURT:  How's that?  Okay?

5                    Now let's take Gerardo Flores Carreto.

6                    Mr. Musa-Obregon --

7                    MR. MUSA-OBREGON:  Yes, Your Honor.

8                    THE COURT:  -- you're retained counsel?

9                    MR. MUSA-OBREGON:  Yes, I am.

10                   THE COURT:  But you're very familiar with how to

11       proceed with federal sentencing, aren't you?

12                   MR. MUSA-OBREGON:  Yes.

13                   THE COURT:  All right, so I'm going to take you

14       first since Mr. Kulcsar is not as familiar and he can perhaps

15       benefit by the process that's about to unfold, so when his

16       turn comes, you know, he can really be up to speed.  Okay?

17                   MR. MUSA-OBREGON:  Well, Your Honor, I believe Mr.

18       Kulcsar is more familiar with this than I am.

19                   THE COURT:  Really?  Well, we'll go forward with

20       Gerardo Flores Carreto first.  Okay?

21                   Now, what we'll do is we'll identify for the record

22       what I have in the sentencing file.  That's the first thing.

23                   And let me first ask you, Mr. Musa-Obregon, even

24       though you're not as familiar with these matters as Mr.

25       Kulcsar, whether you nonetheless realize that you should go

1    over the presentence report carefully with your client before

2    sentence?

3              MR. MUSA-OBREGON:  Yes, Judge.

4              THE COURT:  And I assume as a good lawyer, you've

5    done that?

6              MR. MUSA-OBREGON:  Yes.

7              THE COURT:  So tell the Court since your client is

8    a Spanish speaking gentleman, how you communicated this

9    lengthy presentence report that's in English to him.

10             MR. MUSA-OBREGON:  Your Honor, I speak Spanish.  I

11   went over it with him during the last proceeding.  And he's

12   highlighted certain portions of it for me that he contests.

13   I believe he has a complete understanding of the sentencing

14   PSR report as conveyed to him by me.

15             THE COURT:  There's no question in your mind and

16   since you're a Spanish speaking gentleman, you're perfectly

17   satisfied that you've communicated every relevant aspect of

18   the presentence report to your client?

19             MR. MUSA-OBREGON:  Yes, I am.

20             THE COURT:  All right, and you're satisfied that he

21   understood what you were telling him?

22             MR. MUSA-OBREGON:  Yes.

23             THE COURT:  There's no question in your mind that

24   we can proceed in that regard, is there?

25             MR. MUSA-OBREGON:  No.

1          THE COURT:  All right.  Very good.  So the

2     presentence report is dated January 27th, 2005.  Now, in

3     addition, we have the recommendation of the Probation

4     Department and it's the Court's policy to make these

5     sentencing recommendations available to counsel.  Has that

6     been done here?

7          MR. MUSA-OBREGON:  Yes.  Yes, it has.

8          THE COURT:  Have you folks had ample opportunity to

9     review the recommendation of the Probation Department?

10          MR. MUSA-OBREGON:  Yes, I have.

11          THE COURT:  All right.  And I'm going to take a

12     moment to read it into the record, even though it is part of

13     the sentencing proceeding.  Given the nature and the

14     importance of this particular proceeding and the public

15     interest in it, I think it's probably a good idea for me just

16     to take a moment to read what the Probation Department says.

17          First of all, the Probation Department recommends

18     on counts 2 through 6, 35 years of incarceration --

19          MR. MUSA-OBREGON:  Your Honor, may I know what page

20     you're reading from?

21          THE COURT:  I'm reading the presentence

22     recommendation from the Probation Department.

23          To run concurrent.  I won't mention the five years

24     -- the release provisions.  And on counts 1 and 7 through 27,

25     five years to run concurrent.  So, in effect, Probation

1      recommends 35 years of incarceration.  Okay?

2              And here is the comment that goes along with it:

3                  "The defendant is a lifelong resident of

4                  Mexico with limited ties to this country.  He only

5                  came to the United States several months prior to

6                  his arrest and it appears that he only did so to

7                  further this conspiracy.  He has two children who

8                  are the product of two prior relationships.  One of

9                  the mothers of the children was a victim of the

10                 instant offense."

11     I'm not telling you to comment, you know, just want

12     to explain what they're saying.  You'll have ample

13     opportunity to comment when I give you the opportunity to

14     speak in the course of sentencing.

15              Continuing with the recommendation:

16                 "The instant offense represents the

17                 defendant's first arrest and conviction.  In this

18                 case, the defendant and his cohorts forced numerous

19                 women into prostitution.  These women were held

20                 against their will through threats of death and/or

21                 violence against them or their families, raped by

22                 the defendants, beaten, not allowed contact with

23                 their family members and forced to commit acts of

24                 prostitution.

25                 "The defendants targeted young, poor,

1      uneducated women from impoverished areas of Mexico

2      and kept all of the women's earnings from the

3      prostitution.  The defendant's role in this offense

4      was that of a leader.  He recruited women,

5      collected the money they earned, organized all

6      aspects of the offense, used fraud, force and

7      coercion to control the victims and gave orders to

8      the women and other defendants in this offense.

9           "The victims in this case have suffered

10     immensely.  The defendants controlled every aspect

11     of their lives.  The women were searched for money

12     as they were not allowed to keep any of that which

13     they earned.  Some were required to service more

14     than 20 customers a day, then beaten when they did

15     not earn enough money and repeatedly threatened

16     with death.

17          "In addition to the rapes, one victim was

18     forced to have an abortion when she became pregnant

19     as a result of a rape by one of the defendants.

20          "The crimes against these women are horrific

21     and inhumane.  Further, the advisory guideline

22     range, although high, does not take into

23     consideration all of the victims in this case.  The

24     nature and seriousness of the offense, coupled with

25     the aggravating factors of the number of victims

1          not considered in the advisory guidelines, as well

2          as the history and characteristics of the defendant

3          and the need for punishment and deterrence, call

4          for a sentence of 35 years custody."

5          All right. Now, I'm not saying I agree with all of

6     that or any particular part.  I'm just reading it for

7     informational purposes as part of the information that is in

8     my sentencing file.

9          In addition, I have, in no necessary order, a

10    letter dated April 24th, collectively from Daniel Alonso, the

11    defendants Alonso and Josue Flores and Gerardo Flores, and

12    that asks for all the type of requests that we've already

13    processed here in this proceeding.  They want to withdraw

14    their plea, they're talking about not being happy with their

15    lawyers and other factual matters that they take some issue

16    with.  I'm just identifying that letter at this time.

17         I have Mr. Musa-Obregon's letter of April 21, 2006,

18    submitting a number of objections to the presentence

19    investigative report.  And I have reviewed that.

20         And, you know, it talks about the fact that there's

21    reference in the PSR at paragraph 59 to over 50 women being

22    coerced into prostitution.  You can speak about that at the

23    proper time.  It talks about the government's estimate of

24    over hundreds of thousands of dollars and objects to the

25    introduction of victim impact statements.

1         And then I have the underlying sentencing sheet,

2    so-called *Pimentel* letter, and of course the transcript of

3    the proceedings of April 5th, 2005, which I will deem to be

4    included in this particular sentence, as well as in respect

5    to the sentences with the other two defendants as well.

6         Is there anything else I should have?  There is a

7    letter from the government.

8         MS. RYAN::  Yes, Your Honor.

9         THE COURT:  And that's one letter that, if memory

10   serves me correctly, is dated April 26th, 2006.

11        MS. RYAN:  That's correct.

12        THE COURT:  All right, and that is a letter that

13   the government submitted in respect to each of the

14   defendants, so that letter will be deemed to be incorporated

15   in each of the sentences.

16        MS. RYAN:  Thank you.

17        THE COURT:  And it addresses the concerns of each

18   defendant.  Okay.

19        Anything else I should have before we make our

20   advisory guidelines calculation, Mr. Musa-Obregon?

21        MR. MUSA-OBREGON:  No, Your Honor.

22        THE COURT:  Okay.  So let's try to do that.  Now,

23   of course, they are extensive, but I think we can probably

24   find a realistic way of dealing with them without having a

25   three-day proceeding.  Let's see whether we can do that.

1          And then I'll give you an opportunity to speak in

2     support of the letter that you submitted to me and we can

3     talk about that.  But for purposes of making the guideline

4     calculations, we want to turn to page 32.  And --

5          MR. MUSA-OBREGON:  Your Honor, I'm going to correct

6     myself with the Court's permission.  I'm going to ask that

7     the transcripts that have been marked be also something that

8     be considered by the Court.

9          THE COURT:  Which transcripts?  You mean the

10    Spanish documents?

11         MR. MUSA-OBREGON:  Yes.

12         THE COURT:  Well, that Court Exhibit A and, you

13    know, certainly you can speak to them in the course of

14    sentencing.  I'll give you the opportunity to do that, but

15    I'm not going to delay the proceedings because of that.  I've

16    spoken about that.

17         I'm not going to give them the opportunity to

18    withdraw their guilty plea because of that.  We're clear

19    about that.  But I will give you the opportunity to refer to

20    that.  Since you're Spanish speaking, you probably, you know,

21    a little bit what's contained in that set of papers, okay?

22         All right, so now let's use count 1 as a jumping

23    off point.  Because much of this is going to be repeated

24    throughout all the counts.  And we have here a base offense

25    level in respect to count 1 of 27.  Now, count 1 deals with

44

1     act A and counts 2 and counts 11 collectively deal with

2     conspiracy to engage in sex trafficking, sex trafficking with

3     Jane Doe 1 and transportation for purposes of prostitution.

4            Now we know that when we go through the

5     calculations they are basically the same with just a few

6     variations and the reason why they're so extensive is because

7     we have eight victims.

8            So, we have to go through each of these in respect

9     to each one because each victim is separate and apart and

10    they're not all grouped together.  Of course there is

11    appropriate grouping within the confines of these

12    calculations, but we have to deal with each victim

13    separately.

14           So, here we have base offense level of 27.  And in

15    respect to Jane Doe Number 1, there's a four level

16    enhancement for the use of physical force and threats of

17    serious bodily injury.  And then there's a two level

18    enhancement because the victim was a vulnerable victim.  And

19    there's a four level enhancement because the defendant is

20    deemed to be an organizer.  And that results in an adjusted

21    offense level of 37.

22           Now, there are may 37's, but since the issue of

23    vulnerable victim repeats throughout, of physical force and

24    organizer, if you wish to speak about any of these

25    adjustments at this time, I'll give you the opportunity to do

1     so and then maybe we can cut to the chase when it comes to

2     the others, okay?

3               MR. MUSA-OBREGON:  Yes, Judge.  Understanding that

4     Mr. Carreto's plea to the indictment included elements of him

5     pleading guilty to using force in the course of promoting --

6               THE COURT:  Yes.

7               MR. MUSA-OBREGON:  -- prostitution and the

8     allocution even included elements of -- related to the victim

9     related adjustment as to these women being from poor rural

10    areas and he also acknowledged that he was a leader or a

11    manager --

12              THE COURT:  No, not a manager, you know, he's the

13    leader.  He's an organizer.

14              MR. MUSA-OBREGON:  I'm sorry, an organizer.

15              THE COURT:  That's four levels.  The leader is

16    three levels.

17              MR. MUSA-OBREGON:  Right.  Notwithstanding that --

18              THE COURT:  He did allocute  --

19              MR. MUSA-OBREGON:  -- those acknowledgments --

20              THE COURT:  -- to all of this.

21              MR. MUSA-OBREGON:  -- on behalf -- yes.

22              THE COURT:  Right.

23              MR. MUSA-OBREGON:   Notwithstanding those

24    acknowledgments as to all of those factors, there are

25    elements of this case that I'd like the Court to consider.

1          THE COURT:  Certainly, I'll give you the

2    opportunity, but I just want to make our advisory guideline

3    calculations first.  And I do agree with you, of course, that

4    he has allocuted to this very carefully and very specifically

5    and there's no reason for me not to accept that the adjusted

6    offense level of 37 in respect to count 1 is correct.  And I

7    don't hear any real serious disagreement from you.

8          MR. MUSA-OBREGON:  Your Honor, with the -- I have

9    made an objection to the victim related adjustment and that

10   is that I don't believe that this broad categorization of

11   young, poor and uneducated women from rural areas of Mexico

12   is sufficient to meet the type of standard that would require

13   -- that would be subject -- I mean that would mean any crime

14   against half the population of Mexico would be subject to an

15   upward enhancement.

16         THE COURT:  Well, I think that these particular

17   victims are in a unique position.  Ms. Ryan may wish to

18   elaborate on that at this time.

19         MS. RYAN:  Well, Your Honor, I -- we attempted to

20   address Mr. Obregon's objection in our letter.  On pages 5

21   and 6 of our letter, specifically.

22         THE COURT:  You say that they're wealthy, they

23   lived in good homes, they had cars, but I don't have any of

24   that in the presentence report.  That's just your letter.

25         MS. RYAN:  That may not be entirely correct, Judge.

47

1    We certainly indicated that in our trial brief before the

2    Court and be that as it may, the defendants were rich and

3    powerful because they were operating this criminal

4    organization for some time.

5            THE COURT:  The nature of the fact that they are

6    organizers and controlling this whole operation certainly

7    shows that they were not in the same situation as the

8    victims.  I mean I think it's kind of silly to even, you

9    know, go further in that respect.

10           And, you know, based upon their allocutions, if I

11   recall correctly the total circumstances of this particular

12   prosecution, there's no question that they represent the --

13   these poor women, the very textbook example of vulnerable

14   victims, and it is certainly sufficient throughout the

15   proceedings here without me having to go back and cite

16   chapter, book and verse for me to feel totally comfortable

17   that we're dealing with prototypical vulnerable victims.

18           Okay, you made your record.  So the adjusted

19   offense level is 37.

20           Now having said that, now we then proceed to also

21   agree, without having to be unnecessarily repetitious, that

22   the adjusted offense level for count 1, act B et cetera is

23   also 37?  And --

24           MR. MUSA-OBREGON:  Well, Your Honor, with my

25   same -- noting my same objection --

```
 1                    THE COURT:  Yes, we --

 2                    MR. MUSA-OBREGON:  Yes.

 3                    THE COURT:  -- understand that.  All of these

 4          aspects are still the same.  They deal with vulnerable

 5          victims.  They deal with physical force.  They deal with

 6          being an organizer.  So there's nothing different.

 7                    So we can proceed then, I'm sure you agree, Mr.

 8          Musa-Obregon, to also agree that in respect to count 1, act

 9          C, we're dealing with 37?

10                    MR. MUSA-OBREGON:  Correct, Judge.

11                    THE COURT:  And in respect to count 1, act D, et

12          al, we're dealing with again 37.

13                    MR. MUSA-OBREGON:  Yes.

14                    THE COURT:  Now, we now come to the next set, so to

15          speak, of criminal activity.  And that deals with count 1,

16          act E.  That's the conspiracy to engage in sex trafficking of

17          Jane Doe.

18                    MS. RYAN:  It's Jane Doe No. 5, Your Honor.

19                    THE COURT:  Jane Doe No. 5.  That one has a

20          different element to it.  That's why I call attention to it.

21          Because in paragraph 121, she had not obtained the age of 16,

22          so that requires an additional two levels.

23                    And that's established as a matter of fact in this

24          case that she had not obtained the age of 16?

25                    MS. RYAN:  Yes, Your Honor.  She was 14 when she
```

1    was first --

2              THE COURT:  What evidence do I have of that?

3              MS. RYAN:  I believe that that's indicated in the

4    presentence report.

5              THE COURT:  It is in the presentence report.

6              Do you take any exception to her age?

7              MR. MUSA-OBREGON:  Your Honor, I discussed it with

8    my client and he does not believe that she was 14.

9              THE COURT:  Do we have a way of establishing that

10   factually?

11             If we don't have anything that establishes it

12   factually, then I'm going to just treat this as 37 also.  My

13   guess it's not going to make any difference, but I do see

14   that the defendant has rights and if the defendant says that

15   he doesn't believe she's 14, I need something to satisfy the

16   Court that she was.

17             MS. RYAN:  I understand the Court and I agree with

18   what you've just stated, Your Honor.  I would just note for

19   the record that the Court gave these defendants ample

20   opportunity to make these kinds of factual objections before

21   we actually were here today.  The government -- if you could

22   just give me one moment, Your Honor?

23             THE COURT:  Is there anything in the allocution

24   that he said that she was 16?

25             MR. MUSA-OBREGON:  I don't recall that, Judge.  I

50

1    don't think that was a part of the allocution.

2              THE COURT:  Yes, I don't think so either.

3              MS. RYAN:  Your Honor, I think the allocution

4    indicated that the victims were under the age of 18, which is

5    also a factor to be considered here, but that was a general

6    allocution to the victims generally.

7              THE COURT:  Yes, but we have 16 which is a very

8    specific age.

9              MS. RYAN:  Yes.

10             We're happy to agree to the level 37, Your Honor.

11             THE COURT:  Yes, I think it may well may be that it

12   will not make a difference, but we want to be circumspect.

13   So then in paragraph 125, in respect to count 1, act E, we'll

14   change that 37 also.

15             Now we go on to count 1, act F and that deals with

16   Jane Doe Number 6.  That should be 37.  It's the same as all

17   these others.  So we have another 37.

18             And yet an additional 37 when it comes to count 1,

19   act G.  That's Jane Doe Number 7.

20             And then the same with Jane Doe Number 8 --

21             MR. MUSA-OBREGON:  Your Honor, we have an

22   objection.

23             THE COURT:  Just one second.  Let me just -- Jane

24   Doe Number 8 is a little different in one respect because

25   there's two levels added to the fact that she was allegedly

1    choked and hit in the face that she became permanently

2    scarred.

3              Yes, Mr. Obregon.

4              MR. MUSA-OBREGON:  Your Honor, we neglected to

5    mention that one of the things that was given to us by the

6    private investigator this morning for the first time is a

7    picture of Jane Doe Number 8.

8              And this picture was taken by the investigator

9    who's present in the courtroom a month ago.  And according to

10   the picture, she has no permanent scar on her face.  There's

11   actually multiple pictures that were given to us.

12             THE COURT:  All right.

13             MR. MUSA-OBREGON:  And --

14             MS. RYAN:  Your Honor, I just like state for the

15   record that I've met Jane Doe Number 8 and I don't believe

16   this is actually her.  We may have a problem here, but this

17   doesn't --

18             THE COURT:  All right, so here's my --

19             MS. RYAN:  -- look like the woman I remember.

20             THE COURT:  -- here's my policy here.  We could

21   really get to the nitty gritty of this.  There are all sorts

22   of ways of doing it.  I don't want to debate who has the

23   burden of this or the burden of that.

24             I'm not going to -- since there's a question here,

25   I won't add two levels, so you have another 37.  Okay.  So we

1    are giving the defendant every benefit of all doubts here.  I

2    think considering the fact that they face maybe get life in

3    prison and that -- it's not a bad policy for the Court to

4    adopt under these circumstances.

5         Now let's move to count 1, act 1 and count 6.  Now

6    we're now segueing into the conspiracy to engage in sex

7    trafficking and attempted sex trafficking for Jane Doe Number

8    9.  So that adds the attempted sex trafficking.  That's what

9    make her situation different perhaps than the others.  And we

10    haven't adjusted level 31.

11         Do you take any exception to that Mr. --

12         MR. MUSA-OBREGON:  No, Your Honor.

13         THE COURT:  -- Musa-Obregon.

14         Now we're dealing with the transportation for

15    purposes of proposition.  We have to go through all of those.

16    So we start with Jane Doe Number 1.  That's in count 7.  And

17    in paragraph 515, we have a base offense level of 27.

18         I take it you have no exception to that, Mr. Musa-

19    Obregon, that it is --

20         MR. MUSA-OBREGON:  No, Your Honor.

21         THE COURT:  -- correct.

22         And we have these four levels for the use of

23    physical force that's been established.  Then we have the

24    specific offense characteristic number 2841b4b.  Those

25    numbers give the court reporters fits, don't they?

1          And that involves specifically what, Ms. Ryan?

2          MS. RYAN:  I just opened my book, Your Honor, to

3    make sure I have it correct.  It says, "If any" -- this is

4    284.1b4.  "If any other felony offense was committed during

5    the commission of or in connection with the peonage or

6    involuntary servitude offense, increase to the greater of"

7    and then sub b says --

8          THE COURT:  So that's because there was this other

9    criminal activity --

10          MS. RYAN:  That's correct.

11          THE COURT:  -- on top of that.  So I think that's

12    correct.

13          MS. RYAN:  Yes, Judge.  We agree.

14          THE COURT:  All right, so two levels are added

15    because that as a matter of law applies here.  Then we have

16    once again the vulnerable victims.  I've ruled on that

17    already.

18          MR. MUSA-OBREGON:  Your Honor?

19          THE COURT:  Yes.

20          MR. MUSA-OBREGON:  If I may, with respect to the

21    allegation of a separate criminal act committed by Mr.

22    Gerardo Flores, he is not in agreement with that.  That was

23    not part of the allocution.

24          MS. RYAN:  It certainly was, Your Honor.  The other

25    felony here is the sex trafficking.

54

```
1              THE COURT:  He allocuted to the other crimes.

2              MR. MUSA-OBREGON:  All right.

3              THE COURT:  It's not a standalone crime here, you

4    see.

5              MR. MUSA-OBREGON:  Oh, I'm sorry, I thought the

6    allocution was related to an attempted sexual assault of some

7    sort.

8              MS. RYAN:  No, Your Honor, this -- count 7 that's

9    being discussed right now --

10             THE COURT:  Right.

11             MS. RYAN:  -- is the --

12             THE COURT:  Transportation for purposes of

13   prostitution of Jane Doe Number 1.

14             MS. RYAN:  Correct.

15             THE COURT:  And it calls for two level enhancement

16   if in the course of that there was also another crime

17   committed, right?

18             MS. RYAN:  Yes, and there were several felonies

19   committed in connection with this, alien smuggling and sex

20   trafficking.

21             THE COURT:  Right.  Exactly.

22             MR. MUSA-OBREGON:  Okay.  I'm going to withdraw the

23   objection, Judge.

24             THE COURT:  Okay, so that's 39.  And then count 8

25   we're now going to go through the other Jane Does.  We have
```

1    another 39.  These are all 39's for the same reasons that we

2    just discussed in respect to count 7, so we need not take

3    time -- further time to re-articulate all of this.  Count 10,

4    the same thing; transportation for purpose of prostitution of

5    Jane Doe Number 4, so that's 39.

6            Now we come to count 15, paragraph 179.  That's the

7    conspiracy to commit eight substantive offenses, which are

8    violations of 18 U.S.C. 1328.  And we're talking about the

9    importing aliens for illegal purposes and importation of Jane

10   Doe 1 for immoral purposes.  That's a different set of

11   criminal activity.  And then the base offense level is 27.

12   Physical force is still applicable.  That's four more levels.

13   We're dealing with vulnerable victims.  That's two levels.

14   And once again, organizer of the criminal activity requires

15   four levels.  So the adjusted offense level for that crime is

16   37.

17           And that should be the same in respect to all of

18   the other count 15 situations.  Act B, for example, carries

19   37 for the same reason.  Act C carries 37 also for the same

20   reasons.  Same thing with act D.  Same thing with act E,

21   except here we have 39.

22           And once again, it's going to be reduced to 37

23   because we're not going to hold the defendant accountable for

24   the fact that the victim had not allegedly turned the age of

25   16.  So that's 37.

1          Now, we're talking about count 15, act F and that

2    will be again 37.  And then count 15, act G will be 37.

3    Count 15, act H is going to be 37.  We're not dealing with

4    the question of choking and scarring.  We made a

5    determination about that before.

6          And the next grouping here we're talking about

7    deals with the alien smuggling and alien smuggling for

8    financial gain.  And here on paragraph 230, we have a base

9    offense level of 12.

10         And unless I hear some exceptions since I don't see

11   where there's any basis for it, but nonetheless, you can

12   speak, if you wish, Mr. Musa-Obregon.  I come to a 21

13   adjusted offense level.  Do you agree with that?

14         MR. MUSA-OBREGON:  Yes, Judge.

15         THE COURT:  Now we have the multiple count

16   adjustment and we don't have any 39's anymore or are there

17   any that are left?

18         MS. RYAN:  I think they're all 37's now, Judge.

19         THE COURT:  All 37's.  I don't think it changes the

20   multiple count adjustment, so on page 50, paragraph 241,

21   we'll change that to 37 instead of 39.  We'll do the same in

22   respect to paragraph 244.  And I think that's all we need to

23   do.

24         But I still think it gets the same one count and I

25   still think we come out with eight and a half total number of

1      units and we have a five unit cap on that.  So, whichever way

2      you slice it, we have to add five.

3              So, let's take the greater of the adjusted offense

4      levels, which is 37, add the five increase, gives us a

5      combined adjusted offense level of 42.  And he gets

6      acceptance of responsibility two levels.

7              MS. RYAN:  Well, Your Honor, given the recent

8      submissions, the government would actually like to be heard

9      on that.

10             THE COURT:  Doesn't sound as if they're accepting

11     responsibility.

12             MS. RYAN:  Exactly, they're trying to withdraw

13     their pleas the day of sentence, Your Honor.  I think that's

14     a textbook rejection of responsibility and the government

15     would object to those two levels being reduced to this

16     calculation.

17             THE COURT:  That makes --

18             MR. MUSA-OBREGON:  Your Honor, there's --

19             THE COURT:  That makes good sense to me.  I mean

20     the Court painstakingly went over all their rights.  They

21     have a last minute desire to withdraw their plea.  They're

22     going to complain that they weren't given effective counsel.

23     They're going to make as much as they can over the Spanish

24     documents submitted to the Court at the eleventh hour.

25             Doesn't sound like acceptance of responsibility,

58

1    Mr. Musa-Obregon.

2              MR. MUSA-OBREGON:  Your Honor, if I can speak on

3    behalf of my defendant and also to some extent some of this

4    can be transcended to the others, they've always wanted to

5    accept responsibility with respect to portions of the charges

6    in this case, Judge.

7              They will -- my client will freely acknowledge

8    responsibility for being involved in prostitution related

9    activities.  He would have --

10             THE COURT:  I don't understand that.  You're saying

11   that they accept responsibility for the serious prostitution

12   charges.  Is there any of these charges that they pled guilty

13   that they do not accept responsibility for?

14             MR. MUSA-OBREGON:  Well, Your Honor, I'm not saying

15   that.  I'm saying to the extent that the Court is taking the

16   -- my client's latest ill-advised submission to withdraw the

17   guilty plea as a --

18             THE COURT:  What do you mean by ill-advised?

19             MR. MUSA-OBREGON:  Well, I -- Your Honor, it was

20   not something that I prepared for him.

21             THE COURT:  Right.  So you can't control your

22   client.  Did you counsel your client about this matter --

23             MR. MUSA-OBREGON:  It came as a total surprise to

24   me, Judge.

25             THE COURT:  Oh.

1          MR. MUSA-OBREGON:  And I had no awareness that

2     was --

3          THE COURT:  The last minute surprise --

4          MR. MUSA-OBREGON:  And it arrived two days ago.  I

5     think it was filed with the Court two days ago.

6          THE COURT:  All right.

7          MR. MUSA-OBREGON:  There are issues in this case

8     that transcend the idea of complete acceptance or complete

9     rejection.

10          This was a global plea, Judge, that was offered by

11     the government on the eve of trial and Mr. Carreto would have

12     no problem today, based on my conversations with him,

13     accepting responsibility for portions of it with the

14     extent -- to the extent that he now has information that some

15     of the witnesses that had been -- some of the witnesses that

16     had previously, according to the government, held one

17     position are now holding another and that he pled guilty to

18     those witnesses.  That -- I think that's part of the issue

19     that -- but with -- he's generally accepted --

20          THE COURT:  I don't understand.  The --

21          MR. MUSA-OBREGON:  -- responsibility --

22          THE COURT:  -- application -- I know that you're

23     not responsible for it and you can't be responsible for

24     everything your client does or does not do.  But the

25     application was to withdraw his guilty plea in respect to all

1      of the charges, not some of the charges.  I just went

2      through, you know, nine Jane Does here.  You're talking about

3      perhaps three of these people.  And, you know, your client

4      wants to withdraw his guilty plea completely.

5            Do you think that's acceptance of responsibility?

6      I do not.  So the -- he will not get any acceptance of

7      responsibility and the total offense level is 22.  You have

8      your record and the Court is clear about the reason why the

9      Court is --

10           MS. RYAN:  I'm sorry, Judge, I believe --

11           THE COURT:  -- not going to do that.

12           MS. RYAN:  -- the offense level's a 42.  I think

13     the Court --

14           THE COURT:  Did I say forty --

15           MS. RYAN:  -- misspoke.  You said 22, but it's 42.

16           THE COURT:  I meant 42.

17           MS. RYAN:  Thank you.

18           THE COURT:  Okay.

19           And that with a criminal history category of one

20     would call for a sentence of 360 months to life imprisonment.

21     We know we have certain statutory maximums on these various

22     charges, but counts 2 through 6 carry the 360 to life

23     potential and the probation department recommended 35 years.

24     Counts 1 and 7 through 27 have a five year cap which will run

25     concurrent.  So we understand.

61

```
1              Now it's 1:00.  Do you wish at this time to speak

2      on behalf of your client before the Court imposes sentence?

3      I will say this:  That I know there's some argument about

4      whether 50 women were, you know, victimized, so to speak.

5      The government says that there is that type of evidence.  I

6      don't see anything tangible about it.  We know that a lot of

7      victims were implicated here, but I'm not necessarily going

8      to proceed on the assumption that there was 50 or 40 or 30.

9      So you not -- need not be concerned about that.  And what

10     else do you wish me to take into consideration?

11             MR. MUSA-OBREGON:  Well, Judge, in light of the

12     fact that it is 1:00, I've been standing here for about --

13     all of us for about an hour and a half, may we continue when

14     we come back?

15             THE COURT:  We can take a lunch break now.  Would

16     that be more comfortable for you?

17             MR. MUSA-OBREGON:  Yes.

18             THE COURT:  Do you wish to have the victims speak

19     now or later?

20             MS. RYAN:  I can -- if the Court would -- I mean

21     I'm --

22             THE COURT:  It's up to them.  If it's --

23             MS. RYAN:  Right.

24             THE COURT:  -- more convenient for them now, so

25     they don't have to stay, but it's up to them.
```

1          MS. RYAN:  If you could just give us a moment to

2     check with them, Your Honor.

3          THE COURT:  Go ahead.

4        (Pause.)

5          MR. HOCHBAUM:  Judge, in any respect, regardless of

6     whether the Court wants to continue at this point in time, my

7     client had made a request that he be allowed to go to the

8     bathroom.

9          THE COURT:  The marshals are in charge of that.

10    We're going to be leaving very quickly.  He can hold out,

11    hopefully.  And you'll have ample opportunity during our

12    lunch break to talk to him.  Okay.

13         MR. HOCHBAUM:  I understand that --

14         THE COURT:  Can the marshals allow him to use the

15    facilities in the meantime while we're waiting, okay?

16         MR. HOCHBAUM:  Thank you.

17         THE INTERPRETER:  There's two, Your Honor.  The

18    other defendant also needs to go.

19         THE COURT:  Well, let's -- look, since everybody

20    has to use the facilities, we'll take out lunch break.  The

21    Court will be back --

22         MS. RYAN:  That's fine.

23         THE COURT:  -- 2:00.

24         MS. RYAN:  Thank you, Your Honor.

25         MALE VOICE:  2:00?

```
 1                    THE COURT:  2:00.

 2              (Lunch recess 1:01 p.m. to 2:18 p.m.)

 3                    THE COURT:  Ready to continue?

 4                    MR. MUSA-OBREGON:  Yes, Your Honor.

 5                    MS. RYAN:  We're ready, Judge.

 6                    THE COURT:  You're not going to have these victims

 7         speak?

 8                    MS. RYAN:  They're coming down the hall --

 9                    THE COURT:  They are coming.

10                    MS. RYAN:  -- as we speak.

11                    THE COURT:  All right, because I don't see them

12         here I just wonder, since you were speaking to them, whether

13         you want to report to the Court now as to whether they wish

14         to be heard which is their right and because we're getting

15         close to the point where they will be given that opportunity.

16                    MS. RYAN:  My understanding is that some of them do

17         wish to be heard, Your Honor.

18                    THE COURT:  And I think probably the way to do it

19         would be just before I call upon the defendant to ask whether

20         he wishes to be heard, so that he'll have the benefit of

21         hearing everything that has preceded.  That sounds about

22         right to me.

23                    MS. RYAN:  I had a slightly different idea, Judge,

24         but I can certainly see the --

25                    THE COURT:  Tell me.  It's all right.
```

1          MS. RYAN:  -- validity of the position --

2          THE COURT:  I mean I have some flexibility here.

3          MS. RYAN:  Obviously, the government's concern is

4    with the victims and that it's sort of the reverse concern

5    that the defendant might say something that they would feel

6    that they might like to respond to for the Court to consider.

7          THE COURT:  Well, you know, I guess the question is

8    whether the defendant should have the last word before

9    sentence is imposed.  My thinking is that probably is the way

10   it should be.  Because after all, the defendant is the one

11   that faces incarceration, not the victims.

12         MS. RYAN:  I understand, Your Honor.

13         THE COURT:  All right.  At this time, we made our

14   calculations and Mr. Musa-Obregon, I turn the courtroom over

15   to you if you wish to speak in behalf of where within the

16   range 360 to life your client should be sentenced.

17         MR. MUSA-OBREGON:  Your Honor, most respectfully, I

18   would ask the Court --

19         THE COURT:  Let me take it back.  That's the

20   advisory range.  You can also request that I sentence him to

21   less than the advisory range.

22         MR. MUSA-OBREGON:  Your Honor, most respectfully, I

23   do request the Court use the guidelines perhaps as in an

24   advisory fashion, but not feel that it's bound by the

25   guidelines as is your power.  Mr. Carreto -- Gerardo Carreto

1    stands before you today as a man in his earlier years of life

2    having not had a lot of experience as an adult before many of

3    these things happened.  Mr. Carreto has no criminal record as

4    he appears before you.  He has --

5              THE COURT:  He has not been in this country for

6    long, if I recall.

7              MR. MUSA-OBREGON:  That's correct, Your Honor.

8              THE COURT:  I don't remember how many months has it

9    been.

10             MR. MUSA-OBREGON:  I think it was a question of --

11   it was a short period of time, Judge.  I don't believe the

12   government's position is that he has a criminal record

13   anywhere in the world --

14             THE COURT:  No, no, no, I understand that, but

15   he -- all I'm suggesting is that, you know, when you say he

16   has a criminal history category one, to some extent, that may

17   be the product of the fact that he has only been in this

18   country a short time.  All right, go ahead.

19             MR. MUSA-OBREGON:  Well, Judge, I --

20             THE COURT:  Your argument would take on greater

21   significance if he had been here for let's say 20 years and

22   was not involved with any criminal conduct than if he was

23   here for matter of months or a few years.

24             MR. MUSA-OBREGON:  I understand, Judge, but I don't

25   think there's any evidence and I don't think the government,

1    certainly in its immense resources, would have been able to

2    dig out any evidence of any other crimes that he would have

3    been charged and convicted for in any other country.  I don't

4    think that's (indiscernible).

5              Mr. Carreto, Your Honor, is to some extent a

6    product of his environment.  There is -- and I don't know if

7    the government will ever concede this, but in the town where

8    he is from, prostitution is something that occurs very

9    frequently.  Many households, many families are involved in

10   prostitution, based on the information that I have, and --

11             THE COURT:  Yes, but, you know, I don't know

12   whether if that be the case, it entailed what happened here.

13   For example, maybe Mr. Innelli, the Court's outstanding

14   clerk, could remind the name of the co-defendant who I

15   sentenced who was the madame of the brothel in Coney Island.

16             THE CLERK:  Edith Mosquera.

17             THE COURT:  Mosquera.

18             THE CLERK:  Yes.

19             THE COURT:  Excellent.

20             But I recall her testify that the women weren't

21   given a penny.  So they weren't even to earn a dishonest

22   living, let alone an honest one.  And that struck me as

23   something that's -- you know, I recall as we go through this

24   dialogue.

25             MR. MUSA-OBREGON:  Well, Your Honor, I'm glad that

1    the Court has mentioned this point.  Mr. Carreto's position,

2    as well as I believe other people involved in this case, is

3    that although some of the profits were taken by him, it would

4    not be improper to say that the women were not being given a

5    penny, Judge.  There's evidence that some of the women

6    financed real estate back in their home country as a result

7    of the prostitution --

8            THE COURT:  Well, I'm just saying that at this

9    prior sentencing -- and I can consider everything that

10   relates to the sentence -- a co-defendant did say that, you

11   know, they never got any money.  They were picked up and, you

12   know, that'll -- we can incorporate all of that in the

13   sentencing proceeding.  But she said that they were picked

14   up.  They weren't allowed to even go home on their own.  They

15   were taken back and forth to the place where they were kept

16   basically slavery and that --

17           MR. MUSA-OBREGON:  Your Honor, I --

18           THE COURT:  -- no -- I just want to point out to

19   you so you can comment, if you wish, that there is that type

20   of testimony under oath before me.

21           MR. MUSA-OBREGON:  I understand that, Your Honor.

22   Perhaps the other type of testimony that should be under oath

23   before you is the following:  Some of these women, Judge, did

24   enjoy the opportunity of traveling on their own, meeting with

25   their friends, et cetera, et cetera.  It is inconceivable,

1    Your Honor, that the government's impression is that these

2    women were held under lock and key.  My discussions with the

3    former chief of the general crimes of the U.S. Attorney's

4    Office is not that it was that type of scenario, but it was,

5    according to the government's theory, a type of psychological

6    coercion, as opposed to --

7             THE COURT:  Well, but you know they pled guilty to

8    having, you know, visited physical force upon these people.

9    I mean that's what they said in their allocution.  You know,

10   this is a lot -- look, you have a hard job.  There's no

11   question.  I'm not disrespecting you.

12            But I have to be frank my whole way which I handle

13   sentences is to really enter into an interaction with counsel

14   so that the sentence doesn't come as a surprise.  You have

15   the collective sense of where I'm thinking where I'm going as

16   we discuss things.

17            MR. MUSA-OBREGON:  Yes.  Your Honor, I know Your

18   Honor is privy to a lot of information, some of which I'm not

19   privy to.  But I think it would be naive of --

20            THE COURT:  No, no, I'm not privy to any

21   information that you're not privy to.

22            MS. RYAN:  That's right.

23            MR. MUSA-OBREGON:  I think it would be naive for

24   the Court to believe that it would -- that these women were

25   held under lock and key and that they were not free to ever

1    leave or anything like that, or that the -- that these women

2    -- there are elements of voluntariness, as well as

3    involuntariness to some of these activities, Judge.

4         The women were subcontracted by the defendant that

5    you just mentioned, Edith Mosquera, to work in other homes

6    where the defendants were not involved in.  Those are things

7    that perhaps the government should have made aware -- should

8    have brought to your attention or did not.  The women were

9    taken to other homes out of the purview of the defendant and

10   out of the purview of Ms. Mosquera even.

11        There were money transfers sent back and home --

12   back and forth from the women to their very own families.  I

13   think the government would be very hard pressed today to

14   stand here and tell you that these women were totally out of

15   control of their -- of all financial profits that were being

16   made --

17        THE COURT:  The money went back, you know, to the

18   Carreto family, not to the victims' families.  There's

19   nothing that I have that tells me or informs the Court that

20   these monies went to the victims' family to help these poor

21   people out.

22        MR. MUSA-OBREGON:  Well, Your Honor, certainly,

23   portions and probably large portions went to the Carreto

24   family, but not all of the money went to the Carreto family.

25        THE COURT:  Well, you don't know that, do you, as a

1      matter --

2                    MR. MUSA-OBREGON:  Your Honor, this is the

3      information that I received --

4                    THE COURT:  -- of your own factual knowledge?

5                    MR. MUSA-OBREGON:  Well, we have an investigator

6      here, Judge, who came from Mexico, who was there four weeks

7      ago and he's given us this information.  He's met with the

8      families.  He's met with various people.  He's learned that

9      real estate was purchased by some of the victims' families as

10     a result of remittances --

11                   THE COURT:  All of that knowledge was within your

12     client's awareness when your client pled guilty.  He knew

13     these women.  He knew whether there were trials.  I think

14     there's some reference to some trials in Mexico.  He was

15     there.  He had all the knowledge in the world.  He didn't

16     have to wait till the veritable twelfth hour to bring some of

17     these facts out to muddy the record so that there's at least

18     some colorable claim for appeal or 2255's.

19                   MR. MUSA-OBREGON:  So --

20                   THE COURT:  He can't say that this is newly

21     discovered evidence.  He was there.  He was knowledgeable

22     about all this.

23                   MR. MUSA-OBREGON:  Well, Your Honor, we knew that

24     there were proceedings.  However, when we asked the

25     government do you have any records of proceedings, they

1    indicated that they did not and --

2              THE COURT:  And your clients weren't involved in

3    those proceedings?  There's some reference that they were

4    acquitted on some of these proceedings.

5              MR. MUSA-OBREGON:  Well, Your Honor, from my

6    understanding, they -- the proceedings that I know about my

7    client -- he was here during the course of those proceedings.

8    And I did not see a transcript, Judge.  People can conjecture

9    and talk about everything until this morning.  That's why I

10   did not want to waste anyone's time until --

11             THE COURT:  I know you're --

12             MR. MUSA-OBREGON:  -- I actually saw something.

13             THE COURT:  I know you're in a hard spot here, but

14   go ahead.

15             MR. MUSA-OBREGON:  And, Your Honor, by no --

16             THE COURT:  By the way, the investigator --

17             MR. MUSA-OBREGON:  -- stretch of the --

18             THE COURT:  Let me ask this just so the record's

19   complete.  The investigator that produced this Spanish

20   document I assume is paid by your client and --

21             MR. MUSA-OBREGON:  Yes.

22             THE COURT:  -- the defendants, right?  So I guess

23   they had more money at their disposal and more wealth at

24   their disposal than the victims.  Because you were making the

25   argument that they --

1          MR. MUSA-OBREGON:  Oh, I have --

2          THE COURT:  -- all came from poverty, but it seems

3     like --

4          MR. MUSA-OBREGON:  Well, Your --

5          THE COURT:  -- right there -- let me finish --

6     is --

7          MR. MUSA-OBREGON:  Yes.

8          THE COURT:  -- pretty good evidence, not that we

9     need it necessarily in the context of everything else, that

10    your clients were more privileged than these other people

11    because they were able to afford counsel, they were able to

12    afford an investigator.

13         So, I'm not saying that they don't have a right to

14    do that, but it does suggest that they were not on the same

15    economic level as the victims.  Okay, go ahead.

16         MR. MUSA-OBREGON:  Yes.  Your Honor, by no stretch

17    of the imagination am I trying to in any way excuse Mr.

18    Carreto for the crimes that he's pled guilty to and for what

19    he will be sentenced today.

20         I am merely making an argument of proportionality

21    that there are elements to the government's case that are

22    overblown.  That is that there are elements that to the --

23    certainly the number of people, certainly the number of --

24         THE COURT:  I'm not -- I told you I'm not going

25    to --

1          MR. MUSA-OBREGON:  -- certainly the financial

2     disparity --

3          THE COURT:  I told you I'm not going to take the 50

4     people into consideration.  I don't have any hard evidence

5     about that.  I think there's ample evidence to support there

6     is lots of money involved here without necessarily putting a

7     particular dollar figure on it.

8          So, you know, you can rest assured that your

9     arguments are well-intentioned and, you know, I'm taking them

10    seriously.  Go ahead.

11         MR. MUSA-OBREGON:  Right.  Your Honor, to the

12    extent that the Court is considering financial issues about

13    investigators that the investigator, Judge, has been paid

14    $3,000 for a two-week stay in --

15         THE COURT:  I think I put it in proper context.

16         MR. MUSA-OBREGON:  No, I understand.  But I'm

17    trying to say this was not -- he's essentially doing it pro

18    bono from what I --

19         THE COURT:  Right.

20         MR. MUSA-OBREGON:  -- from what I'm hearing from

21    him to the extent that he's going on a leap of faith and

22    trying to vindicate these -- to the extent that he can,

23    certain aspects --

24         THE COURT:  But money was going back to the Carreto

25    family.  We know that.  I mean we know that from a number of

1      sources --

2              MR. MUSA-OBREGON:  Yes.  Yes, Your Honor.

3              THE COURT:  -- and you don't say otherwise.

4              MR. MUSA-OBREGON:  There is certainly an element of

5      domination and control, et cetera, et cetera, but it is not

6      to say that they were living as virtual slaves, Judge, and

7      that's the point I'm trying to make.

8              THE COURT:  You made your point.

9              MR. MUSA-OBREGON:  It may be more akin to the type

10     of domination and control that exist in certain other types

11     of scenarios, but it is not a slavery master type of

12     relationship as the government would like to make it seem.

13             Mr. Carreto in all --

14             THE COURT:  I didn't think the government made it

15     seem that way at all.  They pled guilty to 27 counts or the

16     entire indictment.  Who pleads guilty to an entire indictment

17     if there's nothing very, very viable and compelling about the

18     charges?

19             MR. MUSA-OBREGON:  Well --

20             THE COURT:  All right, go ahead.

21             MR. MUSA-OBREGON:  Well, Your Honor, one of the

22     reasons they pled guilty, Judge, is because they were led to

23     believe by the government that the victims in this case had

24     absolutely nothing favorable to say about them --

25             THE COURT:  They could have gone to trial.

1          MR. MUSA-OBREGON:  -- and that is directly

2     contradicted by the --

3          THE COURT:  They could have gone --

4          MR. MUSA-OBREGON:  It is directly --

5          THE COURT:  -- to trial.  They could have cross-

6     examined the witnesses.  They had all these rights.  All

7     right, go ahead.  What else?

8          MR. MUSA-OBREGON:  As lawyers --

9          THE COURT:  We were ready to go to trial.

10          MR. MUSA-OBREGON:  Yes, as lawyers, Your Honor, we

11     make it -- we make judgments based on the evidence that the

12     other side shows us.  We had no idea that these transcripts

13     existed, which to a large extent, exonerates the defendants

14     based on those particular witnesses, Judge.

15          THE COURT:  Your argument's -- you keep coming back

16     and that's all you're going to trot out before the Circuit

17     Court of Appeals, but it's silly.  Go ahead.  What else?

18          MR. MUSA-OBREGON:  Mr. Carreto, Judge, as a

19     relatively young man, is keenly aware of --

20          THE COURT:  How old is he?  Thirty?

21          MR. MUSA-OBREGON:  I'm trying to remember, Judge.

22          MS. RYAN:  He's 34.

23          MR. MUSA-OBREGON:  I think he just turned --

24          THE COURT:  Thirty-four.

25          MR. MUSA-OBREGON:  -- 34.

1              -- is keenly aware of the decisions that he's made

2      in his life --

3              THE COURT:  Are you suggesting because prostitution

4      may be rampant in Mexico that the United States of America

5      should condone it --

6              MR. MUSA-OBREGON:  No, no.

7              THE COURT:  -- when it happens here?

8              MR. MUSA-OBREGON:  No, of course not, Judge.  What

9      I'm trying to --

10             THE COURT:  Or should we send a message out that we

11     will do the opposite?

12             MR. MUSA-OBREGON:  No, no, of course not.  I don't

13     think this should be a message case at all, Judge.  I

14     think --

15             THE COURT:  You don't think so?

16             MR. MUSA-OBREGON:  Your Honor, I think --

17             THE COURT:  You don't think it's necessary to

18     perhaps send a message to others who may want to come to the

19     United States because they think prostitution is A-okay and

20     everything else that happened here is okay?

21             MR. MUSA-OBREGON:  Your Honor, I think Mr.

22     Carreto --

23             THE COURT:  You don't think they should be dealt

24     harshly and a message should be sent that this is not going

25     to be accepted in this country?  Especially since you tell me

1    it's okay in Mexico.

2              MR. MUSA-OBREGON:  Judge, I'm not saying it's okay.

3    I'm saying it's something that happens in that particular

4    town.

5              THE COURT:  Maybe it won't happen in this country

6    if the proper message is given.  Go ahead.

7              MR. MUSA-OBREGON:  Your Honor, I think Mr.

8    Carreto --

9              THE COURT:  We are not Mexico.  I love Mexico.

10   Don't get me wrong, but we have different laws and different

11   concepts of justice, perhaps.

12             MR. MUSA-OBREGON:  Your Honor, I think in this

13   particular case, Mr. Carreto should be judged and sentenced

14   according to his own actions.  And I don't think this should

15   be a test case or anything of the sort where I know the

16   government spent millions of dollars on this particular

17   case --

18             MS. RYAN:  Your --

19             THE COURT:  I'm going to sentence somebody because

20   they pled guilty to 27 terrible counts of criminal behavior.

21   That's why I'm going to sentence him.  And it's going to be

22   based upon the facts that I have and the law that I'm going

23   to apply.  That's all I'm going to do.  Nothing else.

24             Anything else you have to say?

25             MR. MUSA-OBREGON:  Mr. Carreto, Judge, as he stands

1    before you, is at a crossroads in his life.  He's 34 years

2    old.

3              THE COURT:  He is at a crossroads.

4              MR. MUSA-OBREGON:  And in this particular

5    situation, Judge, I would ask you to consider sentencing him

6    to 12 years.  I think that would be a number that would

7    certainly send out all the signals that the Court would

8    like to --

9              THE COURT:  All right.  Well, you're doing a good

10   job as his lawyer.  We do candidly have different numbers in

11   mind.  Anything else you wanted to say?

12             MR. MUSA-OBREGON:  Yes, Judge.  The specific

13   instances of violence that are directly attributed to him,

14   Your Honor, are not particularly egregious or very -- in

15   light of the entirety of this accusation, Judge, which is

16   such a big case, the actual specific acts of violence that

17   are attributed to him are not high in numbers, Judge.

18   They're a few instances in the course of several years.

19             I ask the Court to take into account the totality

20   of the circumstances in this case and sentence him to

21   something outside of the range as I had indicated, Judge.

22             THE COURT:  All right.  I can only sentence him

23   some -- outside the range if I depart from the lower and I

24   can't sentence him outside in the higher end because the

25   higher end is life.  So we understand each other.

1          Now, Ms. Ryan, at this time, what do you wish to

2     do?

3          MS. RYAN:  Your Honor, if I could just respond to a

4     few things that defense counsel just stated and then perhaps

5     bring up --

6          THE COURT:  Go ahead.

7          MS. RYAN:  -- some of the victims to speak.

8          In no particular order.  In response to Mr.

9     Obregon's assertion that the government had only said that

10    the victims in this case had only had one position and now

11    there may be this mysterious second position that's more

12    favorable to their clients, I'll simply state that as is

13    customary in this district prior to trial, the victims who

14    were going to be trial witnesses we provided *Giglio* materials

15    in a letter to the defense in accordance with our obligations

16    and there were indications in those letters that at

17    particular points in time, there were statements made by

18    these victims that could arguably used -- be used for cross-

19    examination --

20         THE COURT:  Now I haven't seen that.  And no, it

21    isn't necessary for me to have seen that, unless it was

22    called to my attention.  But you are making a representation

23    now as an officer of the court, as well as persons upholding

24    the hard traditions of your office, that all *Giglio* material

25    was turned over and that includes statements by some of these

1    people that suggested that they were making up these stories?

2            MS. RYAN:  No, Your Honor, that's not what I'm

3    saying.  What I'm saying is that we, in our *Giglio* letter,

4    disclosed that one of the victims in this case had given a

5    statement down in Mexico at some point to the best of our

6    understanding, but it was at the request of the defendants.

7            THE COURT:  Did you disclose what that statement

8    was or you had no knowledge?

9            MS. RYAN:  We disclosed our sum and -- the best

10   understanding we had of the sum and substance of those

11   statements.  We did not physically have those statements

12   because they were in control of the Mexican government.

13           THE COURT:  Do you have an idea what the sum and

14   substance were what you disclosed to the defendants in your

15   *Giglio* disclosure?

16       (Pause.)

17           THE COURT:  Make sure you have it accurate because

18   you're making a representation --

19           MS. RYAN:  Absolutely, Judge.

20           THE COURT:  -- that you made these disclosures.

21           MS. RYAN:  I think that our disclosure was somewhat

22   general, Your Honor, and it's been a while since I looked at

23   it, but I think it had something to do with --

24           THE COURT:  Just be careful because, you know, if,

25   in fact, there were disclosures that arguably could have some

1     relevancy on some issues here.

2              MS. RYAN:  I just wanted to make the Court aware

3     that we've complied with our *Giglio* obligations here.

4              THE COURT:  You're backing away a little bit now.

5     I mean I have to be fair --

6              MS. RYAN:  I don't want to misspeak, Your Honor.  I

7     don't have the letter with me here today.

8              THE COURT:  You ought not be to misspeak.  Be very

9     careful.

10             MS. RYAN:  Thank you.

11             THE COURT:  What else?

12             MS. RYAN:  With respect to Mr. Obregon's comment

13    that the violence perpetrated by Gerardo Flores Carreto

14    really wasn't so bad, it wasn't so often, just by way of

15    example, Your Honor, I'd like to point you to paragraphs 59

16    of the presentence report on page 16 where referenced to him

17    repeatedly raping one of the victims in this case after

18    basically kidnapping her.

19             In paragraph 60, the final sentence of that

20    paragraph is that he hit the victim repeatedly in the face

21    with a cable, leaving her bloody and bruised.

22             THE COURT:  That comes from I guess it's

23    information obtained from the victims --

24             MS. RYAN:  Yes.

25             THE COURT:  -- I assume.

1          MS. RYAN:  So, the government takes issue with his

2     characterization of his client's level of violence in this

3     case.  To best of our knowledge, he was an extremely violent

4     person who routinely beat his victims and threatened them

5     with death.

6          With respect to his -- defense counsel's comments

7     that -- about voluntariness generally in these kinds of

8     cases, I just like to remind the Court about the -- what the

9     Trafficking Victims Protection Act indicates which is that

10    you don't need to have someone chained up in order to have

11    total control of them.  The congress has recognized the kind

12    of control that human traffickers have over their victims and

13    that was certainly at play here.  That's just simply not

14    necessary.  They don't need to be locked up.  These women

15    were under the complete control of the defendants.

16          THE COURT:  There's a congressional finding here.

17          MS. RYAN:  Yes, Your Honor.

18          Also just the defendant's own words contradict some

19    of defense counsel statements here.  The defendant, as the

20    Court has recognized repeatedly, pled guilty to the

21    indictment in this case and he pled guilty to forcing his

22    victims to commit prostitution.  He also --

23          THE COURT:  He allocuted to that.

24          MS. RYAN:  I'm sorry?

25          THE COURT:  He specifically allocuted to that --

1          MS. RYAN:  He specifically -- on page 76 and page

2     77 of the guilty plea transcript, he specifically allocated

3     to forcing specific victims into prostitution.

4          THE COURT:  Allocute, not --

5          MS. RYAN:  Thank you very much, Judge.  He also

6     admitted to using force against these victims.  And he

7     specifically allocuted to the fact that he didn't allow these

8     victims to keep any money they received from engaging in

9     prostitution.

10         THE COURT:  That's right.  Now you remind me of

11    that.

12         MS. RYAN:  He specifically admitted that during his

13    guilty plea.

14         THE COURT:  Shall we hear from the victims at this

15    point?

16         MS. RYAN:  One moment, Judge.

17       (Pause.)

18         MS. RYAN:  One thing I just would like to clarify,

19    Judge, with respect to the monies that were sent from New

20    York down to Mexico that were the proceeds of the forced

21    prostitution activity.  The lion share of that money did go

22    to the Carreto family organization to co-conspirators.

23    Sometimes the defendants themselves when they were still in

24    Mexico.  There were very small instances where victims were

25    permitted by the defendants to send nominal amounts to their

84

1          own family members.

2                     For example, they were allowed to send $80 or $100

3          once or twice over the entire course of the offense conduct.

4          Meanwhile, thousands of dollars were being sent each week by

5          the defendants back to the criminal organization.

6                     THE COURT:  You have any specific knowledge of

7          that, how much money was sent down there?  I know that

8          there's references to all of this in your letter, but --

9                     MS. RYAN:  We -- in preparation for trial, Your

10         Honor, and as indicated in our letter that was filed

11         yesterday, hundreds of pages of wire transfer records were

12         provided in discovery to the defense and the government

13         reviewed those obviously and we came up with some round

14         numbers, but we're not confident that that's all the money

15         that was sent.

16                    THE COURT:  Based upon the wiretaps and you turned

17         them over to defendants --

18                    MS. RYAN:  Not wiretaps, Judge, wire -- money

19         remitters.

20                    THE COURT:  Money wired.

21                    MS. RYAN:  Wire -- money wires.

22                    THE COURT:  Wired monies.

23                    MS. RYAN:  Yes.

24                    THE COURT:  What did that come out to that was

25         actually turned over to the defendants --

1          MS. RYAN:  It was --

2          THE COURT:  -- roughly?

3          MS. RYAN:  It was in excess of $150,000 that had

4     been sent during certain points in time.  We had incomplete

5     records and incomplete information.

6          THE COURT:  At the very minimum, it was at least

7     that that was --

8          MS. RYAN:  Yes.

9          THE COURT:  -- documented and --

10         MS. RYAN:  Yes.

11         THE COURT:  -- the defendants were apprised of

12    that --

13         MS. RYAN:  Yes.

14         THE COURT:  -- by giving them notice and copies of

15    the wire --

16         MS. RYAN:  Yes.

17         THE COURT:  -- transfers.

18         MS. RYAN:  That's correct.

19         THE COURT:  Anything else?

20         MS. RYAN:  No, Judge, I think I'd like to see if

21    any of the victims would like to speak --

22         THE COURT:  Let's do that now.

23         MS. RYAN:  Thank you.

24       (Pause.)

25         THE COURT:  Yes, now who do we have here?

1          OLIVIA:  Olivia.  I am the victim of Gerardo

2     Flores.

3          THE COURT:  All right, now she doesn't have to be

4     placed under oath, but I'll leave the choice to her if she

5     wants to.

6          OLIVIA:  I do.

7          THE COURT:  All right, so at this time, the clerk

8     of the court, who has just left --

9          Mike, do you want to place this person under oath,

10    please?

11         THE CLERK:  Yes, Your Honor.

12         THE COURT:  That's what her preference is.

13         THE CLERK:  First I'll ask the interpreter if you

14    can raise your right hand.

15       (The interpreter is sworn.)

16         THE CLERK:  Please state and spell your name for

17    the record.

18         THE INTERPRETER:  Libia Clancy, C-l-a-n-c-y.

19         THE CLERK:  Thank you.

20         I ask the victim if you could raise your right

21    hand?

22       (Olivia Gutierrez is sworn.)

23         THE COURT:  All right, now bear in mind since

24    you -- I gave you the choice of whether you wanted to talk to

25    me under oath or not, so by choosing to speak under oath,

1    that means if you do not speak truthfully, you run the risk

2    of being prosecuted for perjury or making a false statement

3    under oath.  I just want to counsel you about that.

4                MR. HOCHBAUM:  Your Honor, I'll raise an issue.  I

5    have an objection to the use of this interpreter.  It's an

6    interpreter hired by the government.  I would ask the Court

7    to have an official court interpreter.  This is a woman who

8    was at every proffer session used by the government.  She

9    works specifically for the U.S. Attorney's Office.  I can

10   already tell by the emphasis which she placed the name of the

11   defendant upon the record that she is not --

12               THE COURT:  Not -- yes, go ahead.

13               MR. HOCHBAUM:  -- a impartial --

14               THE COURT:  Here's what we'll do.

15               Ms. Ryan, the interpreter has credentials that you

16   know of?

17               MS. RYAN:  Yes, Your Honor.

18               THE COURT:  All right. State it on the record.

19               MS. RYAN:  My understanding is that Ms. Clancy is a

20   certified Spanish interpreter and that she in fact worked in

21   this courthouse for many years.

22               THE COURT:  Ms. Clancy, are you certified as a --

23               THE INTERPRETER:  Yes, I am.

24               THE COURT:  -- official interpreter?

25               THE INTERPRETER:  Since 1980.

1          THE COURT:  And how long have you been working in

2     this courthouse as an interpreter?

3          THE INTERPRETER:  Since 1966.

4          THE COURT:  All right, that's on the record.

5          Now. we'll do something else, Mr. --

6          MR. HOCHBAUM:  Judge, my problem was not the fact

7     that Ms. Clancy is a certified Spanish interpreter.  It is

8     with the fact that she is retained and paid by the U.S.

9     Attorney's Office, not by the court.  She is not an

10    independent contractor.  She is an employee of the United

11    States Attorney's Office.

12         THE COURT:  That's doesn't mean she's not

13    qualified --

14         MS. RYAN:  Your Honor, she actually is an

15    independent contractor.  She is not an employee of the United

16    States Attorney's Office.  She is a contractor --

17         THE COURT:  She's a contractor --

18         MS. RYAN:  -- who does work for our office.

19         MR. HOCHBAUM:  But she works for their office, not

20    for the courts.

21         THE COURT:  All right, Mr. Hochbaum, you made your

22    record.

23         Now, Mr. Musa-Obregon, you're still here.

24         MR. MUSA-OBREGON:  Yes, I am, Your Honor.

25         THE COURT:  So you come forward and stand up here,

1    since you are fluent in Spanish.  It's good to wear

2    suspenders and a belt.  As an officer of the court, you

3    listen carefully to Ms. Clancy's interpretation.  If there's

4    anything that strikes you as odd or not evenhanded, you let

5    me know as an officer of the court.  Okay, thank you.

6            All right, now continue.  Let me hear from --

7            Your name again is?

8            MS. GUTIERREZ:  Olivia Gutierrez.

9            THE COURT:  I'll call you Olivia.  You're free to

10   speak as a victim.  You have the right to address the Court

11   at this time if you choose to do so.  Go ahead.

12           MS. GUTIERREZ:  Okay.  I understand the defense

13   attorneys that is their job to defend them.  But actually,

14   they were never in my shoes.  They never knew what I actually

15   had to live through because it's not difficult because it's

16   not the same to say something that you live in.

17           So, what I am asking you is to give this man,

18   Gerardo Flores, the high conviction that they deserve because

19   he in fact has hurt a lot.  There are a lot of victims, not

20   just myself.  I am the person who started in prostitution

21   prior to my 16th birthday.  And I know him well.  So, the

22   only thing that I would also like to ask you is that my

23   daughter be returned to me because he took her away.  She is

24   now eight years old and I don't even know her.  And they

25   still have her.

1          THE COURT:  Do you know where your daughter is

2     today?

3          MS. GUTIERREZ:  No.  I have an idea that she is

4     with her family, but only because of the process that I'm

5     undergoing in Mexico for the custody.

6          THE COURT:  All right.  So you -- thank you very

7     much.  Muchos gracias.

8          Anybody else wish --

9          You may sit down.  Thank you.

10    (Pause.)

11         MS. RYAN:  Yes, Your Honor, there's another victim.

12    If I could just clarify or add something to what Olivia just

13    stated, the government has been trying to make efforts to

14    help with returning her daughter to her and have not

15    succeeded yet.  Just want to put that on the record.

16         THE COURT:  Now who do we have here now?

17         MS. CRUZ:  My name is Maria (indiscernible) Garcia

18    Cruz.

19         THE COURT:  All right, now I'll give you the same

20    option that I gave to the prior person.  You can speak to the

21    Court.  You don't have to be placed under oath.  But if you

22    wish to be placed under oath and swear to the truthfulness of

23    your comments, I'll give you the opportunity to do that if

24    that is your desire.

25         MS. CRUZ:  I do.

91

```
1              THE COURT:  All right, so the clerk of the court

2    will administer an oath to you.

3              THE CLERK:  I ask you'll raise your right hand?

4         (Maria Cruz is sworn.)

5              THE CLERK:  Thank you.

6              THE COURT:  Now, before you continue since you have

7    taken an oath, be mindful now that if you do not speak the

8    truth, that you could be prosecuted for perjury or rendering

9    a false statement under oath.  Bear that in mind and at this

10   time, you're free to speak to me as you choose.

11             MARIA:  Yes.  Your Honor, I am here because I want

12   these people to be punished with a very stern sentence for

13   them.  I was badly hurt.  They abused me, seduced me, abused

14   me and tried to woo me.  He wooed me so much only so that I

15   would go work for him.

16             Aside from that, he played with my feelings.  He

17   toyed with my life.  And he stepped on me as though I were

18   garbage.  He did not have the slightest consideration towards

19   me, towards my daughters.

20             And frankly, I know they don't have the slightest

21   idea what the value of a human being is.  They don't care

22   about destroying people's lives because what they want is

23   money.  What they want is to dominate the world by having a

24   lot of women to themself.  They feel like gods before a woman

25   who has no defense because she's beaten and they totally
```

1      mistreat them or --

2              THE COURT:  Anything else?

3              MS. CRUZ:  That's all.

4              THE COURT:  Thank you very much.

5              Anybody else, Ms. Ryan?

6              MS. RYAN:  Let me check, Your Honor.

7              Yes, Your Honor.

8          (Pause.)

9              THE COURT:  All right, and your name?

10             MS. PALMERA:  Veronica Palmera.

11             THE COURT:  All right, Miss Palmera, once again,

12     you can talk to me without being placed under oath.  That's

13     perfectly acceptable.  But if you choose, you can also take

14     an oath which means you'll swear to the truth and I'll give

15     you the option either way.

16             MS. PALMERA:  I just want to talk without having to

17     be under oath.  I just want to tell you something.

18             THE COURT:  Go ahead.

19             UNIDENTIFIED MALE:  Your Honor, I ask that she --

20             MS. CRUZ:  The harm that you have --

21             THE COURT:  Excuse me, stop one second.  What?

22             MS. CRUZ:  -- caused is irreversible.

23             THE COURT:  Just one second.

24             UNIDENTIFIED MALE:  I'm sorry, Judge, I ask that

25     she identify who she's talking --

1          THE COURT:  Who are you speaking about?

2          MS. CRUZ:  Gerardo Flores Carreto.

3          THE COURT:  Go ahead.

4          MS. CRUZ:  The harm you have caused is

5     irreversible.  It's not fair.  As a woman, I cannot wish that

6     upon anybody and as a man, you're not worth it.  That's all.

7          THE COURT:  Thank you very much.

8          Anybody else?

9          MS. RYAN:  Your Honor, I think -- Your Honor, we're

10    having a little bit of confusion here because some of the

11    women were primarily victimized by one particular defendant

12    as opposed to another, but if the Court is willing to listen

13    to the victims generally now --

14         THE COURT:  The ones who spoke so far I take it

15    they were talking about the defendant, Gerardo Flores

16    Carreto.  We should clarify that if there is any -- if I'm

17    under an improper --

18         MS. RYAN:  No, you're --

19         THE COURT:  -- understanding.

20         MS. RYAN:  -- 100 percent correct.

21         THE COURT:  All right.  Now let's hear from this

22    person.

23         Your name?

24         MS. ROMERO:  Veronica Romero.

25         THE COURT:  Romero, is it?

```
 1              THE INTERPRETER:  Romero.

 2              THE COURT:  Okay.  Do you wish to testify -- do you

 3      wish to speak under oath or without taking an oath?

 4              MS. ROMERO:  No oath.

 5              THE COURT:  All right, you're not going to be

 6      talking to me under oath.  You can say what you wish to say.

 7              MS. ROMERO:  What I'm going to say goes to Josue

 8      Flores.

 9              THE COURT:  Just one second.  I'll listen to you,

10      even though we're not talking about Gerardo.  I understand

11      what you're saying now doesn't deal with Gerardo, but deals

12      with Josue.  All right, go ahead.

13              MS. ROMERO:  Yes.  I hope that justice is properly

14      applied.  He hurt me a great deal.  And it was not fair when

15      my parents came to visit me at his house that they were

16      beaten by Josue.  His mother tried to beat up my parents who

17      were just trying to come visit me.  And when I realized that,

18      it was too late to see my parents when they were being beaten

19      up.  And I hope that justice is done because of that.  That's

20      all that I ask you.

21              THE COURT:  Thank you very much.

22              Now the folks who spoke before they were speaking

23      only about Gerardo or they wish to be heard with respect to

24      the other defendants as well?  I just have to be clear about

25      that.
```

1          MS. RYAN:  I appreciate that, Your Honor.  The

2     first three women who spoke were speaking about Gerardo

3     Flores Carreto.  The woman who just spoke was speaking in

4     reference to Josue Flores Carreto.  And we have other victims

5     here who may or may not choose to speak with respect to the

6     other defendant, Daniel Perez Alonso.  If we -- I'll leave it

7     to the Court's discretion as to --

8          THE COURT:  Well, it might be best if --

9          MS. RYAN:  -- when that is appropriate.

10          THE COURT:  -- we just had those people speak in

11     respect to this particular defendant and to indicate whether

12     they are commenting about more than just this defendant, so

13     the record is clear what we are referring to.  Anybody else

14     now?

15          MS. RYAN:  We'll check.

16       (Pause/Court and clerk confer.)

17          THE COURT:  Yes, we have someone else?

18          MS. RYAN:  Your Honor, I just checked with the

19     victims.  With respect to the defendants that have -- with

20     respect to Gerardo Flores Carreto, no one else wishes to say

21     anything at this moment.  With respect to the other

22     defendants generally, no one wishes to say anything else

23     right now.  I would ask the Court for the opportunity to

24     check with them again after they've heard some of the

25     additional statements that defense counsel may make to see if

1          they change their minds.

2                    THE COURT:  All right, I think that is clear enough

3          now.

4                    All right, at this time, the defendant, Gerardo

5          Flores Carreto, is entitled to speak to the Court before

6          sentence is imposed.

7                    And, Mr. Musa-Obregon, would you have him step up

8          here.  If he wishes to speak to me, that is his right.

9               (Pause.)

10                   DEFENDANT GERARDO CARRETO:  Good afternoon.  First

11         of all, what I would like to say is the victims that spoke

12         just now is their word against mine.

13                   THE COURT:  They're what?

14                   THE INTERPRETER:  It's their word against mine.

15                   THE COURT:  I understand.

16                   DEFENDANT GERARDO CARRETO:  From the very beginning

17         I said that I was guilty of prostitution, not that I was a

18         coyote (phonetic)or the other things that I'm being accused

19         of.

20                   THE COURT:  You pled guilty to all those.  You

21         allocuted.  You specifically told me that your crimes involve

22         more than just simple prostitution.  You talked about

23         physical beatings.  You talked about being an organizer.  You

24         talked about alien smuggling.  You talked about sex

25         trafficking.  You said that through your own lips after I

1    questioned you extensively.  You had the right to go forward

2    with your trial and maybe your defenses that you think you

3    had would have gone out, but you pled guilty to everything,

4    not just prostitution.

5              DEFENDANT GERARDO CARRETO:  I'm sorry for my

6    ignorance.  First of all, I don't know English.  Second, my

7    attorney knew that there is evidence and that I wanted to go

8    to trial.

9              THE COURT:  You refuse to accept responsibility.

10   You're telling me you lied when you told me under oath that

11   you were guilty.  You told me you -- in effect you're telling

12   me you lied when you explained the circumstances of your

13   criminal activity in response to my questions when I asked

14   you to tell me what you did to justify my accepting your plea

15   of guilty.  You are not accepting responsibility and you are

16   lying to the Court now.  What else do you have to say?

17             DEFENDANT GERARDO CARRETO:  No, I'm sorry.  It's

18   just that it was confusion.

19             THE COURT:  I tried my very best ability to make

20   sure there was no confusion.  I gave you time and again, you

21   know, information about your rights.  I protected your right

22   to have counsel who would be competent and who would protect

23   your interest.  I did everything imaginable to make sure you

24   understand every single thing that was happening.  You had

25   the ability to have counsel and interpreters as well explain

1   everything to you thoroughly.  So the fact that you don't

2   speak English doesn't really enter into the equation here,

3   does it?

4            DEFENDANT GERARDO CARRETO:  With all due respect to

5   you, once I emphasized to have my attorney changed.  You did

6   not allow it.

7            THE COURT:  I asked you specifically whether you

8   were satisfied with Mr. Lashley's services and told you how

9   important it was for me to make sure that you were

10  comfortable with that.  You told me under oath that you were.

11  You told me that you were going to withdraw any complaints

12  against Mr. Lashley.  I told you --

13           MR. HOCHBAUM:  Your Honor --

14           THE COURT:  -- how important it was for me to

15  explain that to you.

16           MR. HOCHBAUM:  Your Honor, this defendant was never

17  represented by Mr. Lashley.

18           THE COURT:  Oh, I'm sorry.  My mistake, but we went

19  through all of your rights as to whether or not you have been

20  given proper counsel.  Now you're telling me you weren't

21  given proper counsel.  My mistake.  I thought you were -- Mr.

22  Lashley was your attorney because that was the arguments that

23  were made about him.  I didn't realize you had similar

24  complaints.  This is the first I'm really hearing of that so

25  specifically.  Go ahead.  I'm sorry, my apologies.

1          DEFENDANT GERARDO CARRETO:  How could I go to

2     trial?  First of all, I have no relatives here.  No one.  I

3     had no proof.  Everything had to come from Mexico.  I don't

4     know.  I'm confused now.  I don't know what to do.  There is

5     evidence that shows that I'm not guilty.  There's a video

6     where more than one victim threatens death and I don't know

7     why.  Now the girls are alleging this.  I don't know.  We

8     were never allowed to speak with them.  Supposedly she's my

9     wife supposedly because -- I don't know what's going on.

10          THE COURT:  Okay.  Anything else?

11          DEFENDANT GERARDO CARRETO:  Please have mercy.

12    Show the evidence.  Please.  Think that it is my life out of

13    state and I have a daughter; nine year old daughter.  She

14    said eight years.  She never dealt with my daughter.  She

15    never bothered to make a phone call and I never forbid her to

16    do anything.  She could have gone any day at any time.  What

17    was the pressure on her?  What was -- what were the threats?

18    When my daughter had her three year birthday, her mother and

19    her sister were at the party.  Everything she has said is a

20    lie.

21          And if it's true that when I left her, why did she

22    continue with prostitution?  That makes no sense.  They had a

23    cellular phone.  They could go out at any time they wanted.

24    There's evidence of that.  Unfortunately, it all came too

25    late because it's all in Spanish.  Have mercy.  It's my life.

1      Be merciful.

2            THE COURT:  All right.  In imposing sentence, the

3      Court considers the advisory guideline range of 360 months to

4      life and also the factors set forth in 18 United States Code

5      Section 3553(a).  And in particular, the following aspects of

6      that subsection.  One, the nature and circumstances of the

7      offense and the history and characteristics of the defendant.

8            In that respect, the nature and circumstances of

9      the offense I find to be appalling.  We're not talking about

10     one victim.  We're not talking about two victims.  We're

11     talking about multiple victims that the defendant pled guilty

12     to violating in a number of ways.

13           And the Court doesn't have, as hard as I have

14     searched, the proper words to express the Court's shock and

15     disgust for the nature of the criminal behavior of this

16     defendant.  The Court cannot overlook and will not overlook

17     the nature of the multiple charges and the pleas by the

18     defendant to each and every one of those charges, the

19     physical factors associated with them, the vulnerability of

20     the victims and all of these other aspects that make these

21     crimes horrendous.

22           Now, the statute also speaks about the need for the

23     sentence imposed to reflect the seriousness of the offense,

24     to promote respect to the law and to provide just punishment

25     for the offense.  And also talks about the need to afford

1    adequate deterrence to criminal conduct in the United States.

2    I'm not going to speak about Mexico.  I have great respect

3    for the country, Mexico.  I can only talk about the laws of

4    the United States which I am familiar with.

5           We do not condone the crimes that you have pled

6    guilty to and sex trafficking and all these other crimes that

7    you have pled guilty to are things which, in this country of

8    ours, we take a very, very very dim view of.

9           And it's, I think, terribly important in particular

10   in this case to send a message loud and clear that people --

11   I don't care where they come from, whether they come from the

12   United States, Mexico, any place.

13          If they commit these crimes in the United States,

14   they're going to be treated harshly by the law.  We look upon

15   these types of crimes as amongst the most seriousness -- I

16   should say amongst the most serious of crimes that can be

17   committed.

18          The violation of women, the disrespect for women,

19   all of these issues are matters which we take quite seriously

20   in this country and our laws reflect that.  And a stiff

21   sentence is required here in my opinion to send a clear

22   message that these types of criminal conduct will not be

23   tolerated under our laws.

24          And of course, you know, we want to protect the

25   public from further crimes of this nature.  There's nothing

1    that suggests to me that the defendants would not return to

2    their crimes.  They have a hard time accepting responsibility

3    for their acts here.  We've discussed that at length and I

4    think those factors all suggest that the Court must deal

5    harshly in sentencing this defendant.

6         I don't see any particular history or

7    characteristics of the defendant that weight so heavily in

8    his favor to great the type of leniency that the defendant

9    would like to have the Court visit upon.

10        I've considered all the factors under 3553(a), as

11   well as the advisory guideline range and I think the

12   reasonable sentence in this particular -- in this case is 50

13   years of incarceration on counts 2 through 6.  They will run

14   concurrent on each other.  There will be five years of

15   supervised release with a special condition that the

16   defendant, if deported, may not re-enter the United States

17   illegally.

18        Respect to counts 1 and counts 7 through 27, there

19   is a five year maximum will be imposed on each count.  They

20   will be concurrent to each other and concurrent to the 50

21   years imposed on counts 2 through 6 all to run concurrent

22   with each other.

23        There is no fine that's going to be imposed upon

24   the defendant.  He doesn't have the capacity to pay a fine.

25   There's a mandatory $2,700 for special assessment purposes.

103

1       That's $100 for each of the 27 crimes that the defendant has

2       pled guilty to.

3              There are general conditions of supervised release,

4       which the Court is going to give to the defendant.  I should

5       say on counts 1 and 7 through 27, the period of supervised

6       release is three years.  That will run concurrent with the

7       five years in respect to the other counts.

8              The general conditions of supervised release are

9       begin given to the defendant in Spanish and you are to read

10      them and to abide by their conditions if and when they become

11      applicable.

12             Last, there is nothing that tells me that you have

13      waived your rights of appeal.

14             MS. RYAN:  That's correct, Your Honor.

15             THE COURT:  And so I advise you at this time that

16      you have that right.  And certainly, I would encourage you to

17      exercise that right.  Considering the stiff sentence I've

18      imposed upon you, you would be fool hearty not to try to get

19      that overturned.  And you would protect your rights by asking

20      for counsel to be assigned to represent you on appeal, if you

21      were not able to afford to pay for counsel.

22             And in any event, a notice of appeal would have to

23      be filed within 10 days that the written judgement will be

24      entered and you would have to perfect your appellate rights

25      thereafter by -- within 30 days, unless you were to get an

104

1    extension of time from the court of appeals, which

2    undoubtedly would be given to you.  You can make application

3    if you need more time to perfect your rights at least to

4    prepare the record and the appeal and do whatever else you

5    have to do firm up your appellate rights.

6              Now is there anything the Court may have

7    inadvertently omitted?

8              MS. RYAN:  There's one thing I've noticed, Your

9    Honor.  It's really more of a --

10             THE COURT:  There's one thing I'm going to say.

11   Maybe it's the same thing you're thinking of.

12             Because I've sentenced you to a period of

13   incarceration in excess of 24 months from the lower level of

14   the advisory range, it may well be that the law still

15   requires me to state specifically the reasons why I've done

16   that, since there's a great separation.

17             I'm not so sure that that still applies given the

18   advisory nature of sentences now, but in any event, for all

19   the reasons that I explained to you, I feel that the 600

20   months is cundicated (phonetic) here.  Three hundred and

21   sixty months, which is the low end of the advisory range, I

22   don't think would be adequate for purposes of the deterrence

23   and respect for the law and all these other factors I have

24   set forth with you.  So those same factors have informed the

25   Court that the sentence should be the 50 years.

1          Anything else, Ms. Ryan?

2          MS. RYAN:  One thing, Your Honor.  Under the

3    statute that this defendant's been convicted of, there's a

4    mandatory restitution provision.

5          THE COURT:  I notice that, but the presentence

6    report suggest that there's no way of determining whether

7    there is restitution in this case.

8          MS. RYAN:  We would like the opportunity to brief

9    that, Your Honor.  We have a 90 day period after the judgment

10   is entered in the case in order to do that.  Especially based

11   on the information we've learned today that they've been able

12   to pay for an investigator down in Mexico.  They've been able

13   to retain counsel.  There may be funds that are available and

14   should be owed to the victims.

15         THE COURT:  I'm not going to impose that now

16   because based upon the information that I have, there's no

17   basis for me to impose any restitution sum.  If you think you

18   have rights within 90 days to make submissions to me, I'll

19   take it under advisement.  But, you know, as a practical

20   matter, I don't know really whether it's really fruitful for

21   you to pursue that, but I don't want to preclude you from

22   exercising your rights to do so.

23         MS. RYAN:  We'll look into it.  Thank you, Judge.

24         MR. MUSA-OBREGON:  Your Honor, in light of the

25   extensive -- enormous sentence you have imposed on my client,

1    we would ask for -- to foreclose as possible and

2    (indiscernible) restitution.  Mr. Carreto has already been

3    (indiscernible) on probation (indiscernible) --

4              THE COURT:  Well, if restitution is mandatory and

5    there is a basis for it, then I have no flexibility and --

6              MS. RYAN:  That's correct.

7              THE COURT:  -- choice, but, you know, I suggested

8    to the government that maybe under the circumstances, you

9    know, you might be hard press to find a valid basis for

10   restitution in this case so we can serve an end to all of

11   this at this particular time.  Think about that.

12             Anything else?

13             Just one second.

14         (Pause/Court and clerk confer.)

15             THE COURT:  I think that completes the sentence.

16   We'll take a 10 minute recess before we proceed with the next

17   sentence.

18         (Recess 3:15 p.m. to 3:43 p.m.)

19             THE COURT:  We've already flushed out all the

20   preliminaries and we have the presentence report here, and I,

21   you know, rejected the application to adjourn the matter, so

22   this matter will go forward for sentencing now.

23             Have you given your client, Josue Flores Carreto, a

24   copy of the presentence report, Mr. Kulcsar?

25             MR. KULCSAR:  Yes, I have reviewed it with him with

1        the assistance of a Spanish speaking paralegal.

2                THE COURT:  You were there at the time?

3                MR. KULCSAR:  I'm sorry, Your Honor?

4                THE COURT:  You were there at the time?  Was the

5        presence report read to him and all its essential aspects?

6                MR. KULCSAR:  Yes.

7                THE COURT:  And you were there and you discussed it

8        fully with him?

9                MR. KULCSAR:  Yes.

10               THE COURT:  And he understands his context.  You're

11       satisfied with that?

12               MR. KULCSAR:  Yes.

13               THE COURT:  All right.  So let me tell you what I

14       have here.  Of course, the underlying plea minutes of April

15       5, 2005 will be deemed to be part of the sentencing file.

16       The presence report is dated January 25, 2006.  Of course

17       in many respects, it's similar to Gerardo's presence

18       report, but we'll go through very specifically.

19               I have the sentencing recommendation and I take it

20       you have received a copy of it, Mr. Kulcsar?

21               MR. KULCSAR:  Yes, Your Honor.

22               THE COURT:  And the government of course has it.

23       And the recommended sentencing here is the same for this

24       defendant as for his brother who was just sentenced, and that

25       was 35 years on counts 2 through 6 and five years on counts 1

1    and 7 through 27 all concurrent.  And the comments are

2    basically the same as the comments in respect to his brother.

3         Now in addition I have the joint letter of April

4    24th, 2006 that was submitted by Mr. Alonso and the two

5    Flores's and I referred to that before, and that's signed by

6    each of them.  And I have Mr. Kulcsar's letter of April 22nd,

7    2006, speaking about three level downward adjustment for

8    acceptance of responsibility and the objection to the two

9    level upward adjustment for obstruction of justice.  And a

10   sentencing sheet I have in the file as well.

11        And then I have the letter from the government

12   signed by Daniel Alonso -- the Government's Daniel Alonso and

13   Ms. Ryan.  That's dated April 5, 2005.  And that's in respect

14   to the *Pimentel* letter.  And think that's all that I have in

15   respect to the sentencing file, except for of course the

16   government's letter that I mentioned before in respect to all

17   three defendants which will be deemed part of this file also.

18   And that was dated, I think, April 26.

19        Mr. Innelli, that letter may be in the other file.

20   We'll make copies of that letter of the government and place

21   them in each of these files.

22        MS. RYAN:  I have extra copies with me, Your Honor.

23   I'm happy to give those to the Court.  If you like.

24        THE COURT:  Well, let me have it in front of me

25   now.

1           THE CLERK:  It's not here, Your Honor.

2           THE COURT:  We can make the copies --

3           THE CLERK:  It's not in this file.

4       (Pause/Court and clerk confer.)

5           THE COURT:  All right, I do have it.  It was just

6   buried under some papers.  So that will be deemed part of

7   this file as well.  And there's Exhibit A annexed thereto.

8           Is there anything, Mr. Kulcsar, that I don't have

9   that I should have?

10          MR. KULCSAR:  I assume, Your Honor, before getting

11  into a great deal of detail, you're going to make the same

12  adjustment with respect to the physical injury claim that was

13  put forth.

14          THE COURT:  What I want to do is go through count 1

15  and I think this will get a -- probably come out the same as

16  his brother's, but we'll make the same adjustments here.

17  Let's turn to them now.

18           And on page 34, with count 1, act A, we'll have an

19  adjusted offense level of 30 -- well, we want to talk about

20  that.  It may be 39.  Here we have the obstruction of justice

21  aspect here and so we want to separately consider that.  My

22  guess is that when all is said and done, it'll come out

23  probably in the same range, but we still have to be

24  circumspect in making these advisory guideline calculations.

25           But the government says that there was this

1    recorded phone conversation with Veronica, is it?

2              MS. RYAN:  No, Your Honor.  It's Jane Doe No. 8

3    (indiscernible) Mexico.  And her name -- her first name is

4    Minerva.

5              THE COURT:  Minerva.

6              MR. KULCSAR:  That's the same person that's

7    allegedly the victim of the bodily injury for whom we have

8    a --

9              THE COURT:  Right.

10             MR. KULCSAR:  -- photograph showing that she was

11   not disfigured or scarred.

12             THE COURT:  But we do have the actual transcript of

13   the conversation and the conversation tells her that, you

14   know, you know the right thing to do, stuff like that.

15   There's certainly at the very least a veil threat.  And after

16   that she stopped cooperating.

17             Let's hear from the government.

18             MS. RYAN:  That's exactly right, Your Honor.  When

19   the government was investigating this case, we had the

20   opportunity to meet with her and speak with her and she was

21   cooperative.  Then the defendant intervened and he had, I

22   believe, two telephone conversations with her that we have

23   recordings of that were submitted to the Court in attachment

24   to our pretrial letter that the Court's referred to already.

25   And during those conversation, the defendant made it clear to

1  her that there would be adverse consequences if she continued

2  to cooperate with the government.  And in the second

3  conversation, she reported back to him that she had been

4  asked to come to the United States to testify at the trial

5  and that she would not be doing so.

6          THE COURT:  Yes.

7          MR. KULCSAR:  And in that regard, Your Honor, what

8  I would like to have presented to the Court is I offer the

9  testimony of William LaCosta, who's prepared to testify under

10  oath and I'd offer him now as a witness for the defendant.

11          MS. RYAN:  This is highly irregular, Your Honor.

12          THE COURT:  Well, but you see I have his actual

13  words here in the attachment to the government's letter.  And

14  specifically, we're looking at -- let's see what the exact

15  words are.

16          Where is it in your attachment?

17          MS. RYAN:  I'm looking now, Your Honor.

18      (Pause.)

19          THE COURT:  It goes for many pages.  I'm just

20  trying to find the exact location.

21      (Pause.)

22          THE COURT:  Well, look, I'm looking at this thing

23  in content.  You know, at the end, she says take good care of

24  yourself and pray a lot to God and that type of thing.  So,

25  you know, to the extent that there was this veil threat, I'm

112

1   not going to give it any credence, looking at the transcript

2   as a whole and will not give two levels for obstruction of

3   justice.  I don't think it's explicit enough, especially in

4   the context of the entire recording, so the adjusted offense

5   level will be 37.  Okay.  I made that determination.

6           Now let's turn to count 1, act B.  I'm going to

7   reduce that from 39 to 37 also to be consistent with what I

8   just did.

9           Anything else, Mr. Kulcsar?

10          MR. KULCSAR:  No, Your Honor.

11          THE COURT:  Okay.  So, I'm going to do the same

12  thing with the next count.  Paragraph 112 will be 37 instead

13  of 39.  The same thing in -- on paragraph 118.  That becomes

14  37.

15          Now let's take a look at count 1, act B, the

16  conspiracy to engage in sex trafficking of Jane Doe 5.  We

17  have that 16 year reference here in paragraph 121.  For

18  consistency purposes, I'm not going to apply that.  So it's

19  two levels off.  And two levels off obstruction of justice.

20  So that bring us down to 37 as well.

21          Next one, count 1, act F, the adjusted offense

22  level will be 37, since I'm striking out once again the

23  obstruction of justice.  Those will be consistently struck.

24          So then turn to page 27.  The -- there's no

25  obstruction of justice.  It's 37 again.

1        And in respect to count 1, act H, there will be two

2    changes.  One will be paragraph 140, the permanent scarring.

3    And, you know, I'm making determinations consistent with what

4    I previously have ruled without having to, you know, repeat

5    everything.

6        MS. RYAN:  Yes, Your Honor, I -- the government

7    understood that.

8        THE COURT:  All right, and so there's no

9    obstruction of justice, so that's a 37 as well.

10       And now count 1, act 1 respect to Jane Doe, we just

11   eliminated the obstruction of justice, so that's 31.

12       And count 7, transportation for purposes of

13   prostitution of Jane Doe 1, the change there will be the

14   obstruction of justice, so that will be 39.  The reason why

15   it's not 37 is because of where you get the two level

16   enhancement under 2H4.1(b)(4)(d).

17       MS. RYAN:  That's correct.

18       THE COURT:  Count 8, the transportation for

19   purposes of prostitution of Jane Doe 2, paragraph 160, we're

20   eliminating two levels there for consistency purposes, as

21   well as the obstruction of justice.  So that comes out to 37.

22       Count 9 will --

23       MS. RYAN:  I'm sorry, Your Honor, I may have

24   misunderstood you on the count 8 calculation.

25       THE COURT:   Well, count 8 -- oh, I made a mistake

114

1    here.  The specific offense characteristic under

2    2H4.1(b)(4)(b) remains.

3              MS. RYAN:  Correct.  Okay.

4              THE COURT:  But what does not remain is the

5    adjustment for obstruction of justice.  So we'll be left with

6    39, correct?

7              MS. RYAN:  Thirty-nine, yes.

8              THE COURT:  Sorry.  And then on count 9, it's 39

9    also, correct?

10             MS. RYAN:  Yes.

11             THE COURT:  And count 10 will be 39.  And then

12   count 15, the obstruction of justice once again, that will

13   reduce it to 37.  And then count 15, act B, once again is 37.

14   Count 15, act C is once again 37.

15             I think it's understood that we really are

16   incorporating much of what we said in the sentence of

17   Gerardo, so --

18             MS. RYAN:  Yes, Your Honor.

19             THE COURT:  -- you know, that should be deemed to

20   be incorporated by reference in all relevant respects.

21             Now count 15, act D is 37.  Once again, when I say

22   37, invariably I'm eliminating the adjustment for obstruction

23   of justice.

24             Count 15, act E will be 37 because we're

25   eliminating obstruction, as well as the victim being less

1      than 16.

2              Count 15, act F will be 37.

3              Count 15, act G will be 37.

4              And count 15, act H will be 37 because we're

5      eliminating the scarring and the obstruction of justice.

6              And then the alien smuggling and alien smuggling

7      for financial gain will be a 21 adjusted level, since we're

8      once again eliminating obstruction of justice.

9              And then we deal with the multiple count

10     adjustment.  So let's see what we have here.

11             Which are the two 39's that remain?

12             MS. RYAN:  Those were counts 7, 8, 9 and 10 are the

13     level 39's.  But I think based on the grouping, Your Honor,

14     we're going to end up with the same -- at least as far as the

15     units goes, the same --

16             THE COURT:  You wanted the same --

17             MS. RYAN:  -- combined levels.

18             THE COURT:  You wanted the same eight and a half.

19             MS. RYAN:  Yes.

20             THE COURT:  There's no change in that.  Unless --

21             MS. RYAN:  There's no change in that.

22             THE COURT:  Unless we inadvertently slipped up on

23     something.

24             So the units will reflect the adjustments which we

25     made to the adjusted offense level and the total number of

1    units will still be eight and a half.  That does work out

2    that way, I believe.

3              The highest count is 36, right?

4              MS. RYAN:  Yes, Your Honor.

5              THE COURT:  Less the max of five for the multiple

6    counts.  That gives us 44 and as the combined adjusted

7    offense level.  Am I missing anything?  I don't think so.  44

8    -- what's the other one for his brother?

9              MS. RYAN:  42.

10             THE COURT:  The difference being --

11             MS. RYAN:  I think we may actually be at a 42 in

12   this case. I'm not certain, Your Honor, I'll  have to look at

13   it again.  But I think because of the way the counts are

14   grouped, I believe Level 39's that we had for Count 7, 8, 9

15   and 10 were also level 39's in Gerardo Flores Carreto's

16   revised presentence report, but because of the way they're

17   grouped in with the other counts, the adjusted level is the

18   37, not the 39.

19             THE COURT:  What is our calculation here?  The top

20   count is 39.  The top count for Gerardo is --

21             MS. RYAN:  It was, Your Honor, but I think because

22   of the way they're grouped together it's my understanding

23   when I went through this more carefully before we came here

24   today, that even with the -- because there were more 37's in

25   the group than 39, it grouped to a 37.

1          THE COURT:  I don't think so.

2          MS. RYAN:  Okay.  I could be wrong.

3          THE COURT:  I don't see any different here between

4     Gerardo's and -- it's so easy to slip up here, it's so

5     complicated.

6          MS. RYAN:  It is.

7          THE COURT:  All right.  Let me see Gerardo again,

8     Mr. -- do you have it here?

9          MS. RYAN:  Your Honor, I'm looking at page 49 of

10    Gerardo Flores Perez' presentence report.

11         THE COURT:  We said the greater -- there was no 39.

12         MS. RYAN:  I believe that Count 7 in his

13    calculation as well was also a 39.  I may be --

14         THE COURT:  We made a mistake then.  We made a

15    mistake then. I have nothing but 37's.  There was Count 10 is

16    a 39.  We made a mistake.  It's as simple as that.

17         So you know what I'm going to do here -- well, yes,

18    if you look in Gerardo on Count 10, it gives a 39.

19         MS. RYAN:  I think as Count 7, 8 and 9, Your Honor,

20    because the two-level enhancement comes from the other

21    felonies enhancement, which we discussed during that

22    sentencing.

23         THE COURT:  Just one second.

24       (Pause.)

25         THE COURT:  Yes, you're right.  Count 9 is 39.

1          MS. RYAN:  And we all agreed on that at the time.

2          THE COURT:  It's painfully apparent to the Court

3     that we made a mistake in finding that the highest level for

4     multiple count purposes was 37. It should have been 39.

5          Now, that's a mistake that the Court made in

6     Gerardo. It's as simple as that.

7          And I guess the government can appeal because the

8     Court made that mistake, but I suspect the government's not

9     going to do that.

10         It would be easier for purposes of not having a

11    disparity between similarly situated defendants for you all

12    to agree that the defendant will get the benefit of a mistake

13    I made with respect to his brother's calculation and will

14    deem the combined adjusted offense level to be 42 here, just

15    like his brother, otherwise we'll have a sentencing

16    despaired.  And I think we want to avoid that.  Does that

17    make sense, Ms. Ryan?

18         MS. RYAN:  Yes, it does, Your Honor.

19         THE COURT:  Okay.  So we'll deem it 42 and this

20    defendant gets the benefit of the mistake we made and his

21    brother suffers.

22         So with 42 and a criminal history category of one,

23    we still have 60 to life as the advisory guideline range.

24         All right.  Mr. Kulscar, we're all grown up's here.

25    I want to give you every opportunity to tell me why I should

1    sentence Josue differently than his brother. We're concerned

2    about not having disparities amongst similarly situated

3    defendants, and this seems to be the situation.

4              MR. KULSCAR:  At this point, Your Honor, we've

5    resolved the issue of acceptance with respect from my client.

6    I'd like to raise one point I don't think was fully

7    considered, with all due respect to the Court.

8              Your Honor --

9              THE COURT:  Just one second.  I'm treating the

10   adjusted offense level at 37 and with five increase for the

11   multiple count, that's 42.

12             I'm not giving him any acceptance of responsibility

13   because -- for the same reasons that I did not give his

14   brother acceptance of responsibility, this defendant also

15   wants to withdraw his guilty plea and we've been through that

16   before and that doesn't sound like acceptance of

17   responsibility to me.

18             MR. KULCSAR:  I think that's because you may not

19   have considered what I'd like to present to Your Honor -- as

20   I was saying actually, watching you do all those numbers, it

21   flashed through my mind how The Bible might have been changed

22   if Solomon had the guideline before him when he had to make a

23   decision on his motherhood of a trial.

24             THE COURT:  I agree with that, but you see the

25   supreme court in its wisdom has given district court judges

1     very important flexibility and has imposed a -- or created a

2     standard of reasonableness and that takes away the sting of

3     the guidelines.  It should be perfectly apparent that I'm not

4     really wedded by the guidelines here.

5              MR. KULSCAR:  (Indiscernible) left to the

6     discretion of the judges.  Let me just address the exceptions

7     issue.

8              My reading of the transcript of the plea, since I

9     read it long after the event and wasn't there at the time,

10    one thing that struck me was the Court's apparent concern

11    about the fact that on the eve of -- after a jury had been

12    selected, as I understand it, the defendants were going to

13    plead guilty to all of the charges.

14             My understanding is that for some time before that

15    day, there had been many discussions about a plea and my

16    understanding of it is that the problem wasn't -- the

17    government was insisting on a global plea.

18             My client was willing to enter a plea but was

19    precluded from doing so by the fact it was not a global plea.

20    He wasn't able to enter the plea that had been offered by the

21    government, which as I understand it, was significantly, very

22    significantly, less than what they now confront.

23             So I think that having that background, the

24    defendant's desire to withdraw the plea is partly, I think,

25    based on the fact that as part of the plea he didn't allocute

121

1    just for the crime for which he was charged.  He was required

2    to allocute for a lot of the things that are now part of the

3    sentencing enhancements, and I think that that's a large

4    portion of the problem that he has with respect to going

5    forward with the guidelines calculations as they are.

6              And I think part of that is based on the fact that

7    this Court has heard perjured testimony from one victim.

8    Perjured testimony.

9              MS. RYAN:  I object to that, Your Honor.

10             MR. KUSCAR:  Testimony in front of you that was a

11   lie, as I understand it -- one of the victims, Olivia, as I

12   understand it (indiscernible) and testified under oath and

13   part of what I understand she said was untruthful.

14             But other --

15             THE COURT:  I don't know what part was untruthful.

16             MR. KUSCAR:  I'm offering Mr. LaCosta again as

17   witness under oath. He also has videos which I'm offering --

18   willing to offer into evidence at the sentencing hearing, and

19   the second victim.

20             THE COURT:  Do you want to have some sort of a

21   hearing?

22             MR. KULCSAR:  Well, I don't know -- yes. I mean,

23   for the extent that --

24             THE COURT:  A hearing on what issue?

25             MR. KULCSAR: An issue as to the victim's -- one

1    victim's truthfulness and the fact that another victim came

2    before Your Honor and refused to testify under oath and I

3    believe the reason for that is because of what was presented

4    in the presentence report is not truthful.

5            And I think that clearly, Your Honor in sentencing

6    the co-defendant was -- I can only imagine affected by what's

7    in the presentence report and by what you heard in person

8    today.

9            My problem is I don't have any personal

10   relationship with this defendant. A lot of clients you

11   represent after a long period of time you develop a certain

12   closeness to.

13           But my concern is that I was mentored in the

14   Manhattan D.A.'s Office under Frank Hogan and our

15   responsibility, as I always understood it, was if at the last

16   minute something was presented to us that we should consider

17   in any way that impacted on guilt, innocence or sentencing,

18   we were taught that we should look at it and make sure that

19   we're doing the right thing.

20           I haven't seen any of the things that Ms. LaCosta

21   apparently has brought.

22           THE COURT:  The problem I have here is that I have

23   your client who pled guilty to 27 crimes.  I painstakingly

24   went over his rights, made sure that there was a proper

25   allocution and he allocuted to significant criminal behavior.

1        Now listen to me.  Okay?

2                And that's the benchmark for what I am doing today.

3        And I take these types of pleas under oath when I have spent

4        an enormous amount of time making sure that the defendant is

5        satisfied with his lawyering, understands he can't withdraw

6        the guilty plea and allocutes to 27 crimes.

7                When then somebody comes here at the veritable

8        moment of sentencing with some Spanish document which is not

9        even translated and thrusts this upon the Court after this

10       matter has been adjourned a number of times and now is going

11       to use that as the peg for all sorts of applications that

12       would undoubtedly be forthcoming, 2255's, whatever, that's an

13       enormous imposition on the Court.

14               I don't disagree with you that if anything has come

15       to the Court's attention prior to sentencing that I should

16       consider it and I would consider it.

17               But this is the basis for the application to

18       withdraw his guilty pleas.  The defendant has all the

19       knowledge in the world that was necessary for him to decide

20       whether or not to plead guilty. We had the jurors ready to be

21       selected.  Did we actually select the jurors?

22               MS. RYAN:  We did, Your Honor.

23               THE COURT:  We selected the jury and we were ready

24       to go. And I asked the defendants why don't you want to go to

25       trial and they said well, you know, I guess because they felt

124

1    it would be in their best interest to accept responsibility.

2    There was some reference made that this would be one fact

3    that they would get the benefit of acceptance of

4    responsibility and I was prepared to give them the benefit of

5    that, until what happened today.

6         Now, we don't even know what's in that document.

7    You thrust it at the Court here in some sort of a veiled

8    effort, you know, to sort of get a further adjournment here.

9    It just comes with a lot of baggage to it.  All right.

10        And the best that I can glean from giving our

11   Spanish speaking colleague, Senor Musa-obregon, an

12   opportunity to tell me what's in it is that it relates to

13   somewhat three victims having said something in some court

14   proceeding in Mexico, but I'm dealing with nine victims here;

15   not three victims.  And I'm dealing with a guilty plea.  And

16   your clients know all the facts that were necessary to know,

17   including what goes on and what doesn't go on in Mexico, who

18   these people were.

19        If they really believed that these women were not

20   being candid, that there was no basis for the government's

21   charges, they had the opportunity to say not guilty, rather

22   than guilty.

23        That's why I look upon this with sort of -- not in

24   a naive way as a judge on the eve of sentencing.

25        So I thought I would owe you the courtesy of that

1    explanation.  And there may be other good reasons that upon

2    reflection by higher authorities they could think of why I

3    should not allow yet a further continuance and allow

4    testimony about all of this.  But this is the best that I can

5    do on the spot.

6          But once again, he pled guilty to 27 counts and at

7    best, maybe two or three of those were Jane Doe's who he now

8    claims said something down in Mexico that you think, you

9    know, justifies aborting these proceedings and having

10    continued adjournments and taking testimony -- I just don't

11    think looking at this thing in balance that it's unfair to

12    your client to turn thumbs down on that.

13          That doesn't mean you can't talk to me about it,

14    but I'm not going to take testimony about what may or may not

15    have happened in Mexico under all these circumstances in

16    respect to three out of at least nine victims.  Okay?  So

17    what else do you wish to say?

18          MR. KULCSAR:  Well, Your Honor, my purpose was not

19    to undermine the integrity of a plea or the allocution that

20    was taken by the Court.

21          THE COURT:  I interrupt -- my apologies, to add one

22    thing else. And certainly, you can interrupt me, too, as

23    thoughts pop up into our heads.

24          But he wasn't asking, nor were the other defendants

25    asking to withdraw their guilty plea in respect to three

1    victims. He wanted me to throw out his guilty plea with

2    respect to everybody.  That's simply not -- it's the

3    antithesis of the acceptance of responsibility.

4              MR. KULCSAR:  Well, I don't know to what extent

5    information that was presently available might have any

6    affect on the Court in imposing a sentence. I don't know

7    because Your Honor hasn't heard it and --

8              THE COURT:  I know that and if, in fact, a higher

9    authority thinks I should have adjourned the matter, given

10   you an opportunity to get a translation of that and take into

11   consideration on the issue of whether the plea should be

12   withdrawn --

13             MR. KULCSAR:   May I have one second?  I want to

14   ask --

15             THE COURT:  Then I'll have to do it.  But I just

16   don't feel that that's the right thing to do here now.

17             MR. KULCSAR:   May I have one moment, Your Honor?

18        (Pause.)

19             MR. KULCSAR:  One moment. I apologize?

20             THE COURT:  Yes, go ahead.  Take your time.

21        (Pause.)

22             THE COURT:  Ms. Ryan?

23             MS. RYAN: Yes, Your Honor.

24             THE COURT:  You know, the issue that has been

25   framed here, that you're going to have to possibly argue in

1    the Court of Appeals. I just wanted to make a clear record of

2    where we're at.  And I don't mean to preclude you.

3              If you suggest to the Court that there should be an

4    adjournment under all of these circumstances, you can do so.

5    I'm not hearing that recommendation from you, but I don't

6    want you to feel as if I'm forcing the government into an

7    intolerable position here.

8              MS. RYAN:  Certainly not, Your Honor.  The

9    government's in complete agreement with the Court's rationale

10   as to why an adjournment at this point would be

11   inappropriate.

12             THE COURT:  All right. I just want you to know that

13   you have this option here.

14             MS. RYAN:  Thank you very much, Judge.

15             MR. KULCSAR:  Thank you, Your Honor.   I

16   understand, for example, just by way of proffer that Ms.

17   LaCosta has videotaped interviews of the mother of Veronica,

18   one of the persons that came before Your Honor and made a

19   (indiscernible) statement. That woman is the person that --

20   according to what I understand is in the transcripts,

21   precipitated the investigations in the trials in Mexico for

22   which the defendants were found not guilty.

23             Presumably, those documents also demonstrate the

24   fact that Veronica -- withdrawn.  The mother of Veronica was

25   involved with a group of persons that kidnaped the brother of

1    my client and held him for ransom -- I believe there's

2    reference in the --

3         THE COURT:  There's also some allegations and

4    claims that have been going on forever. I'm sure of that.

5    There'll be new allegations next month and next year.

6         MR. KUSCAR:  The videotape itself is of very recent

7    vintage.  And I believe the fact of the matter is that there

8    is a whole undercurrent for this case.

9         My client has admitted guilt for those things that

10   he has done. I think that --

11        THE COURT:  Look what he's allocuted to.  I thought

12   I made it clear before I'm going to sentence him based upon

13   the crimes he allocuted to.  That's what I'm going to be

14   sentencing him, based upon that.  The nature of those crimes,

15   his circumstances, his personal characteristics, the need for

16   deterrents and all those other factors.  That's all I'm going

17   to be doing.

18        The victim's statements I listen to because they

19   would like to be heard.  But his sentence is not going to be

20   based upon the victim's statements and I don't think I've

21   said I've even considered that.

22        I mean, the time that I think is warranted here in

23   respect to his brother is based upon the comments which I

24   made on the record and I think they all relate to 3553 and I

25   think I expressed myself as clearly as I'm capable of doing

1     so.

2              So rest assured that my decision is not based upon

3     any factors or circumstances that are not part of the record.

4              MR. KULCSAR:   I would respectfully suggest one, to

5     the extent that the guidelines are advisory and to the extent

6     that Your Honor has a great deal of latitude, obviously in

7     passing sentence, that the imposition of a sentence beyond

8     the Level 41, which was originally anticipated, is not a

9     reasonable sentence under law in the facts of the case.

10             THE COURT:  You can argue that in the Circuit Court

11    of Appeals that there's no question that Judge Block has

12    looked upon these crimes are horrendous crimes.  There's no

13    question that I see a need for deterrents and to send a

14    message and a powerful message because of the nature of these

15    crimes and everything that flows from that.

16             And you can argue that it was not a reasonable

17    sentence -- that 50 years for his brother, who may be here as

18    well, though I'm not going to sentencing until  I hear from

19    everybody -- you can say that it was not reasonable. You can

20    do that.

21             And this is one judge's view of it and I just have

22    a very dim view of this case. So you know the record is

23    clear.  Go ahead.  Anything else?

24             MR. KULCSAR:  Well, I understand that this is one

25    judge's view of it and I guess it's hard considering that I

130

1    spent many years prosecuting and trying murder cases and saw

2    defendants who committed multiple murders getting 25 or 30

3    years to life, which is still the standard in the state; that

4    the sentence that this Court imposed on the co-defendant --

5              THE COURT:  Because nobody was killed, right?

6              MR. KULCSAR:  I'm sorry?

7              THE COURT:  Because nobody was killed?  I

8    understand what you're saying. I mean, I've imposed sentences

9    where there have been deaths involved that were significantly

10   less than what I'm doing here.  I don't think my reputation

11   is one of being the toughest sentencer on the bench.

12             But in this particular case, the violation of women

13   in this case, their whole modus operandi, the nature of the

14   crimes, their insensitivity to humankind -- I know that

15   nobody was killed, fortunately.  But I still think that this

16   type of punishment was warranted.

17             MR. KULCSAR:   Well, okay, Your Honor. I know Your

18   Honor's view is based on what you read in the presentence

19   report and, obviously --

20             THE COURT:  Not just based on --

21             MR. KULCSAR:  Sorry?

22             THE COURT:  You keep saying that it's based upon my

23   sitting here while they pled guilty after a jury was selected

24   to 27 heinous crimes and just treating women like garbage.

25   They pled guilty to that.  I'm not making this up.  I just --

1    maybe I'm a male chauvinist pig, you know. I don't know.  But

2    it bothers me terribly that people should be so inhumane to

3    their fellow human beings.

4              MR. KULCSAR:  I wasn't -- I certainly don't mean to

5    suggest that the Court shouldn't be bothered or upset, or

6    distressed by any of the allegations and the defendant's

7    plea.  I was distressed myself.

8              But what I'm respectfully suggesting, Your Honor,

9    is that a sentence of -- and the range that you sentenced the

10   co-defendant to --

11             THE COURT:  Is very severe.

12             MR. KULCSAR:  -- is far in excess of what I think

13   is a fair and appropriate and reasonable.

14             THE COURT:  I understand. I understand where you're

15   coming from. I understand that and I respect that.  And this

16   is just the way I see it.

17             I mean, it's -- judges are accused of playing God.

18   We take these things very seriously. I think it should be

19   very apparent how seriously I've taken this matter from the

20   beginning.  And that's why we have appellate courts.  Maybe

21   you'll be able to make the same arguments there and you can

22   argue reasonableness.

23             MR. KULCSAR:  I've never taken that view though.

24   I've never -- I guess since I've been a trial lawyer all my

25   life, I've never taken the view that we have a appellate

1     courts for that reason.

2           THE COURT:  I think it's important for the

3     appellate court to sit in judgement of what I've done here. I

4     think that's part of our process and I would feel badly if

5     that process did not unfold because I would feel more

6     comfortable having judges on the Court of Appeals who are

7     more learned than I am and more intelligent than I am review

8     what I did in a case of this nature.  And I hope that

9     happens.

10          MR. KULCSAR:   I really -- I don't want to have a

11    philosophical -- to say it was wrong. I would just suggest

12    that if I were where this prosecutor was and all the years I

13    stood there and someone said look at something and I'd like

14    to have an adjournment because I think it's significant and

15    should be considered, I wouldn't object to that. I never did.

16    And maybe that's because I was mentored when Mr. Hogan and

17    then Mr. Morgenthal mentored Ms. Ryan's boss.

18          But in addition to that, Your Honor, I have nothing

19    to add. I think Your Honor --

20          THE COURT:  You've got a record and maybe the

21    higher authorities would say under the circumstances I

22    shouldn't have given you the adjournment.  They know. It's

23    not an unreasonable argument.

24          I just -- not at this time and not under all these

25    circumstances and all for the reasons which I've explained

133

1    where I think it's appropriate here.

2            You see, it's not as if you come up with some

3    proffer here and gave it to me yesterday even. It's not as if

4    you're telling me something that would really significantly

5    impact the guilty pleas.  You're just talking about three

6    people down in Mexico who apparently said something different

7    there and I respect that.

8            There's guilty pleas.  They know what they did.

9    They were in full command of all the knowledge that they

10   needed before they pled guilty.

11           Anyway, I respect your arguments.  Does the

12   government want to respond at all?

13           MS. RYAN:  No, I don't think so, Your Honor. I

14   would ask the Court's indulgence for me just to make sure

15   that none of the victims wanted to speak.

16           THE COURT:  Go ahead.

17       (Pause.)

18           MS. RYAN:  Your Honor, one of the victims has

19   something she'd like to add.

20           THE COURT:  This young lady was here before.  Tell

21   us your name again.

22           MS. ROMERO:  Veronica Romero.

23           THE COURT:  All right.  Now, you testified under

24   oath -- not testified. You spoke under oath before, if I

25   recall correctly, right?

134

1          MS. RYAN: I don't believe she did.

2          THE COURT:  Oh, you did not.  For some reason you

3     didn't want to do that.  So you have the right to make a

4     statement. Go ahead.

5          MR. KULCSAR:   Excuse me, Your Honor. I would ask

6     for her take an oath.

7          THE COURT:  No, I don't have to do that. It's not

8     required.

9          MR. KULCSAR:  I'm just asking if you would.  The

10    others did.

11         THE COURT:  No, no. I gave them the option and I

12    should not necessarily have even put them in that position.

13    They don't have to speak under oath.  There's nothing in the

14    law that requires that. I just wanted to give them that

15    option and -- for whatever reason.  But she doesn't want to

16    do that.  Go ahead.

17         MS. ROMERO:  I just heard that it is not

18    appropriate that they be sentenced to the number of years

19    that they were sentenced because they did not kill anybody.

20         But as far as I am concerned, it is a death.  When

21    I was pregnant, five months pregnant, when Josue arrived in

22    New York he caused me to abort and as far as I'm concerned it

23    was a killing that was not deserved for a human being to be

24    killed in that way.

25         THE COURT:  All right.  Anything else you wish to

135

1     say?

2              MS. ROMERO:  No.

3              THE COURT:  All right.  Fine.  Anybody else wish to

4     speak?

5              MS. RYAN:  Not on this defendant, Your Honor.

6          (Pause.)

7              MS. RYAN: I may have spoken too quickly.

8              THE COURT:  Yes. Your name again.

9              MS. CRUZ:  My name is Maria Derayo Garcia Cruz.

10             THE COURT:  Now, you did speak before with respect

11    to Gerardo, correct?  And if I recall, you chose to speak

12    under oath.

13             MS. CRUZ:  Yes.

14             THE COURT:  And so I assume you still are doing

15    this under oath, correct?

16             MS. CRUZ:  Yes.

17             THE COURT:  So what is it that you wish to tell me

18    about this defendant, Josue?

19             MS. CRUZ:  It's only a message.  Just an

20    evaluation as to the fact that this man does not value women.

21    It's not just these women who are here.  There are more women

22    that this man has mistreated, that he has -- whose lives have

23    been destroyed for both the women and their families.  That's

24    it.

25             THE COURT:  Okay.  Thank you very much.  Anybody

136

1      else?

2                MS. RYAN:  No, Your Honor.

3                THE COURT:  All right.  Mr. Josue Flores Carreto,

4      of course, you're here. You know what I said in respect to

5      your brother but nonetheless, sentences are all individual

6      and I don't automatically sentence everybody the same way so

7      I'm very much concerned about your particular circumstances

8      and what, if anything, you wish to say to me before sentence

9      is imposed.

10               DEFENDANT JOSUE CARETTO:  First of all, good

11     afternoon.  Inasmuch as the victims are here and I see the

12     lady who is here, why doesn't she mention her husband.  His

13     name is Aliou (ph).

14               So why is she referring to me?  She's never lived

15     with me.  She's never known anything about my life. Why is

16     she putting me in this conspiracy?

17               I'm being put in it since '91 to this date. And

18     between '91 and '96 I didn't even have a wife. I was in a

19     group of Alcoholics Anonymous and I even have proof of that.

20               In '96 I got together with Minerva Calderone.  I

21     got married to her and I haven't had any problems with her. I

22     continued talking to her by phone and talking to her mom.

23               Now, Ms. Veronica is complaining and she's saying

24     that perhaps I harmed her.  But why doesn't she say that it

25     as she who was looking me up.  When I was in Tijuana, she was

1     always calling me up by phone.

2              Her friends from where she worked. I have their

3     testimony.  They went to Mexico recently.  And what I'm

4     seeing is that we're being judged for the most minimal things

5     that we did, but the proofs that we have otherwise -- don't

6     want to hear them.

7              THE COURT:  No, I certainly am listening to

8     everything but for you to characterize that you're being

9     judged on the minimal things that you did sounds to the Court

10    to be just bizarre in the face of your pleading guilty to 27

11    serious crimes involving multiple, multiple victims and where

12    you acknowledged that you caused physical harm to these

13    people, as well as sex trafficking for the purposes of

14    prostitution and everything else you pled guilty to.

15             And when you speak like this, it doesn't seem as if

16    you're accepting the fact that you did confess to many crimes

17    of the most serious nature here and you seem to want to

18    diminish them and you had all the knowledge in the world

19    before you pled guilty of your acts and your so-called wife

20    and your situations that you speak about. And nonetheless,

21    you pled guilty to all these crimes.

22             You had every opportunity to go to trial and put

23    forward a defense. You did not do that. You pled guilty.

24    What else do you have to say?

25             DEFENDANT JOSUE CARETTO:  How could have I

1      presented any defense?  The attorney I had didn't even have

2      any proof to be able to present them in my trial.

3              I wasn't going to go to a trial with nothing.  And

4      Veronica herself, when my brother was kidnaped, she helped

5      them go and find and arrest the people who had kidnaped him.

6      Yes, she was working in Puerla.  She was working in

7      prostitution, but she called us by phone and she said look,

8      they're here in Puerla. Come pick them up.

9              And she knows that nobody was made to do anything

10     by force here. Whatever was done was because they wanted it.

11             THE COURT:  Well, that's not what you pled guilty

12     to. Okay.  I just find it so disingenuous for everybody to

13     speak in terms of the fact that they're innocent of these

14     charges, when they pled guilt to all 27 counts, including

15     physical violence and everything else that went along with

16     it.

17             I can read you back your own words, if you forgot

18     what they were.  What else?

19             DEFENDANT JOSUE CARETTO:  Yes, I understand what

20     you're saying, but then why -- now she's saying she's a

21     victim.  But when I would go to Chinagua, I would go pick her

22     up and we would go and we went swimming.  All of her friends

23     knew that there was no force involved there.

24             THE COURT:  But there are many other victims that

25     you pled guilty to. Even if I were to credit everything you

1    say about Veronica, what explains the seven or eight other

2    people here that you said you physically abused that you pled

3    guilty to and you admitted being an organizer of the group of

4    people involved here in sex trafficking, et cetera, et cetera

5    and that you just don't want to talk about that. You just

6    want to focus on the one person who spoke today.

7              I'm not necessarily going to sentence you because

8    of that. I'm taking everything into consideration, including

9    the way you speak to me and what you're saying.  I'm giving

10   you all the opportunities to speak. If you wish to say

11   anything more, you can do so.  You let me know.

12             DEFENDANT JOSUE CARETTO:   But in any case, if I

13   behaved so badly with the other girls, why is it that they

14   allow me still to go into their houses, that they talk to me?

15             There are no victims.  The only ones I can see are

16   Minerva and Maricella Hernandez.

17             THE COURT:  Anything else?

18             DEFENDANT JOSUE CARETTO:  That's why I don't agree

19   with the sentence and I would ask that you be fair with me. I

20   don't feel that that's what's happening. This is abuse.

21             THE COURT:  Okay.  The sentence the Court will

22   issue where will be the same as in Gerardo's situation. I

23   want to avoid sentencing disparity, in addition to the fact

24   that I considered the 3553 factors here to be of the same

25   import as with the brother.  They're tied together.  They're

1       both organizers, joint organizers of this horrible criminal

2       activity.

3              And once again, considering 3553(a) and all of the

4       other aspects of 3553(a), I call attention to the horrific

5       nature and circumstances of these 27 offenses. I don't see

6       anything in the history and characteristics of the defendant

7       that is terribly redeeming.

8              I think that, as I mentioned before, there's a

9       terrible need here for a serious punishment to reflect the

10      seriousness of the offense to promote respect for the law, as

11      well as to provide just punishment and also to afford

12      adequate deterrents and to protect the public from further

13      crimes of the defendant.

14             Hopefully, this sentence will go a long way towards

15      deterring others who may believe that they can engage in sex

16      trafficking and all the types of things that are represented

17      in this particular prosecution. I hope it has a chilling

18      effect upon others, because these issues are serious.

19             The Congress of the United States has passed

20      specific legislation, has made findings identifying the types

21      of problems that these activities represent and the Court

22      agrees that it should do -- make a statement consistent with

23      Congressional concerns that we have to stop this type of

24      things in its tracks and I think that this prosecution, even

25      though it's going to result in a long period of incarceration

1    for these defendants, and justifiably so, will also serve the

2    additional salutary purpose of deterrents and protection of

3    the public.

4         So that will be Counts 2 through 6.  50 years on

5    each count.  They'll be concurrent, together with five years

6    of supervised release with the special condition that the

7    defendant was deported and reentered the United States

8    illegally.

9         Counts 1 and 7 through 27 will carry five years of

10   incarceration concurrent to each other, as well, as to the

11   counts 2 through 6.  There will be three years of supervised

12   release that will be concurrent with the five years of

13   supervised release.  A $2,700 special assessment, which

14   reflects $100 for each crime.  The fact that it's $2,700

15   reinforces the seriousness of this criminal behavior. I don't

16   think the Court has ever sat in judgement of defendants who

17   have affected 27 crimes before.

18        I should add also the fact that the  adjusted --

19   the multiple adjustment was capped at five, just because

20   that's the statutory basis.

21        But you know, substantively, the large number of

22   these crimes that were committed, you know, would warrant

23   some consideration for the fact that the -- if not for the

24   cap the eight and a half levels would be indicated. I'm not

25   punishing you for that. I'm just reflecting that the

142

1    multiplicity of the counts here I think adds to the Court's

2    sense of the seriousness of the criminal conduct.

3           There are general conditions of supervised release,

4    which is being handed to you in Spanish by the Court's clerk.

5    I'm not going to fine you.  You don't have the ability to pay

6    a fine.

7           And last, you have absolute rights to appeal.  My

8    hope is that you will do so, because a matter of this

9    seriousness where the Court has imposed a very harsh

10   sentence, it would do the court some comfort to have three

11   judges on a higher level review these proceedings,

12   considering the importance of everything we've been speaking

13   about and, of course, once again, the harsh sentence, which I

14   consider to be reasonable under all of the circumstances.

15          And I think that that concludes the Court's

16   sentence here.  If you wish to exercise your right to appeal,

17   you can make application for the appointment of counsel, if

18   you cannot afford counsel and you would protect your rights

19   to appeal by filing a notice of appeal within ten days after

20   written judgement is entered protecting you within 30 days

21   thereafter, unless you get some extension of time, which

22   undoubtedly you will be able to get, I suspect, from the

23   higher court that will be processing the appeal.

24          I think that concludes the sentence.  Mr. Kulscar,

25   I want to thank you for your comments.  They were well taken

1    and well spoken.  This is why sentencing is so difficult.

2                THE COURT:  Anything else?

3                MS. RYAN:  Your Honor, I just wanted to put on the

4    record --

5                THE COURT:  Just one second.  Restitution again?

6                MS. RYAN:  Well, yes.  First the restitution again.

7    The government -- we can figure out a way to calculate it --

8                THE COURT:  Well, you just think about that

9    carefully, because we've had a long sentencing and you may be

10   within your legal right, but sometimes you look at the

11   practical aspects of sentencing, as well as the strict letter

12   of the law.

13               If you think there's something so compelling, then

14   I'll give you your right to pursue your legal remedies, but

15   at the same time, I would just ask you to think heavily about

16   that before we come back to court again.

17               That concludes the sentence --

18               MS. RYAN:  Your Honor, I'm sorry.  There is one

19   other thing I wanted to put on the record.

20               MR. HOCHBAUM:  Well, my client was not able to be

21   here, so --

22               THE COURT:  Well, we're not dealing with his

23   sentence right now. We will shortly.  Go ahead.

24               MS. RYAN:  I just wanted to indicate, Your Honor,

25   that you may remember much earlier in the case the Court

144

1    signed a no contact order between the defendants and the

2    victims in this case.

3              THE COURT:  Just one second.

4              Mr. Hochbaum, if there's something we have to

5    attend to, let me know. Is there a problem?  Maybe I could

6    help everybody.

7              MR. HOCHBAUM:  Judge, I'm getting directions from

8    marshals as to how I should deal with the Court.  I don't

9    think it's appropriate for them to tell me how to deal with

10   my client.  Within the confines of that absolutely.  That's

11   their job.

12             THE COURT:  Let's just try to move on with the

13   heavy business at hand.  If there's something you feel that

14   you want to bring to my attention as an officer of the court

15   and as a respected attorney, I'll certainly hear you out.

16   Let me just finish with this first.

17             MS. RYAN: Thank you, Your Honor.

18             THE COURT:  Go ahead.

19             MS. RYAN:  There was a no contact order that was

20   authorized by the Court much earlier in this case prohibiting

21   the defendants from contacting the victims in this case.

22             We would just ask that that order -- that the

23   defense be reminded that order is still in effect and that

24   applies to both direct and indirect contact.

25             THE COURT:  Is that a condition of -- well, we're

1   not dealing with supervised release.  I don't have any

2   specific recollection of the tentacles to whatever I said

3   before as to each -- I'm not going to do it now. It's now ten

4   to 5:00. It's been a long day.

5          If there's any problems, you'll let me know and we

6   can deal with it and the Bureau of Prisons is going to take

7   control over his behavior now, too.

8          So I don't see that there's any need for me to say

9   anything about that here today.  Let's take five minutes and

10  then we'll deal with Mr. Hochbaum's client.

11     (Recess from 4:46 p.m. until 4:49 p.m.)

12         THE COURT:  Let's go.  It's five to 5:00.  It's

13  been a long day but let's see wehther we can complete all of

14  this today if it's possible to do so.

15         Any problem ehre?

16         MS. RYAN:  We're having a slight problem with the

17  interpreter, Your Honor. There's only here right now and

18  there's been during the course of the day a second

19  interpreter who's been interpreting into the headphones.

20         With the Court's permission, Ms. Clancy is happy to

21  sub in until the court interpreter --

22         THE COURT:  Who would be?

23         MS. RYAN:  Libia Clancy, the Spanish interpreter

24  who was being used when the victims were speaking to the

25  Court.  It's just so that the victims can hear --

1          THE COURT:  There's no reason why we should not do

2     that, is there?

3          MS. RYAN:  I don't think so, Your Honor.  No, Your

4     Honor.

5          THE COURT:  I mean, we've spoke about Ms. Clancy

6     before. I think she can come in and help us under the

7     circumstances.

8          MS. RYAN:  Thank you.

9          THE COURT:  And also, Senor Musa-obregon was kind

10    enough to act as officer of the court to tell me if there's

11    any problem, but he didn't say anything at all.  So it

12    verifies the fact that she's doing just a perfect job.

13         MS. RYAN:  That's my recollection as well.  Thank

14    you.

15         THE COURT:  Mr. Hochbaum, your client is now in a

16    better position --

17         THE INTERPRETER:  Excuse me, Your Honor.  May we

18    please check out this equipment?

19         THE COURT:  I don't know how to help you

20    technically.

21      (Pause.)

22         MS. RYAN:  It's working.  Thank you, Judge.

23         THE COURT:  All right.  Mr. Hochbaum, I know it's

24    been a long, arduous day and your client is in somewhat of a

25    different position because he's not being characterized as an

147

1    organizer, just as a manager and it seems that his role, his

2    involvement is somewhat less than the Caretta brothers.

3          So with that overture, let me ask you is there

4    anything that remains before we proceed to sentence your

5    client?

6          MR. HOCHBAUM:  Well, Judge, in what has gone on

7    previously with the Court's denial of the acceptance points

8    because of the motion made, I think my client stands in a

9    different position with regard to that than with regard to

10   the other defendants.  He certainly signed the motion, Judge,

11   and he certainly made it with full knowledge.

12         However, the situation is substantially different

13   to him and it deals specifically with the nature of his

14   relationship with his prior lawyer and what was explained to

15   him.

16         And one of the problems that my client has is, as

17   the Court will note, his birthdate is in 1979.  This

18   conspiracy for which he pled guilty to commenced in 1991.

19   Subsequently, upon reading the Probation Department's report,

20   he discovers, as did I, that with regard to one of the

21   victims who is alleged to have been forced into servitude

22   when she was under the age of 16, at the time that that

23   occurred, my client was 12.

24         I believe that part of the reason why he joined in

25   the motion to withdraw his plea is he felt that he was not

1    sufficiently advised by his prior attorney with regard to the

2    consequences of admitting involvement in a conspiracy from

3    1991 on; that he would then subsequently get enhancements for

4    conduct which he was neither part of the conspiracy -- was

5    not a member of the conspiracy and certainly was probably

6    physically incapable of participating in.

7         My conversations with him with regard to his

8    acceptance of responsibility is that he understands that he

9    pled guilty and he accepts his responsibility. I don't

10   believe the existence of a pro forma technical motion to

11   withdraw a plea would preclude the Court from giving him

12   acceptance points.

13        There is an additional factor which I learned

14   today, which has not been put on the record.  During the

15   substantial efforts, and I understand them to be very good

16   hearted efforts and well meaning efforts by the prosecution

17   to convince the defendants to plead guilty, and evidently,

18   they were invited into the discussions by the defense

19   attorneys, there was a suggestion but the former head of the

20   parole division that the clients would be allowed to proffer

21   for cooperation purposes after the entry of their plea.

22        Subsequent to the taking of the plea, a letter was

23   sent by Mr. Alonzo indicating that that would not go forward.

24        I'm hearing this secondhand. I see Ms. Ryan shaking

25   her head, so I'm suggesting that this is information that I

1      received, although I cannot tell you the truth of the matter.

2           I can tell you, however, Judge, that my client has

3      accepted responsibility and has, in fact, plead guilty to

4      crimes at least to a certain -- if one was to look

5      specifically at the dates of the some of the specific crimes,

6      crimes that he could not and did not commit.

7           However, he has acknowledged that he has been a

8      participant in this conspiracy. So my first request is that

9      the Court grant him the acceptance of responsibility points.

10          THE COURT:  Ms. Ryan, I see him in somewhat of a

11     different posture than the other defendants, but I want to

12     give the government an opportunity. I'm open to those

13     suggestions of Mr. Hochbaum.  There seems to be some sort of

14     basis for looking upon him a little differently than the

15     Caretta brothers, but I want to hear from the government.

16          He wanted to accept responsibility. He had Mr.

17     Lashley.  We have a history here.  We went back and forth

18     over this -- I don't want to burden the record further, but

19     it seems that he's been a little bit more amenable, perhaps,

20     to cooperating.  Do I have it wrong?  I mean, you tell me.

21          MS. RYAN:  I don't know about cooperating, Your

22     Honor.  I understand the Court's reference to the problems

23     that the defendant raised with the Court regarding his prior

24     representation.  But the Court carefully asked this defendant

25     about those problems --

1          THE COURT:  I did.

2          MS. RYAN:  -- before taking the plea.  And we took

3     special care with this defendant because of that history.

4          THE COURT:  I did.

5          MS. RYAN:  And the defendant said that he

6     understood that and he withdrew all of the motions he had

7     pending.

8          THE COURT:  He accepted responsibility.  And what

9     happened since then?  You said he signed his name to the

10    elective letter.  My sense is that he wasn't the ringleader

11    there.  I don't know who was.

12         MS. RYAN:  I don't think there's any way for us to

13    know without inquiring into all three defendants, Your Honor.

14    I think this is one of the mysteries of the MDC.  I really

15    don't know who suggested this motion to them, but I don't see

16    any real difference between this defendant and the other two.

17         They've all sprung this on the court and the

18    government and their own lawyers on the eve of sentencing and

19    I submit that it may be purely for delay tactics and for

20    nothing else.  And it certainly --

21         THE COURT:  I'm inclined to agree that this is the

22    antithesis of the acceptance of responsibility after the

23    painstaking efforts the Court made over long periods of time

24    --

25         MR. HOCHBAUM:  Judge?

1        THE COURT:  -- to assure that, you know, they

2    understood that this plea really was going to stick and that

3    we were treating it with that type of seriousness and purpose

4    and you're quite right.

5        I took particular pains in light of the history of

6    Mr. Lashley.  I was tough with Mr. Lashley at times also and

7    I said things to Mr. Lashley; I want to make my best efforts

8    to make sure I will not have to deal with any corroborative

9    matters if your client goes forward and pleads in light of

10   the fact that he's protesting continuously about your legal

11   representation and we went on to say having this colloquy

12   this morning -- I'm talking to pages 12 and 13 of the plea

13   proceedings back on April 5th, 2005 and said it would make it

14   less probable and more probable that I have to deal with

15   2255 collateral attacks.

16       Out of the process of argument, he said you didn't

17   properly advise him, that he wasn't being effective counsel.

18   I think it is important for us to engage in these

19   prophylactic measures at this particular time and I wanted to

20   hear from Mr. Lashley in light of the fact that his client

21   expressed displeasure in his representation in the past.

22       I said that I will speak to him about that

23   extensively and in light of the fact that now, contrary to

24   what he said on prior occasions, he's willing to plead to the

25   entire indictment, strikes me that we have to be very

1    cautious about understanding the exact events transpired --

2    transpired in the court.

3            And then we went on from that point forward and

4    then Mr. Lashley said that he feels that in light of *FanFan*

5    and *Booker*, he thinks his best interests would be to avoid

6    facing the possibility of life in jail and to view with all

7    these matters in sentencing and we go on and on from that

8    point forward to make it clear that Mr. Alonso was satisfied

9    with his counsel.

10           MR. HOCHBAUM:  Judge?

11           MS. RYAN:  Judge, and --

12           MR. HOCHBAUM:  If I might?  It seems to me that the

13   focus on whether or not my client makes a motion after taking

14   his plea to withdraw his plea -- a motion that has very

15   little basis.

16           THE COURT:  I'm saying it's the basis of the motion

17   that really concerns me, you see?

18           MR. HOCHBAUM:  I understand that, Judge.  But also,

19   it's clear in the subsection involving acceptance of

20   responsibility that the major concern is the obviation of the

21   need for the people to try the case.  Okay?  And that has

22   happened.

23           THE COURT:  Right.  And I appreciate that.  But,

24   you know, I just want to make it clear.  It's not that I'm

25   saying that because somebody makes a motion that that

1    automatically withdraw his plea -- that that automatically

2    means he is no longer a candidate for acceptance of

3    responsibility.

4              It's the substance and the nature of the motion.  I

5    read through those three pages, you see?  And those three

6    pages really tell the court that he just doesn't accept

7    responsibility.  That's what I'm referring to.

8              And the three pages are that infamous letter, I

9    guess we can say, jointly signed by the three defendants.

10   It's not just the one paragraph -- please, I've had a change

11   of heart or my lawyer didn't properly advise me and this or

12   that.

13             I know you're faced with a tough cup of tea now.

14   But what should be clear is the substance of the reason why

15   as he sets forth in that letter he wants to change his plea

16   that, you know, I think motivates me to treat him the same as

17   the other defendants by not giving him acceptance of

18   responsibility.

19             And I think in fact for consistency purposes and

20   without elaboration, I just am not going to go along with

21   giving him acceptance of responsibility.  So let's go

22   forward--

23             MR. HOCHBAUM:  Well, Judge, I mean if -- as long as

24   we're making reference to the three pages, paragraph 3 of the

25   letter says, "It is those Rule 11 errors and counsel's

1    ineffectiveness that formed the basis for the motion to

2    withdraw the guilty plea and appoint new counsel."

3            THE COURT:  Let's stop.

4            MR. HOCHBAUM:  Okay?

5            THE COURT:  Look at the Rule 11 errors that's

6    eluded to.  That I did not advise the defendant or defendants

7    they have a right to testify in their own behalf.  That's

8    just wrong.

9            I mean, you know, it's as clear as anything that I

10   gave that specific advice.  This is the basis for his wanting

11   to withdraw his guilty plea?

12           MR. HOCHBAUM:  Which makes me wonder whether or not

13   one could look at this motion --

14           THE COURT:  And take it seriously?

15           MR. HOCHBAUM:  -- on its face in light of the

16   transcript that says that that's a suggestion and he doesn't

17   accept responsibility.

18           Okay?  It seems to me that when you plead guilty

19   and you say it 27 times, that's a heck of a lot more

20   forthcoming and strong evidence of your acceptance of

21   responsibility than a, you know, two-and-a-half page letter

22   that says --

23           THE COURT:  The client sends me a letter that says

24   it's absolutely -- you know, saying that the Court, you know,

25   did not properly advise him.

1          MR. HOCHBAUM:  But it doesn't say, Judge, in the

2    letter that I'm not guilty.  Nowhere does those words come

3    in.  Nowhere does it say I didn't do these crimes.  It simply

4    said there were procedural errors.  I didn't get appropriate

5    advice and I feel that I'm entitled, as well as this new

6    information that seems to be exculpatory in some nature, that

7    I'm entitled to have my plea back.

8          THE COURT:  You've been directed.  I'm not going to

9    give him acceptance of responsibility.  I don't want to

10   burden the record any further but you simply stated -- how

11   you made it, cogent reasons why I should reconsider that I'm

12   inclined to do so.

13         Okay.  Let's move on in a more structured way at

14   this time.  We had the presentence report.  Let me tell you

15   what I have in the file.  And I think it should be understood

16   that everything that I've said that's relevant in the prior

17   sentences should be re-incorporated herein.

18         I just thought as an afterthought in that respect

19   that while with Gerardo Carreto I was very explicit about why

20   I chose that particular sentence, considering that it was 24

21   months in excess of the advisory range on the low level.  I

22   didn't specifically say that in respect to a sway, but I did

23   incorporate my comments that I made and that's certainly, I

24   hope --

25         MR. HOCHBAUM:  Judge, I will --

1          THE COURT:  -- I assume is implicit, but it does

2     not mean explicitly the same reasons why I chose the 600

3     months for Gerardo also of course pertain to --

4          MR. HOCHBAUM:  Judge, as we know --

5          THE COURT:  -- let me finish so that we have a

6     clear record.  Also pertains to Josue.  But that doesn't deal

7     with Josue.  Is that how you pronounce his name?

8          MR. HOCHBAUM:  Josue.

9          THE COURT:  Josue.

10          MR. HOCHBAUM:  Josue.

11          THE COURT:  All right.  So I made that clear.

12     Let's go on and tell you what I have in my sentence file.

13          The transcript, of course, is being incorporated of

14     April 5th, 2005.  The government's letter of April 26th,

15     2006, to the extent that it addresses your client's concerns,

16     is -- is identified in that it will be part of the file.

17          The presentence report, we've referred to that, of

18     course.  That's dated December 15th, 2005.  There's an

19     addendum to the presentence report in this particular case

20     and that deals with his exceptions to the fact that he has

21     been characterized as a manager and that's dated February 9,

22     2006.

23          Of course, I have what I refer to as the infamous

24     letter of April 24th, 2006 which we just have spoken about.

25     And the recommendation by the Probation Department.  You

1    folks have it, I assume?  The comments are basically the same

2    as with the brothers -- a little different.

3          And the recommendation here on Counts 2 through 6

4    is 30 years concurrent and 7 through 27, five years

5    concurrent with everything.

6          What else should I have here?  Let me take a look

7    at my -- yes.  Yes.  I have Mr. Hapgar's letter of April

8    20th, 2006 talking about guidelines sentencing matters.

9          I have the, of course, notice of motion to allow

10   him to withdraw his plea and there is this declaration that

11   has six paragraphs in it.  That's dated April 24th, 2006.

12         And therein, amongst other things, he refers in

13   paragraph 4 the Rule 11(b)(1)(e) which requires the Court

14   before accepting the plea of guilty to inform the defendant

15   of his right to testify and then Mr. Alonso is just wrong.

16   He's saying that the court did not do that.

17         And also in terms of the issue of whether or not I

18   properly inquired as to whether or not the guilty plea was

19   one which did not have any promises associated with it in

20   terms of sentencing or otherwise.  We fleshed it out very

21   carefully, and also another example of he just seems to want

22   to not accept responsibility.

23         MR. HOCHBAUM:  Well, Judge, in light of that, I

24   would bring to the Court's attention this information that I

25   was given today about some suggestions made by the former

158

1    chief of the Criminal Division to the defendants with regard

2    to potential Rule 35 motions or later on in the process.  Not

3    being present, I don't know.  I know there is a letter in the

4    file from Mr. Alonso.  That would be Gerardo Alonso, the

5    former chief, indicating that they were not considering the

6    subsequent cooperation of the defendants.

7           It appears to me that such a letter that occurs

8    after the plea would not be necessary unless, in fact, there

9    were some at least suggestions made prior thereto that that

10    was something that would be considered.

11           Now, I don't suggest that the government promised

12    that they would do it, nor am I suggesting that Mr. Alonso

13    did not have the full power to say to them, we'll take that

14    under consideration and make a determination --

15           THE COURT:  Let me just finish.

16           MR. HOCHBAUM:  -- which, I'm sure, is what he did.

17           THE COURT:  Okay.

18           MR. HOCHBAUM:  However, when my defendant, who's

19    fairly uneducated, has problems with his lawyers and deals in

20    another language, then presents a motion which indicates

21    whether or not -- or questions whether or not -- promises

22    were made, it seems to me that the court should not take the

23    pro forma approach that since he wants to withdraw his plea,

24    he shouldn't get acceptance of responsibility.

25           Certainly, the acceptance of responsibility statute

1    or guideline contemplates defendants getting acceptance of

2    responsibility after trial.

3         THE COURT:  But there's more than that in the

4    declaration and there's more than that in the three- or four-

5    page letter.  I don't want to go over it any further.  It's

6    just the totality of all these factors and circumstances

7    which I've considered.

8         Lest I forget, let me tell you what else I have in

9    the file.  I have Mr. Lashley's letter of February 15th,

10   2006.  I have a typewritten letter from the defendant Alonso

11   which was filed on February 9th, 2006.  I have certificates.

12   I also see that he's attended Bible class.  And I have

13   certificates about that as well.

14        And I have another letter from Mr. Lashley dated

15   February 10th, 2006 and attached to that letter are all these

16   certificates about Bible school.  I'll let you see that.

17        I have this letter from Mr. Alonso dated -- that

18   was filed February 6th, 2006.  It talks about harsher

19   incarceration and other factors for me to consider in terms

20   of sentencing.  It talks about post-offense and

21   rehabilitation.  He does seem to have something to say for

22   himself in terms of his turning to the Bible, which is good

23   to see.

24        And that's basically -- well, I have a letter from

25   Mr. Lashley also of January 9th of 2006 talking about *Booker*,

1    *FanFan*.

2           And that's what I have in the file.  So I just

3    don't want to lose track.  I also have the sentencing sheet

4    that went along with the sentence -- the plea -- back in

5    April of 2005.  I just want to make sure that I have the

6    complete file.  Is there anything that's missing?

7           MR. HOCHBAUM:  Not that I'm aware of, Judge.

8           MS. RYAN:  No.

9           THE COURT:  Let's make our calculations, then.  Let

10   us see how this gentleman fares.

11          MR. HOCHBAUM:  It's just -- before we go through

12   that, one of the issues that was addressed by Mr. Lashley and

13   my client and myself was his role as manager.

14          Now, while I understand that somewhat unusually

15   there were allocutions at the time of the plea to sentencing

16   enhancements, my client has consistently maintained that he

17   was not a manager and I think that the facts as set forth in

18   the presentence report do not indicate that he was a manager.

19          THE COURT:  But tell me this, though.  Why did he

20   say so during his allocution?  Okay?  Am I supposed to just

21   ignore what people tell me?

22          MR. HOCHBAUM:  No, Judge.  But you are supposed to

23   understand the process here.  And the process here was on the

24   eve of trial, everybody is to take a plea and the

25   government's saying the only plea we'll include you're

1    allocuting about sentence enhancements.  See -- you know, we

2    can't divorce ourselves from that process.  Now, I'm not

3    suggesting that there's anything wrong with what the

4    government did.

5         THE COURT:  Let's hear this.  There's a lot of

6    pressure at the eve of the trial and this defendant did say

7    that he was a manager.

8         Now, I guess the Court -- you know, looking at the

9    facts, maybe not impose that type of enhancement on him, not

10   withstanding the fact that he said that.  Because there is

11   some reality to what Mr. Hochbaum said considering the

12   pressures of the moment and things of that nature, but I'd

13   like to hear from the government.

14        Did Mr. Alonso really actively involve himself in

15   these criminal activities as a manager in all of that?

16        MS. RYAN:  Yes, he did, Your Honor.  And the

17   government's position is that these defendants pled guilty to

18   what they actually did.

19        THE COURT:  There's no question he has that to deal

20   with.  But I just want in fairness to the process -- you can

21   explain.  I think there's sufficient here for me to feel

22   comfortable, separate and apart from the fact that he

23   allocuted that he, indeed, had managerial responsibilities

24   under the guidelines.

25        MS. RYAN:  Yes, Your Honor.  I tried to address

1    that in the letter that we filed yesterday with respect to

2    his managerial role.

3            This defendant was tasked with various things

4    during his time that he spent working with his co-defendants.

5    Some of those tasks included watching over multiple women at

6    the same time.

7            He shared an apartment with Josue Flores Carreto

8    and one of his victims and was often left in charge of the

9    women there, was in charge of taking them to and from the

10   brothels where they worked.

11           THE COURT:  But how do we know that?  I know he

12   tried.  But how do we know that?

13           MS. RYAN:  That's contained in the presentence

14   report, Your Honor, and I tried to cite to that as much as I

15   could in my letter.

16           We're at a disadvantage here somewhat, Your Honor.

17   We have all these factual disputes going on when we did not,

18   in fact, actually have a trial.  I am confident all of this

19   evidence would have come to light at that trial.

20           MR. HOCHBAUM:  The question is, Judge, whether or

21   not the factual evidence -- I mean if we want to say it's

22   from the probation court, that's kind of ridiculous because

23   it's from the government.  The Probation Department does not

24   do an independent analysis or an independent investigation.

25   But let's hear what they have to say.

1          THE COURT:  What if you decided to plead this?

2    Would you be prepared to go forward if I thought that the

3    hearing would be appropriate to show what his role was?  You

4    have people who could testify?

5          MS. RYAN:  I do have people who would testify.  I

6    don't know who would be able to go forward right now, Your

7    Honor.

8          THE COURT:  No.  No.  I'm not suggesting you don't,

9    but if Mr. Hochbaum really thinks that his client was just a

10   kind of like a peripheral player here, he wouldn't have

11   accepted 27 counts, that he's not a manager, do you wish to

12   have a hearing on that issue?

13         MR. HOCHBAUM:  Judge, I do, but I don't want the

14   Court to misunderstand me.  I'm not suggesting my client was

15   a peripheral player.

16         That's not -- the statute requiring organization or

17   management requires that he organizes or manages five or more

18   participants.  So far I've seen that there are four

19   participants in this crime.  And the victims are not

20   participants.

21         THE COURT:  And that also includes himself.

22         MR. HOCHBAUM:  I understand that, Judge.  Him, the

23   two co-defendants, the manager of the brothel.  The victims

24   are not considered participants.  All right?  So now we have

25   to get into the area of whether or not this was otherwise an

164

1    extensive venture.  I don't doubt it.

2            But listen to what they've said.  They've said he

3    was directed to go pick people up.  He was directed to go

4    stay in the apartment while everybody else went about their

5    business.  It's hard to understand how that puts him in a

6    managerial role.  Okay?

7            And I think the Court misunderstands me when I

8    suggested he's not a manager.  I'm not suggesting he's

9    peripheral.  He's actively involved, but we have to

10   understand the nature of his involvement.

11           We have a case in which there is an allegation that

12   there are 50 victims.  Then with regards specifically to my

13   client, the allegation is one person who gives a statement

14   and that the government has information about five others and

15   then we had a statement by Gloria A. in which she says,

16   essentially, that my client asked her to be a prostitute.

17           THE COURT:  You're very eloquent.  I'm not so sure

18   I agree, but, of course, you may be right, that just by the

19   fact that somebody's a victim that means that the defendant

20   was not involved with managing that person's conduct, because

21   that person was engaged in prostitution.

22           MR. HOCHBAUM:  I understand that but, Judge, the

23   statute is clear.  The section is clear.  You cannot manage a

24   non-participant.  You are not a participant if you're a

25   victim.

1          THE COURT:  You know, you talk very rapidly.

2          MS. RYAN:  Your Honor --

3          THE COURT:  But that doesn't mean that everything

4     you say I agree with even though I respect you.

5          MR. HOCHBAUM:  I understand that.

6          THE COURT:  I don't think you're correct.  I think

7     you can be a person who is involved in criminal behavior even

8     though you've been a victim.  That these women were still

9     involved in prostitution and he was involved in you know,

10    that whole process.

11         MS. RYAN:  Your Honor?

12         THE COURT:  Yes.  Now, you have something there,

13    Ms. Ryan?

14         MS. RYAN:  Yes.  If we're going to talk about what

15    it means to be a manager, let's actually talk about the

16    language that's in the guidelines.

17         THE COURT:  Right.

18         MS. RYAN:  That says, if defendant was a manager or

19    supervisor but not an organizer and the criminal activity

20    involved five or more participants, or was otherwise

21    extensive.

22         The five or more participants we're talking about

23    here -- the defendant was charged in the indictment -- I

24    think there were five or six other people charged in the

25    indictment with him as members of this conspiracy.  And I'm

1      confident that I --

2              THE COURT:  And we have the person I sentenced?

3      The co-defendant I sentenced before, too?

4              MS. RYAN:  We have her and she's not named in that

5      particular indictment.  She's charged in a separate one.

6              THE COURT:  And in the indictment, it names all

7      these people.  He pled to the indictment.

8              MS. RYAN:  I'm sorry.  I didn't hear you.

9              THE COURT:  In the indictment, he names more than

10     five people.

11             MS. RYAN:  Yes.

12             THE COURT:  Separate and apart from the victims.

13             MS. RYAN:  Yes.  I'm talking about criminal

14     participants in the charged conspiracy that this defendant

15     pled guilty.  They're named in the indictment.

16             THE COURT:  And he also said --

17             MS. RYAN:  And there are certainly more than five.

18             THE COURT:  And he agreed he was the manager?  We

19     went carefully with Mr. Lashley in which the defendant --

20     that he understood that he was being given proper legal

21     representation?  He said yes.

22             We went through that so carefully and I can't ask

23     him in the context of making that inquiry, were you told

24     specifically about every single thing about being the

25     manager, about being this, about being that.  It's not what

1    we do and it's not realistic.

2           We have to accept the fact that he testifies under

3    oath, that he was properly advised of his counsel and

4    properly advised of his legal rights.  And he said that in

5    glowing technicolor.  I've heard your arguments.  Mr.

6    Hochbaum, why don't --

7           MR. HOCHBAUM:  Judge, I'm not looking to repeat my

8    arguments.

9           THE COURT:  I know.  And why don't we do it in the

10   context of making our sentencing calculations?

11          MR. HOCHBAUM:  Well, I thought that's what I was

12   doing, Judge.

13          THE COURT:  But I haven't even gotten to it.

14          MR. HOCHBAUM:  Well, every sentencing calculation

15   with regard to this adds three points for a managerial role.

16   If you want me to object specifically each time, then I'll do

17   it that way.

18          THE COURT:  You were listening to me all day.  You

19   know there's some need for structured organization to get

20   through these types of proceedings.

21          MR. HOCHBAUM:  Absolutely, Judge.

22          THE COURT:  I don't think you've been involved with

23   27 counts before, have you?

24          MR. HOCHBAUM:  I've been involved with 27

25   defendants, but that's not to say 27 counts.

168

1          THE COURT:  So you could appreciate it takes some

2     effort for the court to organize this.  Otherwise, we'll be

3     talking and talking all around the place, right?

4          So I try to do that by going through Count 1 and

5     the others and giving the lawyers, you've heard, the

6     opportunity to talk about all of these issues about how we

7     made our calculations.

8          And can you do the same thing with me?  You're

9     putting the cart before the horse and it makes it difficult

10    for me to keep a structure.  Okay?  Very good.

11         So Count 1 on page 33, Act A, has a base offense

12    level of 27 and as I go through these things, then we can

13    make a final determination with respect to some of these

14    arguments you've already made.  Okay?

15         Then on paragraph 96, we have the use of physical

16    force and threat.  Now, look.  I don't want to re-visit every

17    aspect of his plea allocution.

18         MR. HOCHBAUM:  Right.

19         THE COURT:  He pled to that.

20         MR. HOCHBAUM:  I understand that.

21         THE COURT:  So that's four points.  And then we

22    have the vulnerable victims.  And you know the same thing I

23    said about these victims in the first proceeding today with

24    Gerardo and that's incorporated herein and as well.  All

25    right?  So I'm giving that to the uptake and --

```
 1              MR. HOCHBAUM:  Now, we're at a point, Judge --
 2              THE COURT:  -- then we have the point you made.  So
 3     it's --
 4              MR. HOCHBAUM:  Let the record reflect that I'm
 5     objecting to the adjustment for the role in the offense under
 6     Count 1.
 7              THE COURT:  I think that the alternative is I can
 8     give two levels instead of three if I found that there was
 9     some issue -- what does the --
10              MR. HOCHBAUM:  That is correct.
11              THE COURT:  -- guideline say specifically about
12     that?
13              MR. HOCHBAUM:  The guidelines specifically allow
14     you to do that, Judge.
15              THE COURT:  Read the --
16              MS. RYAN:  3-2-1.1
17              THE COURT:  Yes.  Let me just take a look at that.
18     I'm glad I got a good night's sleep last night.  3(b)1.1.
19     The defendant was an organizer, neither a manager or a
20     supervisor in any criminal activity other than described in
21     (a) or (b).
22              Well, you know, I'm going to give him the benefit
23     of that.  The government may have a good basis for getting it
24     reversed, but I think under all of the circumstances and Mr.
25     Hochbaum's eloquent exposition, that two levels is what I'm
```

1    more comfortable with.  And so that means he gets an adjusted

2    offense level of 35 and 36.

3              I'm going to keep track of all of this here so we

4    make our proper calculations when we get to the multiple

5    count.

6              Next we have Count 1, Act B.  And here we're going

7    to have the same 35.  Right?

8              MS. RYAN:  Yes.

9              MR. HOCHBAUM:  That is correct with the same

10   objections noted, Judge.

11             THE COURT:  35.  Now Count 1, Act 3 will be once

12   again the same 35.

13             MR. HOCHBAUM:  Again, Judge, the record is clear.

14   I'm objecting to the --

15             THE COURT:  Well, you'll have a continuing

16   objection with me giving him two points, right?

17             MR. HOCHBAUM:  Right.

18             THE COURT:  But if that issue is flushed out on

19   appeal, there will be that the Circuit Court would say that

20   he should have gotten three points, but I'm not going to deal

21   with that right now.

22             MR. HOCHBAUM:  I understand.

23             THE COURT:  Okay?  So that the government would

24   have an argument, I'm thinking, right?

25             MS. RYAN:  Thank you.

1          THE COURT:  Count 1, Act D, once again we have 35.

2    Now we come to Act E, Jane Doe number 5 and here we'll have

3    the two-level adjustment for the role and we can eliminate

4    the 16 for the purposes of consistency.  And so we will then

5    have 35.  Is that correct, also?

6          MS. RYAN:  Yes.

7          THE COURT:  Okay.  Another 35.  Now Count 1, Act F

8    will have 35.  And Act G, once again, 35.  Count 1, Act H --

9    let's see what kind of adjustments we are going to make.

10   We're not going to hold him accountable for the scarring and

11   once again, two full adjustment --

12         THE INTERPRETER:  I'm sorry.  Your Honor, could you

13   repeat what he is not being accountable for?

14         THE COURT:  On Act H -- my voice is fading, so I

15   don't mind you telling me to do this.  It's been a long day.

16   Act H, we're not going to hold him accountable for the

17   scarring.  And of course, once again, two levels instead of

18   three for adjustment for role in the offense.  So that means

19   we're at 35 again.  35 seems to be where we're coming out by

20   and large here.

21         MS. RYAN: Yes.

22         THE COURT:  Now Count 1, Act I -- it will be 29.

23   Okay?  Hear any objections?  Count 7 would be I guess 37

24   there.  Am I missing something?  Yes.  Because you get the

25   two levels for the 2H4.1(b)(4)(B).

1          MS. RYAN:  Correct.

2          THE COURT:  So there's 37.  So that's the high

3     water mark so far.  Count 8, we're at 37 again.  Right?

4          MS. RYAN:  Yes.

5          THE COURT:  Count 9, once again 37.  Right?  Count

6     10, 37.  Count 15, Act A is 35.  Right?

7          MS. RYAN:  That is correct.

8          THE COURT:  Count 15, Act B will once again be 35.

9     Act C will be once again 35.  Act D, 35.  And Act E will be

10    adjusted by eliminating the 16-year age one and the

11    adjustment for the response for role is two so that would

12    leave 35.  Right?  Another 35.  And Act F will be 35.  Act G

13    will be 35.  Act H will be 35 because we're eliminating the

14    permanent scarring in paragraph 225 as well once again of

15    change in the adjustment for role for two points instead of

16    three now.  The earlier smuggling ones will carry an adjusted

17    offense level of 19 instead of 20.

18          So there we are and our multiple counts adjustment

19    will reflect all of that and doesn't change the total number

20    of units --

21          MR. HOCHBAUM:  Right.

22          THE COURT:  -- unless I inadvertently make a

23    mistake or I don't think that's affected.  Do you agree?

24          MS. RYAN:  I agree.

25          MR. HOCHBAUM:  I agree, Judge.

1          THE COURT:  The greater of the adjusted offense

2     levels here is thirty --

3          MR. HOCHBAUM:  Seven, Judge.

4          THE COURT:  -- seven and with five added for the

5     multiple counts, we got a 42.  Now, that comes out to the

6     same as the other defendants' that we made a mistake.  If we

7     did not make a mistake, then they would be facing advisory

8     guideline range of life and here it's 360 to life.

9          I'll take this into consideration in terms of

10    washing it out under the standards of reasonableness being

11    mindful of the need not to sentence defendants who may not be

12    similarly situated the same.  We want to reflect the

13    difference in these different postures of the defendants, so

14    to speak.  So we'll take it under consideration.

15         So now we're not giving acceptance of

16    responsibility and Mr. Hochbaum, what do you say about your

17    client?

18         MR. HOCHBAUM:  Judge, I'm constrained to remind the

19    court that it's my position that I go last.  So I would

20    expect the prosecution to make a statement and if any victims

21    are to be called, I would expect them to happen.

22         THE COURT:  Well, are there any victims that want

23    to come forward at this time?

24         MS. RYAN:  I'll check.

25         THE COURT:  Do that now and I'll be right back

174

1      while you do that.

2           (Pause.)

3                THE COURT:  Yes.  Anybody wish to come forward?

4                MS. RYAN:  Yes, Your Honor.

5                THE COURT:  Who do we have here?

6                MS. GARCIA:  My name is Virginia Garcia.

7                THE COURT:  All right.  And you want to speak to me

8      under oath or not under oath?  The choice is yours.

9                MS. GARCIA:  Under oath.

10               THE COURT:  All right.  Then the clerk of the court

11     will administer an oath.

12          (Virginia Garcia is sworn.)

13               THE COURT:  Bear in mind that since you're now

14     speaking to me under oath and if you don't tell me the truth,

15     you could be subject to prosecution for perjury or for

16     rendering a false statement under oath.  Okay.  Go ahead.

17     What do you want to say?

18               MS. GARCIA:  What I want to say is that that man

19     hurt me very badly and because of him, I abandoned my parents

20     and then after that, he put me to work in prostitution and he

21     would say things.  He would not allow me to speak to my

22     parents when we got here.  He would say that they should not

23     find out where I was at.  And he would not allow me to send

24     money to my parents, nothing like that.

25               THE COURT:  Anything else?

1         MS. GARCIA:  Yes.  And then later on, when I was

2     going to work, he would get extremely angry when I came back

3     without any money.  That's it.

4         THE COURT:  All right.  Thank you.  Is there anyone

5     else, Ms. Ryan?

6         MS. RYAN:  Let me check.

7     (Pause.)

8         MS. RYAN:  No one else, Your Honor.

9         THE COURT:  Now let me ask you, Ms. Ryan, a few

10    questions before Mr. Hochbaum speaks again.  I want to give

11    him the chance to catch his breath, okay?

12        MR. HOCHBAUM:  I don't need that, Judge.

13        THE COURT:  This young man is 26 years -- at least

14    -- well, he's more than 26 years.  Well, not much more.  A

15    couple of months.

16        But Mr. Hochbaum points out that in terms of the

17    time span in the conspiracy, he was just 12 years old at the

18    time that this conspiracy commenced.  He pled guilty to it,

19    but you know, I try to look at the individual circumstances

20    of each defendant.

21        It seems that in his circumstances, personal

22    circumstances might be different, let alone the difference in

23    his role than the other two folks that I sentenced today.

24        So I might feel the need, you know, not to hang

25    disparate sentencing for those who are similarly situated and

1    by deductive reasoning, those who were not similarly

2    situated, that should be reflected in the court's sentence.

3           And given his age and the fact that he could not

4    have done all of these things that the older people were

5    around to do, it seems to strike a responsive chord with the

6    Court when I look that he was just a young fellow when this

7    conspiracy was hatched and he obviously was not part of

8    (indiscernible), I guess.  What do you have to say about

9    that?

10          MS. RYAN:  Well, Your Honor, we disagree with the

11   math, but I will say that when he joined this conspiracy, he

12   was a very willing and active participant.  And I think

13   that's something the Court needs to consider.

14          THE COURT:  I will.  But once again, but he

15   certainly wasn't involved throughout the length of the

16   conspiracy as perhaps the others were.

17          MS. RYAN:  That is perhaps true, but I will point

18   out to the court that the majority of the victims who have

19   spoken in court today and were victims of the conspiracy

20   later than 1991 and you can tell from their own ages which

21   are -- they're younger than this defendant.  Even though they

22   were very young when they were being coerced into

23   prostitution.  If he was 12 at the time, then these women

24   have not yet been victimized by the defendant.

25          THE COURT:  Okay.  I just wanted to flesh that out

```
 1   especially since Mr. Hochbaum raises the issue.  Anything

 2   else the defendant wishes to add here?

 3          I'm looking at Mr. Alonso in somewhat of a

 4   different light because I don't think his role was quite the

 5   same as the others.  And that's consistent with the fact that

 6   he was much younger and more likely to have been taking

 7   directions rather than to have been giving directions.  I

 8   consider that to be a significant difference.

 9          MS. RYAN:  We he was certainly taking directions

10   from his co-defendants who were more senior and more

11   experienced at this line of work, but he was coming on --

12          THE COURT:  He was getting up there, right?

13          MS. RYAN:  He certainly was.

14          THE COURT:  He was a potential organizer of

15   meetings?

16          MS. RYAN:  That's our position, Judge.  He was

17   living with (indiscernible) and watching him work and working

18   out --

19          THE COURT:  He was learning the trade?

20          MS. RYAN:  He was.  And he was not just learning

21   it.  This went on for a number of years.  The government's

22   information is that he was learning it since 1999.

23          THE COURT:  I understand.  But you know, now also,

24   unlike the others, there's a touch of rehabilitation.  He

25   does seem to have turned to The Bible.  Sometimes these
```

1    things may be disingenuous.  Sometimes they could be for the

2    purposes of putting him in a favored light.  But at least

3    he's made an effort.  We have the certificates.  The Court's

4    somewhat impressed by that.  What does the government say

5    about that circumstance?

6              MS. RYAN:  I know no reason to doubt that the

7    certificates that are issued by these groups that operated in

8    jail are --

9              THE COURT:  They seem to be genuine?

10             MS. RYAN:  And on that, Your Honor --

11             THE COURT:  In a young man, there's some hope for

12   some redemption somewhere down the line if he chose to.  In

13   the words of the law, then there's some possibility that

14   maybe if he gets out so he gets a little bit of a life

15   outside of jail, he may have the ability in himself, he could

16   process.  Just considering all of the circumstances that

17   might happen.

18             MS. RYAN:  That's certainly the Court's job here.

19   My job, Your Honor, is to stand and choose -- to let the

20   society who's offended by the conduct of this defendant and

21   to stand up and fight for the victims --

22             THE COURT:  That's part of your job and, obviously,

23   we're not treating this matter lightly.  I'm sure that you

24   realize that.

25             Nonetheless, I have an overriding responsibility to

1    also speak in terms of special calling that the government

2    has to notice it as to what's in the interest of justice and

3    weigh all of these special responsibilities.  So that's why

4    I'd like you to interact with me about matters like this and

5    to find out whether there's a legitimacy to and something

6    which the government thinks is worthy of consideration.

7          MS. RYAN:  I'll leave the Court to determine what

8    weight to give this information.  Obviously, the seriousness

9    of these crimes are, as the court would point out --

10          THE COURT:  I pointed out those two facts because

11   the seem to represent at least two situations that place a

12   little bit of additional posture on the co-defendants.  Well,

13   three actually.  That he was not a leader or an organizer.  I

14   know we argued about manager.  There's age and the fact that

15   he has made an effort to embrace the Scriptures.  Anything

16   else, Mr. Hochbaum, I should consider?

17          MR. HOCHBAUM:  I have several things to say, yes.

18          THE COURT:  Have I articulated these three to your

19   satisfaction?

20          MR. HOCHBAUM:  Certainly, Judge.  And I think that

21   the most important thing is -- one of the most important

22   things is to note what Ms. Ryan said.  That my client's

23   involvement in the conspiracy operated yet in 1999.

24          We had a conspiracy that went for 13 to 14 years,

25   three-quarters of it, my client was not involved in.

1           THE COURT:  But the victims, though, came along

2     later on.

3           MR. HOCHBAUM:  Judge, these victims came along

4     later on.  Okay?  I understand that.

5           THE COURT:  There may have been obviously others

6     early on which puts him a different category than the others.

7           MR. HOCHBAUM:  That is correct, Judge.

8           THE COURT:  I think that probably sounds logical.

9           MR. HOCHBAUM:  In fact, though, I would undertake

10    some exception to the determination that simply because my

11    client was living with one of the Carreto brothers, that that

12    meant he was an organizer-in-training.

13          I don't think that that necessarily follows.  And

14    in fact, while I don't think that it's necessarily wholly

15    appropriate to deal with the victim impact statements, one of

16    the things that occurred to me in looking at the victim

17    impact statement of Gloria A. in the probation report who was

18    the -- worked at the billiards parlor where they worked at,

19    indicated that my --

20          MS. RYAN:  They didn't work at the billiards

21    parlor.

22          MR. HOCHBAUM:  No.  No.  Where they hung out.

23    Excuse me.  She worked at the billiard parlor.  They hung

24    out.  And he, in fact, attempt -- she had been involved in

25    this type of activity before, through someone else.  Through

1      a completely different organization and my client asked her

2      to work for him.

3              Now she makes some assumptions about what might

4      have happened if he didn't get arrested, but what is clear,

5      Judge, is that he never exerted the kind of pressure on her.

6      Now maybe because we're in America and she was much older,

7      but he simply asked her a number of times to work in the

8      prostitution business for him.  She then makes an assumption

9      that if he hadn't been arrested, other things would have

10     happened.

11             You know, I don't think that that assumption

12     necessarily follows.  And I only bring it up not to denigrate

13     any of the victims in any way.  Not to suggest that he wasn't

14     involved in this activity.  But when the Court says

15     organizer-in-training because lived with them, it's certainly

16     clear based upon his contact with Gloria A. that he didn't

17     learn the trade the way he should have been learning it.

18             I don't mean to make light of it, Judge.  What I

19     mean to suggest is we've got a situation in which there is a

20     claim that there are more than 50 victims.

21             THE COURT:  Well, I said already that I'm not

22     necessarily accepting that.  Because I'm not accepting that.

23             MR. HOCHBAUM:  Well, I'm willing to accept it,

24     Judge, for the purposes of argument.  But my client,

25     according to the government and the presentence report, have

1    one particular victim -- in fact there were two.

2           He said there were two or three others in Mexico

3    and the government's information is that there were five

4    others that he was involved in.  That's what the probation

5    report suggested, and I presume that that information came

6    from the government.  I don't imagine that they don't have

7    some other ways of getting that information.

8           MS. RYAN:  Actually, Your Honor, in this case

9    unusually, we did.  We had the defendant's own letters that

10   he was writing from the jail where he admitted that he was

11   involved in this kind of activity.  He admitted that this was

12   his job and he admitted that he had other women in Mexico who

13   had done this so the proof came from the defendant himself.

14          MR. HOCHBAUM:  Well, whatever it may be, it's still

15   limited to a much smaller percentage of the victims.

16          THE COURT:  I think you made that point.

17          MR. HOCHBAUM:  Okay.

18          THE COURT:  Go ahead.

19          MR. HOCHBAUM:  The other issue, Judge, and it's a

20   difficult issue for me because of how I want to present

21   myself with regard to other members of the Bar, but it's

22   certainly clear that there were significant problems that

23   occurred between the defendant and Mr. Lashley, his prior

24   counsel.

25          And one of the most important things that I learned

1    in reviewing the file here was the significant amount of plea

2    negotiations that went on and I would suggest, on the

3    government's part, seemed to have gone far beyond what would

4    normally be expected.  Numerous plea offers were made.

5              And it seems to me that when we are in the

6    situation that exists now in the Federal courts after *Booker*,

7    we cannot divorce ourselves from the plea bargaining process

8    and simply rely on the artificial guideline calculations.

9              Now while I know that the government arguments in

10   its letter and that the court should accept the advisory

11   guidelines, it's certainly clear that if my client had pled

12   guilty to a plea agreement in which he was offered 151

13   months, that the government would not have stood up at that

14   point and said, wait a minute, Judge.  That's an unreasonable

15   sentence.  He should be getting more.

16             So while I understand that the government has to

17   take the posture that, you know, plea negotiations go on and

18   once they fall apart, you plead to the indictment and you

19   deal with having plead guilty to 27 counts, it seems to me

20   that the Supreme Court has told us that that formalistic

21   approach should not exist anymore.

22             That when the court -- and what I include in my

23   letter is the filing that I believe is appropriate -- that

24   when a court sentences a defendant within the guideline range

25   without looking at other factors to make a determination as

184

1    to what's a reasonable sentence, it is in fact in violation

2    of *Booker*.  Because of *Booker* and 3553(a).

3         THE COURT:  You don't have to argue about it with

4    me, because I don't do that.  The fact that I happen to

5    sometimes sentence someone from the advisory guideline range

6    doesn't mean that that's what I feel I have to do.

7         MR. HOCHBAUM:  The plea agreements here, Judge --

8    the government alleged a sentencing range.  They made a

9    promise in the plea agreement and if the defendant had

10   accepted it, that they would not argue where within the range

11   he should fall.  They would not ask for upward departures.

12        What we are asking for here in light of what I know

13   about -- what I believe was an ultimate failure in the

14   attorney-client communication, that the court consider a

15   reasonable sentence which would consider the offers made by

16   the government prior hereto.

17        THE COURT:  What do you say about that, Ms. Ryan?

18   I mean, these are a group of people -- he constantly was

19   unhappy with Mr. Lashley.  We know about the history.

20        Mr. Hochbaum is saying that, you know, you're ready

21   to give this fellow a -- what?  150 months or something like

22   that in your plea negotiations.  He was caught up in this

23   situation where there was a global scenario.  The others were

24   willing to -- I think the others were willing to plead.  He

25   was the one that did not want to plead, if I remember

1   correctly.

2            MS. RYAN:  That's my recollection as well, Your

3   Honor.

4            MR. HOCHBAUM:  I don't know about that.

5            THE COURT:  I recall that everybody was willing to

6   plead and he was the one that was holding it up.

7            MS. RYAN:  Yes.

8            MR. HOCHBAUM:  That may be, Judge.  But I

9   understand from special and co-counsel that that role of who

10  was unwilling to plead changed at various times.

11           THE COURT:  I see.

12           MR. HOCHBAUM:  But I do know, however, that at

13  various times when in fact substantial negotiating sessions

14  went on in MDC, Ms. Obregon was there.  Mr. DelValle  was

15  there, representing the other co-defendants.  Mr. Lashley was

16  not.  Okay?  Now, it may be that because my client felt he

17  was not getting individualized attention and individualized

18  advice that he felt, I'm the one to say, I can't plead here

19  because I'm not getting anything.

20           THE COURT:  No.  But I think realistically, they

21  all spoke to each other.  Their lawyers spoke to each other.

22  I mean, I can't be part of plea negotiations.

23           MR. HOCHBAUM:  I understand that.

24           THE COURT:  If I was a state judge, I could, but

25  there's a real distinction in that respect between the

1    Federal system and the State system.

2                    But I do recall that the others were willing to

3    plead.  I don't know exactly what the plea deal was since I'm

4    not involved in that level and that he, you know, was holding

5    it up.

6                    I remember Mr. DelValle talking to me about this.

7    Mr. Musa-Obregon talking about it.  It wasn't as if he was

8    out of the loop because they were all together here with

9    and/or without Mr. Lashley.  And I also remember on the eve

10   of trial when Mr. Lashley was talking about going down to

11   Florida, I said no.  You've got to be here while these plea

12   negotiations are unfolding.

13                   And I made him stay here.  So he was really part of

14   that process and I was on top of it also and your client, I

15   think, to my recollection had a large part to play in the

16   fact that this plea did not come to fruition.

17                   Now, you can tell me if I'm wrong, Ms. Ryan.

18                   MS. RYAN:  That was my recollection as well, Your

19   Honor.  And I could be saying --

20                   THE COURT:  They were all exasperated about that.

21                   MS. RYAN:  They were.  I'd like to also just go

22   back again, Your Honor, to the hearing colloquy that was

23   conducted during negotiation pleas.

24                   Not only did the Court refer back to this problem

25   with counsel creating distance in the cap and the defendant

1      knowingly and intelligently waived problems in the cap there.

2             There was also the standard colloquy that the Court

3      conducted with respect to what other promises may have been

4      made to this defendant prior to this plea and basically

5      making sure that no promises were, in fact, made.

6             THE COURT:  We went over that very carefully also.

7             MR. HOCHBAUM:  And I looked in the transcript and

8      it was a masterable job in that regard.

9             THE COURT:  We have a mutual admiration society.

10            MR. HOCHBAUM:  I still think that the import of the

11     plea negotiations are that at some point everybody involved

12     in this case, excepting me, was prepared to say that

13     sentences and plea negotiations which ranged from 150 up to

14     188 months, went from 165 and I think at some point,

15     everybody was prepared to say they were reasonable.

16            I'm simply asking this Court to take that into

17     consideration on fashioning a reasonable sentence here.  So

18     let's divorce ourselves on who decided not to take the plea,

19     why pleas were offered and not.  It seems to me that that's a

20     factor that the court should consider what is an appropriate

21     sentence.

22            THE COURT:  Yes.  But you know, I --

23            MR. HOCHBAUM:  I just want to cut it short, Judge,

24     and say that my final analysis is in light of what has gone

25     on here today and in light of the distinction between my

188

1    client and the Carreto brothers, difference in age,

2    difference of the years that he was involved in the

3    conspiracy, the difference in his role, that the court should

4    consider a sentence of 20 years as a reasonable sentence.

5            I don't believe my client would be happy -- or is

6    happy that I'm suggesting that.  But it seems to be

7    appropriate in light of what's happened today and what we've

8    heard for me to give at least the court some unofficial -- I

9    don't know whether it's --

10           THE COURT:  No.  That's okay.

11           MR. HOCHBAUM:  -- guidance as to where I deem an

12   appropriate sentence is in light of all the distinctions that

13   we made here.

14           THE COURT:  Very good.  Let me hear the government

15   quickly and then we'll speak to Mr. Alonso.

16           MS. RYAN:  Yes, Your Honor.  I'd just like to make

17   one point in response to Mr. Hochbaum's point about prior

18   plea offers I think that were made by the government and what

19   those ranges were and at that point, everyone thought they

20   were reasonable.

21           I'm sure the court can understand why months in

22   advance of trial, the government's view of what would be a

23   reasonable sentence particularly to a -- I believe that most

24   of these standard agreements were substantially less than 27

25   counts of the conviction.

1          I can't remember now if it was one count or if it

2     was four counts or if it depends on how many victims the

3     defendants in question were personally responsible for, but

4     that certainly would also be something the Court should

5     consider when thinking back to a prior range that was offered

6     in advance of trial that would save the government the time

7     and expense of a trial and would save the victims the trauma

8     of having to testify at the trial.  That would be to the

9     Court what would be reasonable --

10          THE COURT:  Let me ask you this.  I gave very harsh

11     sentences to the other defendants, but -- and I don't have

12     any factual record as to what those prior plea offers kept.

13     Because my sense is that under Rule 11, I'm not privy to

14     that.

15          MS. RYAN:  That's right, Your Honor.

16          THE COURT:  Now, could it be argued, however, on

17     some sort of a collateral basis that since the government's

18     willing to offer these global pleas and in sentencing, it was

19     offering to significantly less than what the court sentenced

20     that my sentence would not be reasonable, and does that have

21     any legal legs to it, in your opinion?

22          MS. RYAN:  No, Judge.  I think that the court's

23     reasons for the sentences that were given previously -- all

24     those facts under 3553 -- that the court was very aptly and

25     correctly identified --

190

1          THE COURT:  So it's your view of the law that the

2     court cannot take into consideration in deciding what's

3     reasonable any plea offers that the government may have made?

4          MS. RYAN:  I've been thinking about this since I

5     received Mr. Hochbaum's letter.  I think it is a very

6     creative argument --

7          THE COURT:  And that's why I'm raising the issue.

8          MS. RYAN:  I understand, Your Honor.  And I think

9     that he's --

10          THE COURT:  Is it a circumstance under 3553(a),

11    *etcetera* for the court to consider -- I don't think there's

12    any law on that at all.

13          MS. RYAN:  I don't expect that there is.  I think

14    that Mr. Hochbaum was careful in crafting his argument to try

15    to avoid the (indiscernible).  I'm not sure if he's

16    succeeded.

17          THE COURT:  Yes.  I don't know whether I can take

18    it into consideration as a factor.  Under Rule 11, I'm not

19    allowed to participate and have knowledge of prior plea

20    negotiation.

21          I just raise this because, you know, it was August

22    when we trotted out the other defendants before the Circuit

23    Court but Mr. Hochbaum raises it -- it's interesting to

24    engage in conversation about it.

25          All right.  Anything else that you wish to say, Ms.

191

1    Ryan?  Okay.

2          MS. RYAN:  Your Honor.  I just -- again.  That the

3    3553 factors here in this case weigh heavily of I think what

4    would be a reasonable sentence in view of the guidelines.

5          THE COURT:  Okay.  We have your position.  Let me

6    hear from Mr. Alonso.  You can speak to the Court now.

7          (Pause.)

8          MS. RYAN:  Your Honor, I'm sorry.  Before the

9    defendant speaks, I just noticed I may not have marked it

10   down and I don't know whether the court required us to or

11   whether Mr. Hochbaum --

12         MR. HOCHBAUM:  I made the objection.

13         THE COURT:  (Indiscernible) because it's so easy to

14   slip up, you know, on a whole day's proceeding.  Need I be

15   concerned about the fact that you went over this very

16   carefully?  Obviously, you did from your comments.

17         MR. HOCHBAUM:  Yes, I did, Judge and in fact, Mr.

18   Lashley did as can be seen by the nature of the objections

19   that he filed prior to my being on this case.

20         MS. RYAN:  Thank you.

21         THE COURT:  I'm satisfied -- I should be satisfied

22   whether you had ample opportunity to review everything with

23   Mr. Alonso.  You used a Spanish interpreter to communicate

24   with him as well?

25         MR. HOCHBAUM:  That's correct, Judge.

192

1              THE COURT:  -- and you're satisfied that he

2      understands its contents?

3              MR. HOCHBAUM:  Yes.

4              THE COURT:  Okay.

5              MS. RYAN:  Thank you.

6              THE COURT:  Thank you for pointing that out.  Do

7      you wish to speak to me, Mr. Alonso, before sentence is

8      imposed?  You have the right to do so.  You do not have to do

9      so, but it is your prerogative.

10             DEFENDANT ALONSO:  What I want to say, Your Honor,

11     is that Mr. Lashley didn't give me the proper advice.  I have

12     here a piece of paper that mentions some of my rights which

13     Mr. Lashley never did.

14             THE COURT:  You see, the problem, Mr. Alonso, is

15     that that's not what you told the Court.  That I

16     painstakingly flushed all of that out because I'm getting

17     smart in my old age.

18             And I know that there are going to be proceedings

19     after today's sentence.  And in reference to them, you may

20     recall when we took your plea to what we call Section 2255

21     and you raised ineffective assistance of counsel.

22             We get those applications very frequently and I was

23     trying to nip that in the bud.  That in taking extraordinary

24     efforts to make sure that Mr. Lashley and you were in sync,

25     that you were satisfied with his representation.

Fiore Transcription Service, Inc.    203-929-9992

1          I'm not going to repeat what I already pointed out

2    to you before.  I gave you ample opportunity to say no.  But

3    you said that you're satisfied.  I could not do more that.

4          For you to come before me now and tell me you have

5    a list of grievances against Mr. Lashley is not becoming of

6    you, considering the efforts I made back in April of 2005 to

7    cover all of that.

8          And you may recall how careful I was in making sure

9    that you had proper counsel and how I spoke with Mr. Lashley

10   and how I made efforts to safeguard your rights.

11         But for you to come now, tell me you're not

12   satisfied with what I did and what Mr. Lashley did, doesn't

13   speak well for you in my humble opinion.

14         But if you want to persist in not taking

15   responsibility here, you know, you can say whatever you

16   choose, but I just want to caution you that it doesn't speak

17   well for you.

18         (Pause.)

19         THE COURT:  Anything else you wish to say, Mr.

20   Alonso?  You could say things -- you don't have to -- like --

21   I'll try my Spanish here.  Lo siento.  That's one

22   possibility.  I'm not saying you have to say that, but you

23   could say those types of things.

24         THE INTERPRETER:  I will now interpret the phrase

25   that the defendant uttered before.

194

1          DEFENDANT ALONSO:  I have many things to say.

2     Amongst the things that I have to say is that there are

3     victims and I am sorry.  I am very sorry for it.

4          I ask for your forgiveness.

5          THE INTERPRETER:  Interpreter's correction.

6          DEFENDANT ALONSO:  I ask for your mercy.  And

7     that's it.

8          THE COURT:  All right.  You seem to be somewhat

9     contrite.  Of the three defendants here, you seem to be the

10    most contrite.

11         And as I indicated before, I put you in a different

12    category because you're a young person and to some extent

13    when you were 12 years old, you got involved in this

14    activity.  Is that how old he was at the time?

15         MR. HOCHBAUM:  Well, the age -- the conspiracy he's

16    charged with --

17         THE COURT:  Right.  But he was older when he got

18    involved.

19         MR. HOCHBAUM:  -- when he was 12.  He didn't get

20    involved until he was 17 or 18.

21         MS. RYAN:  I think that's right, Judge.

22         THE COURT:  He's still a young person.  You know,

23    to some extent, considering that he was 17 or 18 when he got

24    involved which would put him in a different category, makes

25    him a little bit more susceptible to being part of the gang.

1          MS. RYAN:  That may be true, Your Honor.  I will

2     say that I think the other defendants started when they were

3     quite young as well and just continued longer into their

4     adulthood.

5          THE COURT:  It's true.  They were older when -- I

6     think one was 33.  The other was 40.  All right.  There's

7     somewhat of a nature for correction.

8          But I also, as I mentioned before, considering the

9     fact that he was not an organizer -- that he would become one

10    in the future.  I'm not going to speculate.  So his role was

11    different.

12         And I'm also impressed by how he's conducted

13    himself while he's been incarcerated and I have these

14    certificates of Bible study.  They are legitimate.  This is

15    different than the other fellows.

16         He seems to have some recognition of this was not

17    the type of life he should be leading in the future, so I

18    think that there are significant differences when I consider

19    his personal circumstances.

20         Now, of course, the seriousness of the offenses

21    remain because he pled to all 27 of them.  There's no

22    difference in that respect and of course the need for

23    deterrence is paramount and protecting the public from any

24    further crimes of the defendants, but he's going to have a

25    considerable amount of time to continue his Bible studies in

1    school and in jail and hopefully the public will be protected

2    when he gets out of jail.  And he'll still be a relatively

3    young man.

4              I find that a reasonable sentence in respect to

5    Counts 2 through 6 is 25 years.  Now that's concurrent.

6    There'll be five years of supervised release with a special

7    condition that he be deported.  He may not re-enter the

8    United States illegally.

9              On Counts 1 and 7 through 27, the sentence is five

10   years each.  And all of that will be concurrent to each other

11   and to the other sentence is there's a $2,750 special

12   assessment.

13             If he doesn't have the ability to pay a fine, there

14   are general conditions of supervised release that can be made

15   to the court.

16             Just hand it to the defendant.  They're in Spanish.

17   They have to be read by him.

18             He has the right to appeal.  If he cannot afford

19   counsel, he can ask for counsel to be appointed by reason of

20   indigency.  And Mr. Hochbaum will make sure that his current

21   rights are protected.  That has to be done by filing a notice

22   of appeal within ten days after judgment -- written judgment

23   is entered.  And perfect it within 30 days thereafter unless

24   he gets an extension of time from the Court of Appeals to

25   perfect the appeal.

197

1        I think that's covered for on the basis it's ten

2    after 6:00.  Is there anything I may have inadvertently left

3    out?

4        The sentence I've given is below the advisory

5    range.  So I took in that consideration as well as all of the

6    factors set forth in 3553(a) and then Mr. Hochbaum, as I

7    would expect, rendered valuable assistance to his client.

8        Anything else?

9        MS. RYAN:  I don't believe so, Your Honor.

10        THE COURT:  I'm not going to deal with the

11    restitution issue again.

12        MR. HOCHBAUM:  That's fine.

13        THE COURT:  I expect that I'm not going to have to

14    come back again for another sitting here, but once again, I

15    don't want to preclude the gentleman from exercising his

16    legal entitlements.  That concludes the sentence today.

17        MR. HOCHBAUM:  I just want to say that on behalf of

18    my client, I would like to thank for its reasonable

19    consideration here.  And that I will on receipt of the

20    judgement, file a notice of appeal on his behalf.

21        THE COURT:  Okay.  Very good.

22        MS. RYAN:  Thank you very much, Your Honor.

23        THE COURT:  Thank you.

24    (Proceedings concluded at 6:05 p.m.)

25    I, CHRISTINE FIORE, court-approved transcriber, certify

1    that the foregoing is a correct transcript from the official

2    electronic sound recording of the proceedings in the above-

3    entitled matter.

4

5

6

7    _____May 1, 2006

8         Christine Fiore